## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Roger A. Herndon, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> Huntington Ingalls Industries, Inc., the HII Administrative Committee, and John/Jane Does 1–5, <br><br> Defendants. | Civil Action No.: 4:19-cv-00052 <br><br><br><br><br><br> CLASS ACTION |

## COMPLAINT

Plaintiff Roger A. Herndon, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.     This is a class action against Defendants Huntington Ingalls Industries, Inc. ("Huntington Ingalls"), the HII Administrative Committee (the "Committee"), and the individual members of the Committee (collectively, with Huntington Ingalls and the Committee, the "Defendants") concerning the failure to pay benefits under the Huntington Ingalls Industries, Inc. Newport News Operations Pension Plan for Employees Covered by United Steelworkers Local 8888 Collective Bargaining Agreement (the "Plan") in amounts that are actuarially equivalent to a single life annuity, as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  By not offering benefits that are actuarially equivalent to the

single life annuity, Huntington Ingalls is causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      Huntington Ingalls sponsors the Plan for its employees. Under the part of the Plan that covers employees hired before June 7, 2004 ("Legacy Part"), participants accrue a retirement benefit that is a flat monthly rate for each year of service in the form of a single life annuity ("SLA"), a payment stream that starts when they retire and ends when they die. Participants can choose from several forms of benefits other than an SLA, including joint and survivor annuities, which offer payment streams for retirees' lives and their spouse's lives after the retiree dies, and a Social Security leveling option annuity, which enables early retirees to collect pension benefits until they begin receiving Social Security benefits at which point their pension benefits would be lowered (collectively, "Non-SLA Annuities").

3.      To calculate the benefit amounts for retirees who receive these Non-SLA Annuities, Defendants apply actuarial assumptions to calculate the present value of the future payments. These assumptions are based on a set of mortality tables to predict how long the participant and beneficiary will live and interest rates to discount the expected payments.  The mortality table and interest rate together are used to calculate a "conversion factor" which is used to determine the amount of the benefit that would be equivalent to the SLA.  Under ERISA, the present value of the Non-SLA Annuities must be equal to the value of the SLA for the forms of payment to be "actuarially equivalent." *See* 29 U.S.C. § 1055 (d)(1)(B), (2)(A)(ii); 29 U.S.C. § 1002(27).

4.      Mortality rates have improved over time with advances in medicine and better collective lifestyle habits. People who recently retired are expected to live longer than people who retired in previous generations. Older morality tables predict that people will die at a faster rate (higher mortality rate) than current mortality tables. As a result, using an older mortality table to

calculate a conversion factor decreases the present value of the Non-SLA Annuities and — interest rates being equal — the monthly payment that retirees who select these Non-SLA Annuities receive.

5.     Defendants calculate the conversion factor (and thus the present value of the Non-SLA Annuities) for the Legacy Part using the 1971 Group Annuity Mortality Table ("1971 GAM table") — assuming 90% of the employees are male, and 90% of contingent annuitants are female — and a 6% interest rate.

6.     Using the 1971 GAM table, which is based on data collected roughly 50 ago, depresses the present value of Non-SLA Annuities, resulting in monthly payments that are materially *lower* than they would be if Defendants used reasonable, current actuarial assumptions.

7.     By using outdated mortality assumptions to calculate Non-SLA Annuities under the Legacy Part, Defendants improperly reduce Plaintiff's benefits.

8.     Plaintiff has forfeited his benefits causing him to receive less than he should each month in violation of ERISA.

9.     Accordingly, Plaintiff seeks an Order from the Court reforming the Plan to conform to ERISA, payment of future benefits in accordance with the reformed Plan, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

11.     This Court has personal jurisdiction over Defendants because Huntington Ingalls is headquartered, transact business or reside in, or has significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

13.     Plaintiff Roger A. Herndon is a resident of Hayes, Virginia, and a Participant in the Legacy Part of the Plan. Mr. Herndon worked for Huntington Ingalls for approximately 40 years until he retired in 2013.  Mr. Herndon is currently receiving a 50% joint and survivor annuity, with his wife as the beneficiary.

### Defendants

14.     Huntington Ingalls is a shipbuilding company with its headquarters in Newport News, Virginia. Huntington Ingalls sponsors the Plan.

15.     The Committee has fiduciary responsibility for the administration and operation of the Plan. The Committee is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control respecting the management of the Plan and authority or control respecting the management or disposition of its assets.

16.     John/Jane Does 1 through 5, inclusive, are the individual members of the Committee responsible for controlling and managing the Plan.  Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Benefit Options*

17.     ERISA requires that pension benefits be paid to married participants in the form of a qualified joint and survivor annuity (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment, making the QJSA the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

18.     ERISA defines a QJSA as an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  *See* ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  For example, if a plan participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month for the rest of the spouse's life after the participant's death. Plaintiff receives a 50% joint and survivor annuity.

19.     Pension plans may also offer participants alternative forms of survivor annuities, known as qualified optional survivor annuities ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g).  A common form of QOSA is a "certain and life" annuity, whereby a participant (and beneficiary) receives benefits for at least a specified minimum number of years, regardless of how long the participant lives. For example, a 10-year certain and life will provide a participant with a stream of 10 years, or until death, whichever is longer.   If the participant dies within the 10-year period, the stream of payments to the participant's beneficiary continue for the remainder of the 10-year period.

20.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the participant's surviving spouse (i.e. a beneficiary) if the participant dies before reaching the plan's normal retirement age.  *See* ERISA § 205(e), 29 U.S.C. § 1055(e)

### Benefit Options Must Be Actuarially Equivalent

21.     A QJSA must be actuarially equivalent to an SLA. *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

22.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[1] Indeed, a QJSA "must be at least as valuable as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16.

23.     Both ERISA and the Tax Code require that a QOSA be actuarially equivalent to an SLA.  *See* 29 U.S.C. § 1055(d)(2); 26 U.S.C. § 417(g).

24.     A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA and any QOSAs. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

25.     ERISA does not require that plans offer lump sum distributions to retirees.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump sum distribution as an

---

[1]     26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to SLAs.  As the Treasury regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity.  For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities."  26 C.F.R. § 1.401(a)-11(b)(1)(i).

optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[2] and applicable interest rate (the "Treasury Interest Rate")[3] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to Tax Code §§ 417(e) and 430(h) which are based on current market rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).   In other words, the lump sum distribution must be at least the actuarially equivalent of the QOSA, QJSA and QPSA.

26.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.

27.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

28.     ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.

### *Reasonable Factors Must be Used When Calculating Actuarial Equivalence*

29.     "Two modes of payment are actuarially equivalent when their ***present values are equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[4]  Actuarial equivalence should be "cost-neutral," meaning that

---

[2]      26 C.F.R. § 1430(h)(2)-1.
[3]      26 C.F.R. § 1430(3)-1.
[4]      According to Merriam Webster: "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

neither the Plan nor the participants should be better or worse off if the participant selects either the normal retirement benefit or an optional form of benefit. *See Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517, 540 (S.D.N.Y. 2015).

30. Under ERISA, "present value" must "reflect anticipated events." Such adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed numerous regulations describing how present value should reasonably reflect anticipated events, including:

(a) The Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b) A plan must determine optional benefits such as QJSAs, QOSAs, and QPSAs using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c) The term actuarial present value means actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d) With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

(e) With respect to nonforfeitability, "[c]ertain adjustments to plan benefits such as adjustments in excess of ***reasonable actuarial reductions*** can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a) (emphasis added).

## SUBSTANTIVE ALLEGATIONS

### I.  THE PLAN

31.     Huntington Ingalls established the Plan and is the Plan sponsor.

32.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A) and a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

33.     The Plan consists of two sub-parts: the Cash Balance Part, which generally covers eligible employees hired on or after June 7, 2004, and the Legacy Part, which covers eligible employees whose date of hire was before June 7, 2004.  Employees hired on or after July 10, 2017 are not eligible to participate in the Plan.

34.     Under the Legacy Part, workers accrue benefits in the form of an SLA, which is based on a participant's years of service. The normal form of payment is an SLA for single participants and a reduced 50% joint and survivor annuity" for married participants.

35.     Participants can receive benefits under the Legacy Part in several forms, including: a joint and survivor annuity in percentages of 50, 75 or 100%; a 75% joint and survivor annuity with pop-up option; a Social Security leveling option annuity with pivot age 62 (collectively "Non-SLA Annuities"); or an SLA for a married participant.

36.     Under the Legacy Part, Defendants convert SLA benefits to Non-SLA Annuities using the 1971 GAM table (assuming 90% of the employees are male and 90% of the contingent annuitants are female) and a 6% interest rate.

### II.  The Non-SLA Annuities Are Not Actuarially Equivalent to the SLA.

### A.     Converting an SLA to Other Forms of Benefits.

37.     As set forth above, ERISA requires that a QJSA, a QPSA and QOSAs be the "actuarial equivalent" of an SLA.  *See* ERISA § 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2); *see* ERISA § 205(e)(1)(A), 29 U.S.C. 1055(e)(1)(A).  Under the Plan, the 50% joint and survivor annuity is a QJSA and must be actuarially equivalent to the SLAs that participants earned.

38.     To convert an SLA into a QJSA, QOSA or QPSA, the present value of the ***aggregate*** (i.e., total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under both the SLA and the QJSA, QPSA or QOSA must be determined.  The present values are then compared to determine the conversion factor.[5]  There are two main components of these present value calculations: an interest rate and a mortality table.

39.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

40.     The interest rate used by a plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events."  *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment.  *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

41.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

---

[5]     The conversion factor is easily calculated by a computer model.  Defendants simply input the assumptions and the model instantaneously calculates the conversion factor.

42.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The SOA publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1983, 1976 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

43.     Since at least the 1980s, the life expectancies in mortality tables have substantially improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

44.     Pursuant to Actuarial Standard of Practice No. 35, para. 3.5.3 of the Actuarial Standards Board,[6] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[7]

45.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality.  For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[8] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[9]

46.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

47.     Using the selected interest rate and mortality table, the present value of the SLA and the QJSA, QPSA or QOSA can be compared to determine whether the amount of the QJSA, QPSA or QOSA is actuarially equivalent to the SLA.

---

[6]     Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[7]     Available at: http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement (last accessed on Apr. 18, 2019).

[8]     Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf

[9]     Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

48.     Changes to mortality assumptions can have dramatic effects on the conversion factor and the value of a QJSA, QPSA or QOSA.  Using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a QJSA, QPSA or QOSA decreases.

49.     Plans must use reasonable interest rates and reasonable mortality tables to determine whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

**B.      The Legacy Part Does Not Use Reasonable Actuarial Factors for Participants Who Receive Non-SLA Annuities.**

50.     The Legacy Part uses the 1971 GAM and a 6% interest rate to calculate the present value of Non-SLA Annuities.

51.     Using the 1971 GAM table to determine the present value of Non-SLA Annuities is unreasonable because the 1971 GAM table is severely outdated and does not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).

52.     The 1971 GAM table is decades old and does not incorporate improvements in life expectancy that have occurred since it was published. According to the Centers for Disease Control and Prevention, in 1960, a 65-year-old had an average life expectancy of 15.2 years.[10]  In 2010, a 65-year-old had a 19.1-year life expectancy, a 20% increase. Accordingly, by 2010, the average employee would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than in 1971.

53.     Using the 1971 GAM table decreases the values of Non-SLA Annuities, thereby materially reducing the monthly benefits that participants and beneficiaries receive in comparison

---

[10]     Available at: https://www.cdc.gov/nchs/data/hus/2011/022.pdf

to the monthly benefits participants and beneficiaries would receive if the Plan used updated, reasonable mortality assumptions.  Thus, participants who receive Non-SLA Annuities under the Plan do not receive actuarially equivalent benefits.

54.     Defendants knew or should have known that the 1971 GAM table was outdated and that it was unreasonable because it results in lower monthly benefits for participants and beneficiaries receiving Non-SLA Annuities.

55.     For example, Defendants use up-to-date actuarial assumptions for the Huntington Ingalls Retirement Plan.  Under this plan, Defendants use the RP-2000 mortality table projected to 2015 using projection scale AA and a 6% interest rate to determine the benefits for account balances earned prior to January 1, 2009. HII Retirement Plan Form 5500 at 62.

56.     "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) quoting, *Edsen v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

57.     Further, under Generally Accepted Accounting Principles ("GAAP"), mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[11]  In its Annual Report to shareholders filed with the SEC on Form 10-k, in calculating pension plan costs, Huntington Ingalls represents as follows:

---

[11]     As noted in a "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption

> *Mortality - **Mortality assumptions** are used to determine the retirement related benefit obligations and expense, and represent the likelihood and duration of benefit payments to plan participants **based on historical experience and projected longevity. We periodically update our mortality assumptions as circumstances warrant.**[12]*

58.     Yet, Defendants continue using the 1971 GAM table, which is nearly 50 years out of date, to calculate Non-SLA Annuities under the Legacy Part.   There is no reasonable justification for Defendants to use an old mortality table that presumes an early death and an early end to benefit payments in order to calculate an unfairly low annual benefit for participants in the Legacy Part, while at the same time using a reasonable mortality table to determine the benefits of certain participants in their Retirement Plan and in reports to shareholders.

---

should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aers-fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-103015.pdf

[12]     Available at: http://services.corporate-ir.net/SEC.Enhanced/SecCapsule.aspx?c=243052&fid=16078862, at 38 (last accessed on May 1, 2019).

59.     Defendants knowingly and wrongfully used the 1971 GAM table that is several decades out-of-date to convert the SLAs to Non-SLA Annuities under the Legacy Part.

60.     During the relevant period, Defendants' use of the 1971 GAM table to calculate Non-SLA Annuities was unreasonable. Had the Plan used reasonable actuarial assumptions to calculate Non-SLA Annuities, such as the Treasury Assumptions, Plaintiff and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

61.     The chart below compares the amount that a Legacy Part participant who is 65-years old (with a 65-year-old spouse) who accrued an SLA of $1,000/month would receive per month if she elected to receive her benefits in the form of a 50% joint and survivor annuity, using the 2018 Treasury Assumptions and the Plan's actuarial assumptions:

| Benefit Form | 2018 Treasury Assumptions | 1971 GAM/6% |
|---|---|---|
| SLA | $1,000 | $1,000 |
| 50% JSA | $926.67 | $876.80 |

62.     While the amount of the differences between the 2018 Treasury Assumptions and the assumptions that Huntington Ingalls uses will vary depending on the ages of the participant and the beneficiary, *no* participants of the Legacy Part and their beneficiaries who receive Non-SLA Annuities under the Plan are receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA.

63.     Plaintiff retired at age 67 and 2 months and accrued an SLA of $125.51 per month. He is receiving a 50% joint and survivor annuity which pays $100.14 a month. If the Treasury Assumptions were applied, Plaintiff's benefit would be $112.41, or $12.27 more per month than

if the 1971 GAM/6% formula is used.  By using the 1971 GAM/6% formula instead of the applicable Treasury Assumptions, Plaintiff has been shortchanged by 12.52%. Moreover, Defendants reduced the present value of Plaintiff's benefits at the time of his retirement by $2,136.32.

64.     Discovery will likely show that Defendants' use of unreasonable actuarial assumptions deprived retirees and their spouses of tens of millions of dollars.

65.     Because the Plan used grossly outdated, unreasonable mortality tables to determine benefits under the Legacy Part throughout the relevant time period, the benefits paid to participants and beneficiaries who receive Non-SLA Annuities under the Legacy Part are ***not*** actuarially equivalent to what they would have received if they had selected an SLA, in violation of ERISA § 205 (d)(1)(B) and (d)(2)(A), 29 U.S.C. § 1055 (d)(1)(B) and (d)(2)(A).  Rather, the benefits paid to retirees receiving Non-SLA Annuities under the Legacy Part are much lower than they should be.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants and beneficiaries of the Plan who are receiving Non-SLA Annuities calculated by using the 1971 GAM table and a 6% interest rate.  Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plan.

67.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

68.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class members arise out of the same policies and practices

as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

69.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

      A.     Whether the Plan's formula for calculating Non-SLA Annuities under in the Legacy Part provides benefits that are actuarially equivalent to the SLA;

      B.     Whether the Plan's actuarial assumptions are reasonable;

      C.     Whether the Plan should be reformed to comply with ERISA; and

      D.     Whether Plaintiff and Class members should receive additional benefits.

70.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

71.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

72.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

73.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FIRST CLAIM FOR RELIEF
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

74.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

75.     The Plan improperly reduces annuity benefits for participants and their beneficiaries who receive Non-SLA Annuities under the Legacy Part below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires.

76.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

77.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plan's established

methodology for calculating actuarial equivalence of Non-SLA Annuities under the Legacy Part

violates ERISA because it does not provide an actuarially equivalent benefit. By not providing an

actuarially equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA §

203(a), 29 U.S.C. § 1053(a), and ERISA's "actuarial equivalence" rule, ERISA §§ 204 and 205,

29 U.S.C. §§ 1054 and 1055.

78.     Plaintiff further seeks orders from the Court providing a full range of equitable

relief, including but not limited to:

(a)     re-calculation, correction and payment of benefits previously paid for Non-SLA

Annuities under the Plan;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan
### (ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))

79.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this

Complaint.

80.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary

to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

81. The Plan improperly reduced annuity benefits for participants and their beneficiaries who receive Non-SLA Annuities under the Legacy Part below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires. By not providing an actuarially equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a), and ERISA's "actuarial equivalence" rule, ERISA §§ 204 and 205, 29 U.S.C. §§ 1054 and 1055.

82. Plaintiff is entitled to reformation of the Plan to require Defendants to provide actuarially equivalent benefits.

83. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

84. Plaintiff is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits under the Plan following reformation.

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**(ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

85. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

86. As the Plan's administrator, the Committee is a fiduciary of the Plan.

87.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

88.     The Committee and its members are fiduciaries for the Plan because they exercised discretionary authority and control over management of the Plan as well as authority and control over the disposition of Plan assets. In particular, they had authority or control over the amount and payment of benefits paid through Non-SLA Annuities under the Legacy Part, which were paid from Plan assets.

89.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

90.     The Plan is not consistent with ERISA because it uses the outdated 1971 GAM table and a 6% interest rate to calculate Non-SLA Annuities under the Legacy Part. As a result, the Plan's calculation of these, produces results that are not actuarially equivalent resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

91.     In following the Plan, which did not conform with ERISA, the Committee and its members exercised their fiduciary duties and control over Plan assets in breach of its fiduciary duties.

92.     ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Huntington Ingalls breached its fiduciary duties to supervise and monitor the Committee.

93.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

94.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan's established methodology for calculating actuarial equivalence of Non-SLA Annuities under the Legacy Part violates ERISA because it does not provide an actuarially equivalent benefit.

95.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction and payment of benefits previously paid for Non-SLA Annuities paid under the Legacy Part;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims

and requests that the Court award the following relief:

A.     Certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil

Procedure;

B.     Declaring that the Plan fails to properly calculate and pay Non-SLA Annuities

under the Legacy Part that are actuarially equivalent to SLAs, in violation of ERISA §§ 205

(d)(1)(B) and (d)(2)(A), and 204(c)(3), 29 U.S.C. §§ 1055 (d)(1)(B) and (d)(2)(A), and 1054(c)(3);

C.     Ordering Defendants to bring the Plan into compliance with ERISA, including, but

not limited to, reforming the Plan to bring it into compliance with ERISA with respect to

calculation of actuarially equivalent QJSAs, QOSAs, and QPSAs;

D.     Ordering Defendants to correct and recalculate benefits that have been paid;

E.     Ordering Defendants to provide an "accounting" of all prior payments of benefits

under the Plan to determine the proper amounts that should have been paid;

F.     Ordering Defendants to pay all benefits improperly withheld, including under the

theories of surcharge and disgorgement;

G.     Ordering Defendants to disgorge any profits earned on amounts improperly

withheld;

H.     Imposition of a constructive trust;

I.    Imposition of an equitable lien;

J.    Reformation of the Plan;

K.    Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.    Ordering Defendants to pay future benefits in accordance with the terms of the Plan, as reformed;

M.    Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.    Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.    Any other relief the Court determines is just and proper.


Dated: May 20, 2019                          Respectfully submitted,


*/s/ Gregory Y. Porter*
Gregory Y. Porter (VSB # 40408)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103 fax
Email: gporter@baileyglasser.com


Mark G. Bokyo (to be admitted *pro hac vice*)
**BAILEY & GLASSER LLP**
8012 Bonhomme Avenue
Suite 300
Clayton, MO 63105
Tel: (314) 863-5446
Fax: (314) 863-5483
Email: mboyko@baileyglasser.com

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (to be admitted *pro hac vice*)
Mark P. Kindall (to be admitted *pro hac vice*)
Seth R. Klein (to be admitted *pro hac vice*)
Douglas P. Needham
Oren Faircloth
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  sklein@ikrlaw.com
Email:  dneedham@ikrlaw.com
Email:  ofaircloth@ikrlaw.com

*Counsel for Plaintiffs*