**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| ROGER A. HERNDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-CV-00052-HCM-DEM |
| | ) | |
| HUNTINGTON INGALLS INDUSTRIES, | ) | |
| INC. AND THE HII ADMINISTRATIVE | ) | |
| COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

This is a straightforward case requiring the Court to apply the plain language of the

Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Plaintiff's claims

are based upon a supposed legal "duty" that does not exist. Therefore, those claims fail as a matter

of law, and the Complaint should be dismissed with prejudice for the reasons set forth in

Defendants' pending Motion to Dismiss (ECF Nos. 10-11). Discovery has done nothing to save

Plaintiff's claims. Rather, the undisputed facts only confirm—without question—that there is no

theory upon which the Plaintiff can prevail. The duty Plaintiff claims he was owed—if it existed

in the law—would be directly contrary to ERISA and its regulations. Thus, Plaintiff's case is

baseless, and Defendants are entitled to judgment as a matter of law.

Plaintiff Roger Herndon ("Plaintiff") is a retiree of Huntington Ingalls Industries, Inc.

("HII" or the "Company"). He currently receives pension benefits under the Legacy Part of the

Huntington Ingalls Industries, Inc. Newport News Operations Pension Plan for Employees

Covered by United Steelworkers Local 8888 Collective Bargaining Agreement (the "Plan"). Plaintiff admittedly "loves" the Company, and does not believe the Company would do anything "illegal" or "wrong" towards its retirees. Indeed, Plaintiff never had *any* concerns about his pension benefit until he stumbled upon his counsel on the internet and was fed their theory.

The Complaint advances a novel theory that a collectively-bargained term of the Plan—specifically, the Treasury-approved mortality table set forth in the Plan as required by law, and used to convert Plaintiff's single life annuity ("SLA") benefit to his monthly Joint & Survivor annuity ("JSA") benefit—is too "old" and "outdated" and, therefore, the Plan's conversion factors are "unreasonable."[1] According to Plaintiff, the Company and/or the Plan's named fiduciary, Defendant HII Administrative Committee (the "Committee") ("Defendants"), have a legal duty to replace the mortality tables established by the Plan (and approved by the United Steelworkers Local 8888 (the "Union")) with ones he thinks would be more favorable to him.

This theory may have some initial appeal, but it is not consistent with either the law or common sense. One of the fundamental purposes of ERISA is to provide plan beneficiaries (like Plaintiff) with certainty and transparency of the expected benefit. That is precisely what the Plan here does. The benefits at issue depend upon a combination of *three* actuarial assumptions (a mortality table for participants, a mortality table for beneficiaries, and an interest rate) which taken *together* make up the conversion factor. As discussed below, updates to these actuarial

---

[1] Indeed, this novel theory is one invented by Plaintiff's counsel (and their purported expert) and has formed the basis of several lawsuits filed against similarly situated companies in the past year. *See, e.g., Masten v. Metro. Life Ins. Co.,* No: 1:18-cv-11229 (S.D.N.Y.) (filed Dec. 3, 2018); *Torres v. Am. Airlines, Inc.*, No: 4:18-cv-00983 (N.D. Tex.) (filed Dec. 11, 2018); *DuBuske v. PepsiCo, Inc.,* No: 7:18-cv-11618 (S.D.N.Y.) (filed Dec. 12, 2018); *Smith v. U.S. Bancorp,* No: 0:18-cv-03405 (D. Minn.) (filed Dec. 14, 2018); *Duffy v. Anheuser-Busch Cos. LLC,* No. 4:19-cv-01189 (E.D. Mo.) (filed May 6, 2019); *Smith v. Rockwell Automation*, No. 2:19-cv-00505 (E.D. Wis.) (filed Apr. 8, 2019).

assumptions could result in decreases in benefits as easily as increases. However, ERISA requires employers to specify the factor (or the underlying assumptions) in the plan document, so as to prevent future manipulation. Plaintiff's theory is inconsistent with ERISA's mandate of certainty and predictability.

In any event, discovery has confirmed that the Plan's factors used to convert a SLA to a JSA are objectively *reasonable* in the context of Plan-specific demographic experience as well as current economic conditions. Indeed, Plaintiff's belief that he would receive *more* monthly benefits if the mortality tables were updated is belied by undisputed facts confirmed in discovery. Rather, the assumptions used by the Plan (the 1971-GAM mortality tables with a 6% interest rate) to convert the benefit actually result in *higher* benefits for Plaintiff and the class he represents, than using Plan-specific demographic experience and current interest rates. And Plaintiff has no competent evidence the Plan's conversion factors are *unreasonable* because his purported "expert" provides no opinion that the factors themselves are unreasonable. Thus, the Court is left with the inescapable conclusion that the Plan provides Plaintiff with greater benefits than Plaintiff's own theory would give him, making Defendants' actions objectively reasonable.

For the reasons discussed herein, judgment should be entered for Defendants on all claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.** **Defined benefit plans use *three* actuarial assumptions—mortality of the participant, mortality of the beneficiary, and an interest rate—to calculate a conversion factor when determining actuarial equivalence for alternative forms of benefits.**

1. A "defined benefit" pension plan does just that—its terms "define" the benefit amount a participant will receive, usually based on years of service and wages, payable periodically for the rest of the individual's life. Ex. A, Declaration of Thomas A. Terry ("Ter. Dec.") ¶ 66; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-440 (1999).

2. This defined "accrued benefit" is the annual amount payable commencing at the

participant's normal retirement age, typically age 65, and is typically payable as a SLA—a monthly pension that continues for the life of the participant.  Ex. A, Ter. Dec. ¶ 66.

3.      In a typical defined benefit pension plan, a participant may choose to receive his or her pension payable in an alternative form—something *other* than a SLA commencing at the normal retirement age.   For example, a participant may elect to receive his or her pension as a JSA (where all or a portion of the pension is payable to the surviving spouse after the participant dies), or as a single lump sum amount.  Ex. A, Ter. Dec. ¶ 68.

4.      To determine the amount of an alternative form of pension—the SLA pension amount must be "converted" to the alternative form of pension using a "conversion factor".  Ex. A, Ter. Dec. ¶¶ 70, 74.

5.      An assumption about mortality is used to estimate the lifetime of the retiree, thus, the estimated number of years for which pension payments will be made to the participant.  Ex. A, Ter. Dec. ¶ 82.  Actuaries develop mortality tables in order to estimate this duration.  *Id.*

6.      An assumption about beneficiary mortality is used to estimate how long the beneficiary will continue to receive payments after the retiree has died.  Ex. A, Ter. Dec. ¶ 82.

7.      An assumption about interest rates is necessary in order to account for the time value of money.  Ex. A, Ter. Dec. ¶ 83.

8.      Discounting the projected pension payments using the interest rate is an essential step in calculating the annuity present value. Ex. A, Ter. Dec. ¶ 83.

9.      The mortality tables and interest rate together are used to calculate the conversion factor which determines the amount of benefit that would be "actuarially equivalent" to the SLA the participant accrued.  Ex. A, Ter. Dec. ¶¶ 81-86.

10.      The JSA benefit is the result of multiplying the SLA by the conversion factor.  Ex.

A, Ter. Dec. ¶ 78.

11.     The JSA benefit increases if the conversion factor increases.  Ex. A, Ter. Dec. ¶ 78.

12.     The conversion factor will be impacted by changes in the mortality and interest rate assumptions.  Ex. A, Ter. Dec. ¶ 84.

13.     An increase in the assumed life expectancy of retirees will generally cause the conversion factor to increase.  Ex. A, Ter. Dec. ¶ 84.

14.     An increase in the assumed life expectancy of beneficiaries will generally cause the conversion factor to decrease.  Ex. A, Ter. Dec. ¶ 84.

15.     A decrease in the interest rate will cause the conversion factor to decrease.  Ex. A, Ter. Dec. ¶ 84.

16.     These directional impacts assume a change to a single indicated ingredient only, while holding both of the other ingredients constant.   If more than one ingredient is changed simultaneously, the impact is hard to generalize, even directionally, because various impacts may offset one another.  Ex. A, Ter. Dec. ¶ 85.

17.     If both retiree life expectancy and beneficiary life expectancy increase, then the conversion factor could go up or down, depending on which ingredient had the bigger impact.  Ex. A, Ter. Dec. ¶ 85; *see also* Ex. B, Deposition of Mitchell Serota ("Serota Dep.") at 64:18-66:3.

18.     If retiree life expectancy increases and the interest rate decreases, the conversion factor could go up or down depending on which ingredient has the greater impact.  Ex. A, Ter. Dec. ¶ 85.

19.     In the context of JSA conversion factors, examining any one actuarial ingredient on its own is inappropriate.  Ex. A, Ter. Dec. ¶ 86.   It is the interaction between and among the various ingredients, and their combined effects, that is important.  *Id.*; *see also* Ex. C, Amended

Declaration of Mitchell I. Serota ("Serota Am. Dec.") at p. 18.

**II.**     **The actuarial assumptions at issue here have been expressly stated in the Plan document since the 1980s, negotiated by the Union, and approved by the IRS.**

20.     The Plan is a "defined benefit" pension plan.   Ex. D, 2016 Plan (HII-0000001156-1237).

21.     The Plan is a subject of collective bargaining between the Company and the Union, and the Plan is maintained pursuant to a Collective Bargaining Agreement between the Company and the Union.   Ex. D, Plan, Preamble and § 1.04.

22.     The Company and the Union engage in collective bargaining approximately every few years, and such bargaining discussions often last several weeks or months.   Ex. E, Deposition of Bill Ermatinger ("Erm. Dep.") at 127:10-128:21.

23.     During the collective bargaining process, the Company and the Union bargain over various aspects of employment for Union members, including, but not limited to, wages, retirement, work conditions, safety, health benefits, sick time and vacation time.   Ex. E, Erm. Dep. at 127:10-128:21.

24.     During the collective bargaining process, the Union brings legal counsel and actuaries to the table to assist the negotiation process.   Ex. E, Erm. Dep. at 128:22-129:7.

25.     The Company and the Committee rely on legal counsel to ensure the Plan is legally compliant.   Ex. E Erm. Dep. at 64:3-69:1; 32:25-33:17; Ex. F, Deposition of Karen Velkey ("Velkey Dep.") at 55:7-8.

26.     The Plan states that the Company is the entity with authority to amend the Plan by written resolution of the Board, or its delegate.   Ex. D, Plan at p. 37, Article XI, § 11.01(a).

27.     The Company may amend the Plan only with written approval of the Union.   Ex. D, Plan at p. 37, Article XI, Section 11.01(a).

28.     The Committee is the Plan administrator, and named fiduciary responsible for administration of the Plan.  Ex. D, Plan at § 1.09; Article X.

29.     The Plan grants the Committee limited authorization to amend the Plan to the extent necessary to keep the Plan in compliance with the law, make clarifying changes, and correct drafting errors.   Ex. D, Plan at p. 37, Article XI, § 11.01(b)(1); Ex G, Committee Charter (HII-0000006086-6094).

30.     The Committee may not amend the Plan for any other reason without the written approval of the Union.  Ex. D, Plan at p. 37, Article XI, § 11.01(b)(2).

31.     The Plan has been amended or restated every few years to reflect the results of collective bargaining between the Company and the Union.  Ex. H, 1987 Plan (effective June 1, 1987 to March 31, 1991) (HII-0000001365-1453); Ex. I, 1991 Amendment (extending 1987 Plan from April 1, 1991 to February 5, 1995) (HII-0000001347-1349); Ex. J, 1995 Amendment (extending 1987 Plan from February 6, 1995 to April 4, 1999) (HII-0000001353-1359);  Ex. K, 1999 Plan (effective April 5, 1999 to June 6, 2004) (HII-0000001528-1561); Ex. L, 2004 Plan (effective June 7, 2004 to October 26, 2008) (HII-0000001788-1859); Ex. M, Fourth Amendment (extending 2004 Plan from October 27, 2008 to March 10, 2013 and amending Appendix A to the Plan) (HII-0000001626-1639); Ex. D, Plan (effective March 11, 2013 to July 9, 2017) (HII-0000001156-1237).

32.     On or about June 7, 2004, the Plan closed to new entrants, and new hires became eligible to participate in a different plan.  Ex. D, Plan at Preamble; Ex. L, 2004 Plan at Preamble; Ex. E, Erm. Dep. at 56:1-20.

33.     Participants in the part of the Plan that covers Plaintiff and other employees hired before June 7, 2004 (the "Legacy Part") accrue benefits in the form of a SLA,  and the Plan offers

several alternative forms of benefits that participants may elect, including 50%, 75% and 100% JSA options. Ex. D, Plan at Article V.

34.     Appendix A of the Legacy Part of the Plan discloses the conversion factors used to calculate optional forms of benefits. Ex. D, Plan, Appendix A.

35.     For participants, the Plan uses the 1971 Group Annuity Mortality table ("1971-GAM table") with male and female rates blended to reflect a population that is 90% male and 10% female. Ex. D, Plan, Appendix A.

36.     For beneficiaries, the Plan uses the 1971-GAM table reflecting a population that is 10% male and 90% female. Ex. D, Plan, Appendix A.

37.     The Plan uses an interest rate of 6% compounded annually to calculate actuarial equivalence. Ex. D, Plan, Appendix A.

38.     The Plan's 6% interest rate is higher than the current interest rates of approximately 3%, as published by the Internal Revenue Service ("IRS").[2] *See* https://www.irs.gov/retirement-plans/minimum-present-value-segment-rates.

39.     The 1971-GAM table and the 6% interest rate have been expressly disclosed in the plan document since the version of the Plan effective June 1, 1987. Ex. H, 1987 Plan (Appendix I); Ex. I, 1991 Amendment; Ex. J, 1995 Amendment; Ex. K, 1999 Plan (Appendix I); Ex. L, 2004 Plan (Appendix A); Ex. M, Fourth Amendment (Appendix A); Ex. D, Plan (Appendix A).

40.     HII (through its legal counsel) applied for, and received a favorable "determination letter" from the IRS in 2000, 2012 and 2016. Ex. N (HII-0000172620-21); Ex. O (HII-

---

[2]     The IRS publishes current interest rates each month in the form of three "segment" rates. The most recent set of segment rates, for December, 2019, are 2.03% (applicable to the first 5 years of monthly benefit payments), 3.06% (applicable to the next 15 years of benefit payments), and 3.59% (applicable to benefit payments more than 20 years in the future).

0000172617-19);  Ex. P (HII-0000172590-92).

41.     In June 2017, the Union asked HII to "modify of the surviving spouse reduction factors [in the Legacy Plan] to reflect updated 2014 mortality tables."  Ex. Q, Union Proposal dated June 14, 2017 (HII-0000133720-133734) at p. 6.

42.     In a letter to members dated July 9, 2017, Arnold Outlaw, President Local 8888, summarized the most recent bargaining negotiations with the Company, including the negotiated increases to pension benefits.  Ex. R (HII-0000135042-135056).

43.     On or about August 16, 2017, the Plan was amended "to incorporate the [] pension changes negotiated between the Company and the Union for the term of July 10, 2017 through November 14, 2021."  Ex. S, First Amendment to the 2016 Plan (HII-0000001298-1300).

III.    **Plaintiff challenges just one of the Plan's actuarial factors—the 1971-GAM table.**

44.     Plaintiff is a participant in the Legacy Part of the Plan.  Compl. ¶ 13.

45.     Plaintiff retired around September 1, 2013, and selected the 50% JSA option for his Plan benefit.  Compl. ¶  13; Ex. T, Deposition of Roger Herndon ("Herndon Dep.") at 24:4-6 (last day of August 2013); 73:6-12.

46.     Plaintiff's 50% J&S benefit is $100.14 per month.  Ex. T, Herndon Dep. at 21:20-23:11; 43:14-16; Ex. U, Roger Herndon's January 22, 2014, Pension Plan Recalculation Notice (HII-0000000193).

47.     Plaintiff challenges the Plan's use of the 1971-GAM table to calculate his JSA benefit.  Specifically, Plaintiff claims that this mortality table is "outdated" because "mortality rates have improved over time" and "people who recently retired are expected to live longer than people who retired in previous generations."  Compl. ¶¶ 4, 7, 51, 54, 65, 90; Ex. T, Herndon Dep. at 33:20-34:24.

48.     Prior to meeting his counsel, Plaintiff never had any concerns or questions about the calculation of his J&S benefit under the Plan, but only formed his concerns after he started speaking with his counsel.  Ex. T, Herndon Dep. at 36:16-37:14; 43:17-25.

49.     Plaintiff never contacted anyone at the HII benefits department with questions or concerns regarding the calculation of his JSA benefit under the Plan.  Ex. T, Herndon Dep. at 44:18-45:6; 52:1-18.

50.     Prior to filing this lawsuit, Plaintiff never filed a claim with the recordkeeper or the Committee questioning the calculation of his JSA benefit under the Plan.  Ex. T, Herndon Dep. at 44:18-45:6; 53:8-14.

51.     Plaintiff "love[s]" the Company, and thinks it is "one of the best companies in the world."  Ex. T, Herndon Dep. at 45:17-47:13.

52.     Plaintiff thinks the "senior members of the company" are "good people" and does "not think they would do anything purposefully with malice toward their employees to lower their benefits in any way."  Ex. T, Herndon Dep. at 45:17-47:13.

53.     Plaintiff does not believe the Company would do anything "illegal" or "wrong . . . against its employees."  Ex. T, Herndon Dep. at 77:11-78:11.

54.     Plaintiff does not allege any "fraud" or "intentional misrepresentation" by the Company.  Ex. T, Herndon Dep. at 77:11-78:11.

55.     Plaintiff only formed the belief that his pension benefits were calculated incorrectly after speaking with his counsel.  Ex. T, Herndon Dep. at 34:17-35:3.

56.     Plaintiff believes he is entitled to more money per month, and would not support this lawsuit if he were going to receive less money per month.   Ex. T, Herndon Dep. at 48:7-49:2.

57.     Plaintiff agrees that $106/month and $100/month are "roughly the same."  Ex. T,

Herndon Dep. at 72:8-73:5.

## IV.     **The Plan's conversion factors are reasonable.**

58.     Mr. Thomas S. Terry ("Mr. Terry") is the Chief Executive Officer and founder of The Terry Group, an actuarial and employee benefits consulting and research firm based in Chicago, Illinois.  Ex. A, Ter. Dec. ¶¶ 1, 3.

59.     Mr. Terry is a past president of the American Academy of Actuaries, a past president of the International Actuarial Association, an Enrolled Actuary under ERISA, and has been a pension actuary for over forty years.   Ex. A, Ter. Dec. ¶¶ 1, 3.

60.     Mr. Terry believes that, if the Plan were amended to provide that JSA conversion factors were determined based solely on the actuarial assumptions in ERISA Section 205(g), the IRS would consider that amendment to violate the anti-cutback rule in IRC Section 411(d)(6) (also included in ERISA Section 204(g)).  Ex. A, Ter. Dec. ¶ 64.

61.     The most recent three years of data show life expectancy decreasing.   Ex. A, Ter. Dec. ¶ 110.

62.     Section 2.10 of the Actuarial Standards of Practice ("ASOP") No. 1 provides:

In many instances, the ASOPs call for the actuary to take "reasonable" steps, make "reasonable" inquiries, select "reasonable" assumptions or methods, or otherwise exercise professional judgment to produce a "reasonable" result when rendering actuarial services. The intent is to call upon the actuary to exercise the level of care and diligence that, in the actuary's professional judgment, is necessary to complete the assignment in an appropriate manner.

Ex. V, ASOP 1.

63.     Actuaries understand that, in dealing with uncertainty, there is rarely just one single, "correct" assumption about the future.  Ex. A, Ter. Dec. ¶ 130.

64.     Because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions, and two actuaries could follow

a particular ASOP, both using reasonable methods and assumptions, and reach different but reasonable results.  Ex. A, Ter. Dec. ¶ 156 (quoting ASOP No. 1, Section 2.10).

65.     Actuaries often will think and communicate in terms of reasonableness of an assumption or method as falling in a range.  Ex. A, Ter. Dec. ¶ 130.

66.     A plan document for a defined benefit pension plan cannot provide for a range of JSA conversion factors to be used for a particular retiree.  Ex. A, Ter. Dec. ¶ 133.

67.     A plan sponsor has to define a particular basis or a particular factor in order to be consistent with the requirement that pensions be "definitely determinable."   Ex. A, Ter. Dec. ¶ 133.

68.     There is a range of possible reasonable actuarial bases or conversion factors that could be defined by the plan.  Ex. A, Ter. Dec. ¶ 133.

69.     Mr. Terry reviewed the Plan's statistically credible mortality experience for its union population and created his own mortality table (the "Terry Table") for the Plan.  Ex. A, Ter. Dec. ¶¶ 145-150.

70.     Mr. Terry created the Terry Table by relying on mortality experience data for participants of HII's union pension plans assembled by HII's actuaries at Ernst & Young.  Ex. A, Ter. Dec. ¶ 146.

71.     This experience data reflected annuitant deaths and exposures over a five-year period from 2012 to 2016. Ex. A, Ter. Dec. ¶ 146.

72.     The conversion factor for Plaintiff using the Plan's current assumptions of a 1971-GAM table and a 6% interest rate is .8450.  Ex. A, Ter. Dec. ¶ 46.

73.     Using the Terry Table combined with a current interest rate of 3.5%, Mr. Terry calculated a conversion factor for Plaintiff of .8338, which would result in a monthly 50% JSA

benefit for Plaintiff of $98.81 per month. Ex. A, Ter. Dec. ¶¶ 50, 160, 163.

74.    Mr. Terry then repeated the calculation with the interest rate and mortality table identified by Plaintiff's designated expert Mitchell Serota ("Mr. Serota") as the "best estimate" – specifically a 4.19% interest rate and the mortality table used by the Plan for purposes of its financial statements (the "GAAP table"). Ex. A, Ter. Dec. ¶¶ 53, 161, 168, 170.

75.    Using Mr. Serota's "best estimate" assumptions, Mr. Terry calculated that Plaintiff's factor would be .8389, resulting in a benefit of $99.42 per month. Ex. A, Ter. Dec. ¶¶ 53, 161, 168, 170.

76.    "Plus or minus 5%" is a common standard among actuaries when considering a range of reasonableness for a calculated value premised on assumptions about uncertain future events. Ex. A, Ter. Dec. ¶ 134.

77.    In the actuarial community, 26 C.F.R. § 417(a)(3)-1(c)(2)(iii)(C) is understood to be authoritative guidance that alternative forms of benefit that are deemed to be within 5% of the value of the single life annuity benefit are deemed to be "approximately equal," where "approximately equal" is used in the context of allowing participants to make informed choices about their benefit options.   Ex. A, Ter. Dec. ¶¶ 136-137.

## V.    Plaintiff has no competent evidence that the Plan's conversion factors are unreasonable.

78.    Plaintiff's designated expert, Mr. Serota, provides no opinion on whether the conversion factors in the Plan are unreasonable.  Ex. B, Serota Dep. at 111:22-112:7.

79.    Mr. Serota has not investigated whether there could be a reasonable set of actuarial assumptions that would produce the same conversion factor for Plaintiff as the Plan's conversion factor.  Ex. B, Serota Dep at 63:8-12.

80.    Mr. Serota does not know how often the Plan's mortality table should be changed.

Ex. B, Serota Dep. at 37:13-21.

81.     Mr. Serota does not know when the 1971-GAM table became unreasonable, and he does not think that all 40 year old tables are necessarily unreasonable.  *Id.*

82.     Mr. Serota offers no opinions or testimony controverting Mr. Terry's calculations. *See generally* Ex. W, Rebuttal Declaration of Mitchell I. Serota ("Serota Rebuttal Dec.").

83.     The Plan's participant ratio is 86% male, 14% female, while the population of participants who elect the JSA form of benefits is 95% male, and the beneficiaries are 95% female. Ex. A, Ter. Dec. ¶¶ 33, 34, 102 n.5, 167, Ex. X, 2014 mortality study (HII-0000011593-11627); Ex. Y, Affidavit of Carrie Brewer (HII-0000168031-34).

84.     Mr. Serota uses a mortality table from 1994 for his own defined benefit Plan.  Ex. B, Serota Dep. at 93:13-96:9.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Alternatively, the moving party can show that the nonmoving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial.  *Id.* at 322-25.

Once the moving party meets its initial burden, the burden shifts to the nonmoving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting

then-Fed. R. Civ. P. 56(e)).   To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Carlton v. Williams*, No. 4:94cv196, 1995 U.S. Dist. LEXIS 19952, at *6 (E.D. Va. July 18, 1995) (Morgan, J.) (citing *Celotex Corp.*, 477 U.S. at 322).

## ARGUMENT

I.   **There is no legal requirement under ERISA to "update" actuarial assumptions specified in a plan document.**

Congress enacted ERISA in 1974 to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996); 29 U.S.C. § 1001.   Although ERISA comprehensively regulates employee benefit plans, it does not require "employers [to] provide any particular benefits."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983).  Rather, plan sponsors have "considerable latitude in plan design, including the establishment of methods for paying benefits."  *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 58-59 (1st Cir. 2014) (citing *Hughes Aircraft*, 525 U.S. at 444).   To the extent employers choose to offer benefits, however, ERISA serves to protect such "contractually defined benefits."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations omitted); *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013).   In sum, employees should be able to rely upon the plan document for the defined benefits contractually promised to them.

As explained in detail in Defendants' Motion to Dismiss (ECF No. 11 at pp. 10-16), the plain text of ERISA does not require changes to the factors used to calculate actuarial equivalence

for the benefits at issue here. Congress made clear that such actuarial factors must be put in the plan document, and expressly "precluded" future employer "discretion" with regard to such factors. 26 U.S.C. § 401(a)(25). Requiring these factors to be put in the plan document and remain unchanged gives participants the certainty and comfort that they will receive the contractually defined benefit they expect, and prohibits employers from later manipulating that contractual promise. *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609, 612 (7th Cir. 2001) ("The Internal Revenue Code does not require that the defined benefit be fixed, but only that it be determinable according to criteria specified in advance that do not permit the plan to play favorites."); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 206-207 (2d Cir. 2007) ("The court recognizes the concern expressed in the relevant provisions of Title 26, Title 29, and the related regulations, that employers should not be able to manipulate actuarial assumptions to their benefit and to the detriment of employees."); *McCutchen*, 569 U.S. at 100.

Moreover, Congress specifically included a requirement to update actuarial equivalence factors periodically in the calculation of other forms of defined benefits that are not at issue here, namely lump sums. *See, e.g.,* ERISA § 205(g)(3)(B)(ii), 29 U.S.C. 1055(g)(3)(B)(ii) ("The term 'applicable interest rate' means… *for the month before the date of the distribution*…") and ERISA § 303(h)(2), 29 U.S.C. 1083(h)(2) (requiring factors to be updated annually based on *the plan year*) (emphasis added). The absence of any statutory or regulatory requirement to "update" the actuarial equivalence factors for the annuity benefits that *are* at issue here, when Congress did require updates to such factors for other benefit forms, is dispositive. ECF No. 11 at p. 11 (citing *Bates v. United States*, 522 U.S. 23, 29-30 (1997)); *see also Hughes Aircraft*, 525 U.S. at 446 (In the ERISA context, Congress "says in a statute what it means and means in a statute what it says there.") (quotation marks and citation omitted). Indeed, the only Circuit to address this issue

- 16 -

definitively rejected the argument that ERISA requires such actuarial equivalence factors to be "periodically" updated once they are put in the plan document. *McCarthy*, 482 F.3d at 206-07 ("ERISA does not specifically require that retirement plans periodically adjust their actuarial interest rates.").

Further, as Plaintiff acknowledges, there is not one, but *three* important actuarial assumptions at issue: mortality tables for participants and beneficiaries, and the interest rate. Compl. ¶ 3. Plaintiff's theory focuses exclusively on mortality tables, to the exclusion of interest rates. If plan sponsors were required periodically to "update" actuarial factors and/or the assumptions upon which they are based (mortality tables and interest rates) as Plaintiff suggests, such a requirement would bring ERISA § 204(g), 29 U.S.C. § 1054(g) (which prohibits reducing such factors to the extent they are in the plan document) into conflict with IRC § 401(a)(25), 26 U.S.C. § 401(a)(25) (which requires that the factors be specified in the plan document).   In other words, the "updates" could only occur if the result was a *higher* benefit, because the anti-cut back rule prevents making changes that would *lower* a participant's accrued benefit. *Id.*  If there were a requirement for plan sponsors to change factors periodically (as Plaintiff advocates), the factors could only be adjusted *upward*, consistent with the anti-cut back rule in ERISA and the IRC.  *See* 29 U.S.C. § 1054(g); 26 U.S.C. § 411(d)(6)(B)(ii); 26 C.F.R. § 1.411(d).  There is no indication Congress intended such an extraordinary result. *See* ECF No. 11 at pp. 12-14.

Congress has repeatedly amended ERISA and the IRC to specify when various actuarial assumptions for different purposes need to be increased, decreased, capped or changed.[3]  Though

---

[3]      *See e.g.*, Retirement Equity Act of 1984, Pub. L. No. 98-397, § 203(b), 98 Stat. 1426, 1441 (codified as 26 U.S.C. § 417 (1984)); Tax Reform Act of 1986, Pub. L. No. 99-514, § 1139(b)-(c), 100 Stat. 2085, 2487-2488 (1986); Retirement Protection Act of 1994, Pub. L. No. 103-465, §§ 751(a)(7), 761(a)(7), 767(a)(2), 767(c)(2), 108 Stat. 4809, 5015-5016, 5028, 5038-5039 (1994);

Plaintiff urges this Court to find that the Plan's factors became unreasonable at some point in the past 30 years, he does not articulate *when* the 1971-GAM table supposedly became outdated, *when* Defendants should have changed it in the Plan, or *how often* Defendants should have updated it. And his expert refused to do so either. SOF ¶¶ 78-81. This only highlights the fundamental flaw in Plaintiff's theory. Plan sponsors like HII cannot be expected to know *when* and *how often* such tables need to be changed without a detailed and comprehensive set of rules, akin to the statute itself, as to *when*, *how* and, *how often* such changes need to be made. This task must be left to Congress, or the regulatory agencies, none of which have seen fit, during the 45 years since ERISA was enacted, to impose such rules for annuity benefits, despite having done so repeatedly for lump sum benefits. This Court should similarly reject such an invitation, and leave such matters exclusively to the Legislature. *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015).

## II. **Plaintiff should not be permitted to unilaterally renegotiate terms of a collectively bargained Plan.**

Further, it is undisputed that this Plan is a subject of collective bargaining with the Union. SOF ¶ 21. Over the years, the Union has bargained for changes and other increases to pension benefits for participants in this Plan, and the Plan has been amended accordingly to reflect these negotiated changes. *Id.* ¶¶ 22-31; *see, e.g.,* Ex. M. During the most recent negotiation (2017), the Union asked the Company to "modify" the surviving spouse reduction factors to reflect updated 2014 mortality tables, but then abandoned this request during the negotiating process. *Id.* ¶¶ 41-43. In short, the Union made a deliberate choice on behalf of its membership—it "bargained" for increased minimum monthly benefits instead.

If the Court were to adopt Plaintiff's theory, it would upend the result of collective

---

Pension Protection Act of 2006, Pub. L. No. 109-280, §§ 102, 112, 302, 120 Stat. 780, 797-798, 800, 834-837, 920-921 (2006).

bargaining that occurred several years ago. This Court should be wary of unilaterally modifying Plan terms that were properly negotiated through the collective bargaining process. *See, e.g., UMW of Am. Health & Ret. Funds v. Robinson*, 455 U.S. 562, 576 (1982) ("When neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract."); *Alexander v. Bosch Auto. Sys*., 232 F. App'x 491, 499 (6th Cir. 2007) (refusing to unilaterally amend a collective bargaining agreement to displace the parties "resolution of [a benefits] issue" because the agreement "was mutually agreed-upon, accurately expressed, and properly ratified."); *Dist. 2, United Mine Workers v. Helen Mining Co.*, 762 F.2d 1155, 1161 (3d Cir. 1985) ("The courts are not free to modify the terms of collectively bargained benefit plans"); *Jackson v. Smith*, 927 F.2d 544, 549 (11th Cir. 1991) ("Where . . . the parties have established during the course of collective bargaining the level of benefits as well as the procedure for changing those benefits, federal courts are barred from modifying those terms."); *White v. Distribs. Assoc. Warehousemen's Pension Trust*, 751 F.2d 1068, 1071 (9th Cir. 1985) (reasoning that because "the rules affecting the plaintiff's pension benefits were fixed by the collective bargaining process. . . [they are] insulated from judicial review under ERISA.").

## III.    The factors used to calculate J&S benefits under the Plan provide an actuarially equivalent benefit.

Judgment should be entered for Defendants because, as a matter of law, ERISA does not require actuarial conversion factors to be "updated" once they are drafted into the plan document. And in any event, Plaintiff's theory fails because the factors used to calculate J&S benefits by the Plan are objectively *reasonable*, and provide an actuarially equivalent benefit. Moreover, Plaintiff has no admissible evidence the factors are *unreasonable*.

A. **The test of "reasonableness" applies to the actuarial factors, _not_ the underlying assumptions.**

As Plaintiff concedes, ERISA requires only that J&S benefits be at least the "actuarial equivalent" of the SLA.   Compl. ¶ 37 (citing 29 U.S.C. §§ 1055(d)(1), (d)(2) and (e)(1)(A)). ERISA itself does not define what "actuarial equivalent" means.   Rather, the crux of Plaintiff's theory is that the underlying actuarial conversion _factors_ used to calculate actuarial equivalence must be _reasonable_.   Compl. ¶ 30 (citing 26 C.F.R. § 1.401(a)-11(b)(2) (actuarial "[e]quivalence may be determined, on the basis of consistently applied _reasonable actuarial factors_. . .")).

Significantly, Rev. Rul. 79-90 provides that the plan can _either_ specify the interest rate and mortality tables, _or alternatively_ can simply include a table of conversion factors (referred to in the revenue ruling as "adjustment factors").   _See, e.g._, Rev. Rul. 79-90.   Thus, there is no requirement to include mortality tables in a plan document, much less that such tables, by themselves, be "reasonable."   Rather, the parties agree it is the conversion _factors—i.e._, the combined result of both mortality and interest rate—that would be subject to any reasonableness requirement.   _See_ Pls.' Opp. to Mot. to Dismiss, ECF No. 20, p. 17 n.14 ("Plaintiff's claim is not simply that 'old mortality tables are bad' . . . but rather that the 'conversion factor' resulting from the Plan's use of an old mortality table, coupled with its use of a 6% interest rate, harms participants who select Non-SLA Annuities.").

B. **Reasonableness is a range, not a point.**

This word—_reasonable_—necessarily implies that there is not a precise point, nor a single set of actuarial assumptions, that is required.   _McCarthy_, 482 F.3d at 203 ("We conclude, as did the district court, that the regulations do not specify a rate or range of discount rates that qualify as 'reasonable actuarial reductions' for payment of early retirement benefits."); _see also Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.,_ 888 F.3d 696, 706 (4th Cir.

2018) ("[r]easonableness is a zone, not a point") (quoting *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1351 (7th Cir. 1992)).   The ASOPs recognize this very point.  SOF ¶ 62.  Indeed, because they are dealing with estimation of uncertain events, actuaries understand that there is not just one single, "correct" assumption about the future; rather, there will often be a range of reasonable methods and assumptions.  *Id.* ¶¶ 64-65.  For this reason, it is well-understood in the actuarial community that two actuaries could both use reasonable methods and assumptions, and reach *different*—but still *reasonable*—results.  *Id.*

As a practical matter, a plan document for a defined benefit pension plan cannot provide for a "range" of J&S conversion factors to be used for a particular retiree.  *Id.* ¶ 66.  That is because the plan sponsor must define a particular basis or a particular factor consistent with the requirement that pensions be "definitely determinable."  Rev. Rul. 79-90.  But this does not change the fact that there is a *range* of possible actuarial bases or conversion factors that could be defined by a plan that would be *reasonable*.  *Id.* ¶ 67.

C.  **The undisputed evidence demonstrates that the actuarial factors used to calculate J&S benefits by the Plan are reasonable**.

As a preliminary matter, the IRS repeatedly reviewed the Plan—including the actuarial factors identified in Appendix A—and found the terms to comply with the tax-qualification requirements of the Code.  SOF ¶ 40; I.R.S. Pub. No. 794, Cat. No. 20630M (Nov. 2016), https://www.irs.gov/pub/irs-pdf/p794.pdf; *see also* 26 C.F.R. § 601.201(a)(3).

Defendants' expert, Mr. Terry, provided uncontroverted evidence demonstrating that the Plan's actuarial conversion factors used to convert SLA to 50% J&S annuities are reasonable in the context of Plan-specific demographic experience and current economic conditions.  SOF ¶¶ 69-73, 82.  To reach this conclusion, Mr. Terry reviewed the Plan's statistically credible mortality experience for its union population and created his own mortality table (the "Terry Table") for the

Plan. *Id.* ¶ 69. Applying a current interest rate of 3.5% and the Terry Table, Mr. Terry calculated a reasonable conversion factor for Plaintiff of .8338, which is *less* than the Plan's factor for Plaintiff, .8450. *Id.* ¶¶ 72-73. In short, the current Plan factor for Plaintiff (.8450) is more generous than the reasonable factor Mr. Terry developed independently (.8338) and, as a result, yields a benefit for Plaintiff that is larger ($100.14 per month) than the benefit he would receive using the reasonable factor calculated by Mr. Terry using Plan-specific mortality data and a current interest rate ($98.81 per month). *Id.*

Mr. Terry then repeated the calculation with the interest rate and mortality table identified by Plaintiff's designated expert, Mr. Serota, as the "best estimate"—specifically 4.19% interest and the mortality table used by the Plan for purposes of its financial statements (the "GAAP table"). *Id.* ¶ 74. Using Mr. Serota's "best estimate" assumptions, Plaintiff's factor would be .8389—which would result in a benefit that is less ($99.42 per month) than his current benefit using the Plan's factors ($100.14 per month). *Id.* ¶¶ 46, 75.

Plaintiff has no evidence to dispute Mr. Terry's analysis. Plaintiff's designated expert: (1) admits he did not analyze or opine on the reasonableness of the Plan's actuarial conversion factors (*id.* ¶¶ 78-79); and (2) offers no opinions or testimony controverting Mr. Terry's calculations (*id.* ¶ 82). Therefore, he does not address the key undisputed material facts justifying summary judgment for Defendants on all of Plaintiff's claims.

    **D.** **Plaintiff has no evidence or admissible expert opinion that the actuarial factors used for calculating benefits under the Plan are *un*reasonable.**

Although it is the reasonableness of the factors (which are based in turn on mortality tables and interest rate) that would be subject to any reasonableness requirement, the crux of Plaintiff's Complaint is the Plan's use of the 1971-GAM table is *unreasonable* because it is supposedly "old"

or "outdated" or "antiquated."  Compl. ¶¶ 51, 52, 54, 65, 90.[4]  But Plaintiff has no factual or legal support for this theory.   Indeed, it is beyond dispute that the 1971-GAM table still  is listed as a "standard mortality table" under the regulations (26 C.F.R. § 1.401(a)(4)-12), which  means it is still "considered reasonable" by the Commissioner.  26 C.F.R. § 1.401(a)(4)-3(f)(7).[5]  Absent any further change by the Commissioner, there is no basis for the Court to conclude—that the current list of "standard mortality tables" is "outdated" or "unreasonable."  Based on the regulations, it is not, and there is no reason for the Court to inject its views into this well-regulated area.

Rather, Plaintiff's theory—that increasing life expectancy, in general, should result in larger benefits—is fundamentally wrong because (i) increasing life expectancy of beneficiaries, if reflected in the factors, would result in smaller benefits, and (ii) reduced interest rates, if reflected in the factors, would result in smaller benefits.  SOF ¶¶ 11, 14-15.  Thus, Plaintiff's theory necessarily *requires* an expert opinion that the *factors* are *unreasonable*.

To that end, Plaintiff may proffer the opinion of Mr. Serota,  however, Mr. Serota's opinion is fundamentally unsupported and therefore of no assistance to the trier of fact.  Specifically, in his original expert report ("Original Report"), Mr. Serota opined that the GAAP table is the "best estimate" mortality table.  However, applying: (1) a unisex version of the table Mr. Serota describes as the "best estimate" mortality, and (2) the 4.19% interest rate Mr. Serota describes as a reasonable interest rate, Mr. Terry calculated that Plaintiff's JSA benefit is $99.42, which is

---

[4]  Curiously, Mr. Serota, still uses a mortality table from 1994 for his own defined benefit plan.  SOF ¶ 84.
[5]  This definition of "standard mortality table" expressly grants the Commissioner the authority to change the definition of "standard mortality table" through revenue rulings and notices.  26 C.F.R. § 1.401(a)(4)-12.  This regulation was last updated in 2001.  Nondiscrimination Requirements for Certain Defined Contribution Retirement Plans, 66 Fed. Reg. 34,535, 34,545 (June 29, 2001).

*lower* than the $100.14 benefit he is currently receiving under the terms of the Plan. SOF ¶¶ 46, 75.

Recognizing this problem with his theory, Mr. Serota did not use the "best estimate" GAAP table. Instead, he attempted to use the IRS Applicable Mortality Table which has a 50% male / 50% female blend, despite the fact that the Plan's population is mostly male.[6] However, his calculations were in error, as he actually (and accidentally) used a revised version of the Applicable Mortality Table that assumes a 10% male population.[7] *Thus, all of the numbers in Mr. Serota's Original Report are wrong.*

After Defendants' *counsel* identified these fundamental flaws with his analysis, Mr. Serota amended his expert report (the "Amended Report"). Not surprisingly, Mr. Serota changed his theory entirely. In his Amended Report, Mr. Serota now claims the proper mortality table would be a version of the Applicable Mortality Table with a 71% male population of participants, and a 71% female population of beneficiaries.[8] Mr. Serota acknowledges that his numbers are entirely dependent on the fundamental premise that the Plan's participant ratio is 71% male / 29% female, and the beneficiaries are 71% female.[9] *However, this premise is demonstrably wrong.* The Plan's participant ratio is, in fact, 86% male / 14% female, while the population of participants who elect the J&S form of benefits is 95% male, and the beneficiaries are 95% female. SOF ¶ 83. In this regard, Mr. Serota admitted at his deposition that all of the calculations in his Amended Report would be different if a different male percentage were used, and that he intended to use the male percentage of the Participants (which is 86%, not 71%).[10] *Thus, all of the numbers in Mr. Serota's*

---

[6]    Ex. B, Serota Dep. at 131:5-11; 142:11-143:7.
[7]    Ex. B, Serota Dep. at 139:14-140:15; 142:11-143:7 .
[8]    Ex. B, Serota Dep at 66:5-22; 68:21-69:19; 143:10-144:8.
[9]    Ex. B, Serota Dep at 66:5-22; 68:21-74:3; 143:10-144:8; 158:18-160:4.
[10]    Ex. B, Serota Dep. at 69:20-74:3.

*Amended Report are wrong.*

For these and many other reasons, Defendants intend to move to strike all of Mr. Serota's opinions as inadmissible under Fed. R. Evid. 702, and Mr. Serota's opinions (if proffered by Plaintiff) should be disregarded on summary judgment.[11]  Thus, Plaintiff has no expert testimony to support the primary contention of his Complaint—*i.e.*, that he is not being paid enough.

Even if the Court were to consider the opinions in Mr. Serota's Amended Report, summary judgment in favor of Defendants is still warranted.  While neither ERISA nor the IRC, nor any regulations under ERISA or the IRC, define any specific basis for establishing conversion factors (except in the case of lump sum conversions), Treasury Regulations issued in 2003 and amended in 2006 provide guidance with respect to disclosures that must be provided to Plan participants explaining the relative value of the forms of benefits the participant can elect:

> The relative value of all optional forms of payment that have a present value that is at least 95% of the actuarial present value of the QJSA and no greater than 105% of the actuarial present value of the QJSA is permitted to be described by stating that those optional forms of benefit are approximately equal in value to the QJSA…

26 C.F.R. § 417(a)(3)-1(c)(2)(iii)(C). [12]

> The preamble to the regulation describes its purpose as follows:

> …consolidate the content requirements applicable to explanations of qualified joint and survivor annuities… and provide disclosure requirements that would enable participants to compare the relative values of the available distribution forms using more readily understandable information.

T.D. 9099, 68 Fed. Reg. 70,141 (Dec. 17, 2003).

---

[11]    *See, e.g.*, *Belville v. Ford Motor Co.*, 919 F.3d 224, 228 (4th Cir. 2019) (affirming grant of summary judgment where district court granted *Daubert* motions as to expert opinions that were "critical to the remaining summary judgment issues," and without which plaintiff's theory was "largely hypothetical"); *see also Ruffin v. Shaw Indus.*, 149 F.3d 294, 300 (4th Cir. 1998); *Holmes v. Wing Enters.*, No. 1:08-cv-822, 2009 U.S. Dist. LEXIS 53108, at *22 (E.D. Va. June 23, 2009).
[12]    Plaintiff cites this regulation, but not this particular subsection, in his Complaint ¶¶ 30, 46.

This regulation is deemed to be authoritative guidance in the actuarial community that alternative forms of benefit that are deemed to be within 5% of the value of the single life annuity benefit are deemed to be "approximately equal," where "approximately equal" is used in the context of allowing participants to make informed choices about their benefit options.  SOF ¶ 77.  In other words, this Treasury regulation, considering the variability and uncertainty of individual mortality and other circumstances, defines "approximately equal" to be a plus or minus 5% range.  *Id.*

Plaintiff receives a J&S benefit of $100.14/month.  *Id.* ¶ 46.  In his Amended Report, Mr. Serota contends that the 1971-GAM table is unreasonable, but that a reasonable factor for Plaintiff would result in a benefit of $104.87/month.  Ex. C, Serota Am. Dec. at pp. 28-29.  Even if Mr. Serota's opinions were accepted, for the purposes of this Motion, adopting Mr. Serota's proposed change would result in a difference to Plaintiff of *just 4.5%* per month.[13]  Such a 4.5% difference is not only reasonable but, *as a matter of law*, is considered "approximately equal" in value to his current benefit under the very regulations cited in Plaintiff's Complaint.[14]

IV.    **Plaintiff's specific claims under ERISA fail as a matter of law.**

Plaintiff fails to present a viable legal basis for his claim that the Plan's mortality tables must be "updated."  Further, for the reasons set forth in Defendants' Motion to Dismiss (ECF Nos. 10-11), Plaintiff's specific claims fail under ERISA as a matter of law.  Discovery has confirmed additional reasons why Plaintiff's claims fail.

A.    **There is no evidence of any mistake or fraud to justify reforming the Plan and awarding benefits thereunder.**

Plaintiff seeks "reformation" of the Plan, and benefits under the reformed Plan. *See* Compl.,

---

[13]    The other putative class member used as an example by Mr. Serota has a current benefit that is just 4.7% less than Mr. Serota's proposed new benefit.   Ex. C, Serota Am. Dec. at pp. 28-29.

[14]    Even Plaintiff agrees that $100/month and $106/month are "roughly the same." SOF ¶ 57.

Counts I and II. However, "a court may not reform or alter the terms of a benefit plan in crafting

a remedy for an ERISA violation." *Helton v. AT&T Inc.*, 709 F.3d 343, 360 (4th Cir. 2013) (citing

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877 (2011)). Rather, the equitable remedy of

"reformation" is only available in cases of "mutual mistake" or "fraud." *See. e.g, Cross v. Bragg*,

329 F. App'x 443, 454 (4th Cir. 2009) (the party seeking reformation of an ERISA plan must

"present clear and convincing evidence showing that 'the mistake [was] mutual, or if unilateral, it

[was] accompanied by fraud on the part of the other contracting party.'") (quoting Restatement

(Second) of Contracts § 155 (1979)); *see also Moon v. Bwx Techs., Inc.*, 956 F. Supp. 2d 711, 716

(W.D. Va. 2013) (reformation only available under ERISA § 502(a)(3) on grounds of "(1) mutual

mistake, or (2) unilateral mistake plus fraudulent conduct").[15]

Here, Plaintiff does not suggest—much less assert—there was a *mutual mistake* in drafting

the Plan. Nor could he. The undisputed facts in discovery have confirmed that: (1) the IRS

reviewed the Plan (including the requirements of ERISA that Plaintiff contends were violated) and

issued favorable determination letters as recently as 2016 (*id.* ¶ 40);[16] and (2) the Union, its

lawyers, and its actuaries, reviewed the Plan and *bargained* for greater monthly benefits instead

of a change in mortality tables for survivor benefits (*id.* ¶¶ 41-43). Such facts belie any notion of

"mutual mistake." And Plaintiff affirmatively disclaims any notion of *fraud* or intentional

misrepresentation here. SOF ¶ 54. As such, Plaintiff's claims for "reformation" of the Plan and

---

[15]     Other Circuits are in accord. *See, e.g., Pearce v. Chrysler Grp., LLC Pension Plan*, 893
F.3d 339, 347-49 (6th Cir. 2018); *Amara v. CIGNA Corp.,* 775 F.3d 510, 525-26 (2d Cir. 2014);
*Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 961 (9th Cir. 2014); *Morales v. Intelsat Glob.
Serv. LLC*, 554 F. App'x 4, 5 (D.C. Cir. 2014).
[16]     Obtaining a determination letter from the IRS means that, "in the opinion of the IRS, the
terms of the plan conform to the requirements of [Internal Revenue] Code Section 401(a)" which
contains the qualification requirements, including the requirements of ERISA that Plaintiff
contends were violated. *See irs.gov/pub/irs-pdf/p794.pdf.*

benefits awarded thereunder necessarily fail.

**B.  <u>Neither the Company nor the Committee breached any duty to the participants</u>.**

Plaintiff contends it was a breach of fiduciary duty for the Committee to continue to permit the Plan to use the 1971-GAM table for calculating JSA benefits.  However, it is well-established that ERISA's fiduciary duty rules are not implicated where, as here, the plan sponsor makes a "plan design" (*i.e.*, a settlor) decision regarding "the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft*, 525 U.S. at 444; *see also Lockheed*, 517 U.S. at 891 (indicating that plan design was not subject to fiduciary review but was instead a settlor function); *Johnson v. Ga.-Pac. Corp.,* 19 F.3d 1184, 1188 (7th Cir. 1994) (when "[e]mployers decide who receives pension benefits and in what amounts, select levels of funding, adjust myriad other details of pension plans . . . [they] are no more the employees' 'fiduciaries' than when they decide what wages to offer or whether to close the plant and lay the workers off.") (internal citations omitted).  Here, the *Company*—as plan sponsor—is the entity empowered to amend the terms of the Plan, and only with the written approval and consent of the Union.  SOF ¶¶ 26-27.

It is particularly noteworthy here that the determination and "discretion" regarding actuarial equivalence factors *used to be* a fiduciary function.   *See* Section I, *supra* at pp. 15-16.  But Congress found this regime to be unsuitable, and took such discretion out of the hands of the fiduciaries, and gave it to the plan sponsor to draft into the plan document as a settlor function. *Id.*   Indeed, the Plan documents confirm that the Committee had no such "discretion" under the terms of the Plan.  SOF ¶¶  29-30.  Thus, the Committee simply cannot be liable for any such breach of fiduciary duty.

Indeed, based on the facts adduced in discovery, it is ridiculous to suggest the Committee breached any duty here.  ERISA fiduciaries have an obligation to follow the Plan terms (which

Plaintiff admits they did), unless such terms are inconsistent with ERISA.  29 U.S.C. § 1104(a)(1)(D); *see also In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2010 U.S. Dist. LEXIS 79971, at *32 (W.D.N.C. Aug. 6, 2010) ("fiduciaries are required to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of' ERISA") (citation omitted).   This is not a situation where the terms are plainly inconsistent with ERISA.   It defies all logic that the Union—*assisted by its own legal counsel and actuaries during the bargaining process*—would approve the Plan as currently drafted, if it violated ERISA.  SOF ¶¶ 21-25.

The Committee engaged and relied upon reputable legal and actuarial firms to provide expert advice on such legal and actuarial compliance matters (SOF ¶¶ 25, 70)—which is exactly what plan fiduciaries are supposed to do. *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984) ("ERISA fiduciaries need not become experts. . . [as] they are entitled to rely on the expertise of others.").[17]  There is no evidence the Committee was ever advised by legal counsel that such a change was necessary or required by the law.  Indeed, because the IRS issued favorable determination letters confirming that the terms of the Plan comply with all tax-qualification requirements of the Code, the Committee had no basis to think that any of the Plan's terms violated ERISA.  For all of these reasons, the Committee breached no duty enforcing the express terms of the Plan—which were negotiated by the Union and approved by the IRS.

Plaintiff makes one vague and entirely conclusory allegation against the Company for a supposed failure to "supervise and monitor" the Committee.  Compl. ¶ 92.  However, this is a

---

[17]     *See also Witmeyer v. Kilroy*, 788 F.2d 1021, 1025 (4th Cir. 1986); *King v. Guynn*, No. 91-669, 1992 U.S. Dist. LEXIS 21582, at *34-35 (E.D. Va. July 20, 1992).

derivative claim that falls apart without any underlying breach.  *See In re Constellation Energy Grp., Inc. ERISA Litig.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010).

    **C.  <u>Plaintiff has no reliable evidence of damages to the Plan or its participants</u>.**

    Further, it is well-established that in order to prevail on any breach of fiduciary duty claim, Plaintiff must prove he was harmed by any alleged breach.  *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 220 (4th Cir. 2011) ("the plaintiff bears the burden of at least making a prima facie showing that there was a breach of fiduciary duty and that there was some sort of loss to the Plan").  Once again, Plaintiff has placed all of his eggs in Mr. Serota's basket.  Beyond the many errors throughout his analysis, Mr. Serota's damages assessment is based on demonstrably erroneous, unsupported, and as a result, inadmissible assumptions that cannot create a genuine issue of material fact.  Specifically, he makes assumptions about the participant population that are demonstrably untrue, and admits that all of his numbers would be different if different statistics (*i.e.*, not the wrong ones) were used.  *See supra* at pp. 23-24.  This flawed damages analysis is unreliable and therefore inadmissible and should not be considered.  *Seawell v. Brown*, No. C-1-08-614, 2010 WL 11561287, at *9 (S.D. Ohio Sept. 9, 2010); *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002)*.*  Accordingly, Plaintiff has not carried his burden of proving the essential element of damages.

<u>**CONCLUSION**</u>

    For the reasons set forth above, judgment should be entered for Defendants on all claims.

January 27, 2020                    Respectfully submitted,

                        _____/s/ *Robert W. McFarland*_____
                        Robert W. McFarland (VSB No. 24021)
                        Jeanne E. Noonan (VSB No. 87863)
                        MCGUIREWOODS LLP
                        World Trade Center
                        101 West Main Street, Suite 9000
                        Norfolk, Virginia 23510
                        Telephone: (757) 640-3716
                        Facsimile: (757) 640-3730
                        E-mail: rmcfarland@mcguirewoods.com
                        E-mail: jnoonan@mcguirewoods.com

                        Cari K. Dawson (*pro hac vice*)
                        H. Douglas Hinson (*pro hac vice*)
                        Emily Hootkins (*pro hac vice* pending)
                        ALSTON & BIRD LLP
                        1201 W. Peachtree Street
                        Atlanta, GA 30309
                        Telephone: (404) 881-7000
                        Facsimile: (404) 881-7777
                        E-mail: cari.dawson@alston.com
                        E-mail: doug.hinson@alston.com
                        E-mail: emily.hootkins@alston.com

                        Emily Seymour Costin (*pro hac vice*)
                        David R. Godofsky (*pro hac vice*)
                        ALSTON & BIRD LLP
                        950 F Street, NW
                        Washington, D.C. 20004
                        Telephone (202) 239-3300
                        Facsimile: (202) 239-3333
                        E-mail: emily.costin@alston.com
                        E-mail: david.godofsky@alston.com

                        *Counsel for Defendants Huntington Ingalls Industries,*
                        *Inc. and the HII Administrative Committee*

## CERTIFICATE OF SERVICE

I certify that on this 27th day of January 2020, a true and correct copy of the foregoing was

served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF

system.

        /s/ *Robert W. McFarland*
        Robert W. McFarland (VSB No. 24021)
        Jeanne E. Noonan (VSB No. 87863)
        MCGUIREWOODS LLP
        World Trade Center
        101 West Main Street, Suite 9000
        Norfolk, Virginia 23510
        Telephone: (757) 640-3716
        Facsimile: (757) 640-3730
        E-mail: rmcfarland@mcguirewoods.com
        E-mail: jnoonan@mcguirewoods.com

        Cari K. Dawson (*pro hac vice*)
        H. Douglas Hinson (*pro hac vice*)
        Emily Hootkins (*pro hac vice* pending)
        ALSTON & BIRD LLP
        1201 W. Peachtree Street
        Atlanta, GA 30309
        Telephone: (404) 881-7000
        Facsimile: (404) 881-7777
        E-mail: cari.dawson@alston.com
        E-mail: doug.hinson@alston.com
        E-mail: emily.hootkins@alston.com

        Emily Seymour Costin (*pro hac vice*)
        David R. Godofsky (*pro hac vice*)
        ALSTON & BIRD LLP
        950 F Street, NW
        Washington, D.C. 20004
        Telephone (202) 239-3300
        Facsimile (202) 239-3333
        E-mail: emily.costin@alston.com
        E-mail: david.godofsky@alston.com

        *Counsel for Defendants Huntington Ingalls Industries, Inc.*
        *and the HII Administrative Committee*