## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Roger A. Herndon, on behalf of himself and all others similarly situated, | Civil Action No.: 4:19-cv-00052-HCM-DEM |
| Plaintiff, | |
| vs. | |
| Huntington Ingalls Industries, Inc., the HII Administrative Committee, and John/Jane Does 1–5, | |
| Defendants. | CLASS ACTION |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL
      FACTS ...................................................................................................... 1

III.  ARGUMENT ............................................................................................. 4

      A.    Defendants Cannot Use Actuarial Assumptions That No Longer Reflect Reality . 4

      B.    Defendants Cannot Hide Behind Union Negotiations ............................................ 8

      C.    Defendants' Use of a 40-Year-Old Mortality Table Is Not Reasonable ............... 10

            1.    The Reasonableness of Conversion Factors Cannot Be Determined
                  Without Reference to Actuarial Assumptions .......................................... 10

            2.    Terry's Actuarial Analysis Is Not Credible ............................................. 12

                  a.    Terry's Mortality and Interest Rate Assumptions are
                        Inadmissible ................................................................................. 13

                  b.    Terry's Mortality Table Is Flawed ................................................ 14

                  c.    Terry's Interest Rate Assumptions Are Implausible ..................... 17

            3.    The Plan Does Not Provide Actuarial Equivalence ................................. 20

                  a.    Defendants' Legal Arguments for Disregarding Serota's
                        Report Are Without Merit .............................................................. 20

                  b.    Serota Uses Sound Actuarial Assumptions .................................... 24

      D.    Plaintiff's Legal Claims Do Not Fail .................................................................... 27

            1.    Plaintiff Has a Valid Claim for Reformation of the Plan in Count II ....... 27

            2.    Plaintiff Has a Valid Claim for Breach of Fiduciary Duty ...................... 29

IV.   CONCLUSION ......................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Amara v. CIGNA Corp.,* 775 F.3d 510 (2d Cir. 2014)................................................. 29

*Bakery & Confectionary Union & Industry Int'l Pension Fund v. Just Born II, Inc.,*
    888 F.3d 696 (2018)................................................................................. 9

*Boeing Co. v. United States,* 143 Fed. Cl. 298 (2019)................................................ 28

*Brooklyn Sav. Ank v. O'Neil.,* 324 U.S. 697 (1945). .................................................. 9

*Bruesewitz v. Wyeth LLC,* 562 U.S. 223 (2011). ...................................................... 6

*Central States, Southeast and Southwest Areas Pension Fund v.*
    *Central Transport, Inc.,* 472 U.S. 559 (1985). ...................................... 30

*Cf Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71 (2d Cir. 1998)............................... 30

*CIGNA Corp. v. Amara*, 563 U.S. 421 (2011)........................................................ 28

*Connell Constr. Co., Inc. v. Plumbers & Steamfitters,* 421 U.S. 616 (1975). ................. 9

*Cross v. Bragg,* 329 F. App'x 443 (4th Cir. 2009).................................................... 28

*Cruz v. Raytheon Co.,* No. CV 19-11425-PBS, 2020 WL 254848 (D. Mass. Jan. 17, 2020). . 5, 20

*Esden v. Bank of Boston,* 229 F.3d 154 (2d Cir. 2000)............................................ 8, 9

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014). ...................................... 29

*Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1 (1987)........................................ 9

*Gabriel v. Alaska Elec. Pension Fund,* 773 F.3d 945 (9th Cir. 2014). ......................... 29

*Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v.*
    *Dorado Beach Hotel Corp.,* 617 F.3d 54 (1st Cir. 2010). ......................... 8

*Gruby v. Brady*, 838 F. Supp. 820 (S.D.N.Y. 1993)................................................ 30

*Helton v. AT&T Inc.,* 709 F.3d 343 (4th Cir. 2013)................................................. 28

*Hughs Aircraft Company, et al. v. Stanley I. Jacobson et al.,* 525 U.S. 432 (1999). .......... 9

*Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America,*
325 U.S. 161 (1945)............................................................................................. 9

*Laborers Nat. Pension Fund v. Northern Trust Quantitative Advisors, Inc.,*
173 F.3d 313 (5th Cir. 1999). ........................................................................... 30

*Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739 (2d Cir. 2019)....................................... 28

*Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765 (7th Cir. 2011).................................... 6

*Miller v. CBS Ret. Plan,* No. 12-cv-3697, 2013 WL 864610 (S.D.N.Y. Mar. 7, 2013). .............. 23

*Moon v. BWX Techs., Inc.,* 956 F. Supp. 2d 711 (W.D. Va. 2013). ............................................ 28

*Morales v. Intelsat Glob. Serv. LLC*, 554 F. App'x 4 (D.C. Cir. 2014). ....................................... 29

*Pearce v. Chrysler Grp. LLC Pension Plan,* 893 F.3d 339 (6th Cir. 2018). ............................... 29

*Retirement Committee of DAK Americas LLC v. Brewer*, 867 F.3d 471 (4th Cir. 2017)............ 23

*Reyazuddin v. Montgomery Cty., Maryland,* 789 F.3d 407 (4th Cir. 2015). ..................... 1, 12, 17

*Thomas v. Carmeuse Lime & Stone, Inc.,* No. 7:12-CV-00413-GEC,
2017 WL 1216614 (W.D. Va. Mar. 31, 2017)................................................... 12

*Torkie-Tork v. Wyeth,* 739 F. Supp. 2d 895 (E.D. Va. 2010). ..................................................... 12

*Torres v. American Airlines,* No. 4:18-cv-00983-O, 2019 WL 7756076
(N.D. Tex. Aug. 7, 2019)................................................................................... 21

*UMW of Am. Health & Ret. Funds v. Robinson*, 455 U.S. 562 (1982)......................................... 9

*West v. AK Steel Corp.,* 484 F.3d 395 (6th Cir. 2007)................................................................... 8

*White v. Distribs. Assoc. Warehousemen's Pension Trust*, 751 F.3d 1068 (9th Cir. 1985). .......... 9

**Statutes**

26 U.S.C. § 401(a)(4)................................................................................................................ 21

26 U.S.C. § 401(a)(25).............................................................................................................. 14

26 U.S.C. § 411(a)(7).................................................................................................................. 6

29 U.S.C. § 401(a)(11).............................................................................................................. 22

29 U.S.C. § 417(a) .................................................................................................................... 22

29 U.S.C. § 1002(23)(a).............................................................................................................. 6

29 U.S.C. § 1002(27) ............................................................................... 13

29 U.S.C. § 1053(a) ................................................................................... 5

29 U.S.C. § 1055(a)(1) ............................................................................. 22

29 U.S.C. § 1055(c) .................................................................................. 22

29 U.S.C. § 1055(c)(3)(A)(i) .................................................................... 22

29 U.S.C. § 1104(a)(1)(D) .................................................................... 8, 29

29 U.S.C. § 1132(a)(3) ............................................................................. 28

29 U.S.C. § 1133(a)(3) ............................................................................. 28

**Regulations**

26 C.F.R. § 1.401(a)(4)-3(f)(7) ................................................................ 21

26 C.F.R. § 1.401(a)(4)-12 ....................................................................... 21

26 C.F.R. § 1.401(a)(4)-12 ....................................................................... 21

26 C.F.R. § 1.401(a)-11(b)(2) .................................................................. 16

26 C.F.R. § 1.401(a)-20, Q & A-16 .................................................... 16, 23

26 C.F.R. § 1.411(d)-3 ............................................................................... 7

26 C.F.R. § 1.411(d)-3(a) ........................................................................... 7

26 C.F.R. § 1.411(d)-3(b) ........................................................................... 7

26 C.F.R. § 1.417(a)-20 Q & A-36 .......................................................... 22

26 C.F.R. § 1.417(a)(3)-1(c)(2) ............................................................... 23

26 C.F.R. § 1.417(a)(3)-1(c)(2)(iii) ......................................................... 23

26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B) .................................................... 24

68 Fed. Reg. 70141 ............................................................................. 22, 23

**Other Authorities**

https://www.cdc.gov/nchs/products/databriefs/db355.htm............................................................ 3

Rev. Rul. 81-12, 1981-1 C.B. 228 (1981)................................................................................ 7

Rev. Rul. 79-90, 1979 WL 51516............................................................................................ 10

## I.     Introduction

The Court should deny Defendants' Motion for Summary Judgment (the "Motion") and reject the arguments in Defendants' Memorandum of Law in Support ("Def. Br."), ECF Nos. 53 and 54.  Plaintiff's expert, Dr. Mitchell Serota, testified ***without contradiction*** that the 1971 GAM Mortality Table the Plan uses to calculate actuarial equivalence is outdated, showing significantly higher mortality rates than current mortality tables.  Moreover, Serota demonstrated that the use of this outdated mortality table, in conjunction with a 6% interest rate, resulted in lower monthly retirement benefits for Plaintiff and other plan participants who took their benefits in the form of a Joint and Survivor Annuity.  Defendants' expert, Mr. Thomas Terry, contests this opinion, but the flaws in Terry's analysis are so grave that it should be given little weight if it is admitted at all.  At best, this is a "battle of experts," which provides no basis for summary judgment.  *Reyazuddin v. Montgomery Cty., Maryland,* 789 F.3d 407, 417 (4th Cir. 2015).

Defendants also repeat a host of legal arguments advanced in their Motion to Dismiss.  These arguments have been rejected by other Courts and are not well founded.

## II.     Response to Defendants' Statement of Undisputed Material Facts

In accordance with Local Rule 56(b), the following paragraphs of Defendants' Statement of Material Facts Not in Dispute are disputed.

13.    Contested in part.  Defendants cite paragraph 84 of the Terry Declaration in support of this assertion.  The cited paragraph indicates that an increase in the assumed life expectancy of retirees will generally cause conversion factors to increase for conversions to a joint and survivor annuity ("JSA" or "J&S").  Declaration of Thomas Terry ("Terry Decl."), ¶ 84, attached as Exhibit A to the Declaration of Emily Seymour Costin ("EMS Decl.").

14.    Contested in part.  Defendants cite paragraph 84 of the Terry Declaration in support of this assertion.  The cited paragraph indicates that an increase in the assumed life expectancy of beneficiaries will generally cause conversion factors to decrease for conversions to a joint and survivor annuity.

15.    Contested in part. Defendants cite paragraph 84 of the Terry Declaration in support of this assertion. The cited paragraph indicates that an increase in the interest rate will generally cause conversion factors to decrease for conversions to a joint and survivor annuity.

16.    Contested. Plaintiff's expert testified that decreasing the mortality rates for both participants and beneficiaries simultaneously would in almost every instance increase the conversion factor. Deposition of Mitchell I. Serota, Transcript ("Serota Tr."), EMS Decl. Exh. B, at 65:5–66:1.

17.    Contested. Plaintiff's expert testified that decreasing the mortality rates for both participants and beneficiaries simultaneously would in almost every instance increase the conversion factor. Serota Tr. 65:5–66:1.

18.    Contested in part. Defendants cite paragraph 85 of the Terry Declaration in support of this assertion. The cited paragraph only discusses the impact of simultaneous increases in retiree life expectancy and decreases in interest rates on conversions to a joint and survivor annuity.

19.    Contested. Defendants' claim that "in the context of JSA conversion factors" it is "inappropriate" to "examine any one actuarial ingredient on its own" is disputed and is not supported by the record. Asked if it's reasonable to use any assumptions provided you get to a reasonable conversion factor, Defendant's expert admitted he would not do that, but would instead develop reasonable assumptions based on current economic and demographic conditions. Deposition of Thomas Terry, Transcript ("Terry Tr."), attached to the Declaration of Mark P. Kindall ("MPK Decl.") as Exhibit A, at 79:9–80:14. Terry further testified that, if asked how to comply with the requirement that a QJSA be as valuable as any other optional form of benefit, he would advise using reasonable actuarial assumptions. Terry Tr. 110:18–114:2. Additionally, Serota testified that the appropriateness of a conversion factor can only be determined by the reasonableness of the assumptions used to produce it. Serota Tr. 62:2–63:12; 111:13–112:7.

40.    Incomplete. The IRS determination letter "relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other federal or local statutes." EMS Decl. Exhs. N and O.

42.    Incomplete. The Union Letter demonstrates that in negotiations that covered job classifications, wage increases, health insurance premiums, pension plans and more, the Union was unsuccessful in its effort to get the Company to use current actuarial assumptions.

43.    Incomplete; see paragraph 42.

60.    Irrelevant. The opinion of Defendant's actuarial expert on the legal question of whether a plan amendment would violate the anti-cutback rule is not a "material fact."

61.  Contested.  The most recent data indicate that life expectancy improved in 2018. https://www.cdc.gov/nchs/products/databriefs/db355.htm. Further, Terry admits life expectancy in the U.S. has improved over the past 100 years. Terry Decl. ¶ 61. Since 1971, life expectancy for a 65-year-old has increased significantly.  Amended Declaration of Mitchell I. Serota ("Serota Am. Decl."), EMS Decl. Exh. B, at 11; Rebuttal Declaration of Mitchell I. Serota ("Serota Rebuttal"), EMS Decl. Exh. W, ¶ 13.

68.  Incomplete.  That different, but still reasonable, assumptions could produce outcomes that fall within a range is uncontested; the scope of the range is disputed. Dr. Serota opined that because an annuity is a fixed income instrument, the range is a few basis points. *See, e.g.,* Serota Am. Decl. at 25; Serota Rebuttal ¶ 13, 47.

69.  Contested.  Terry did not look at "***the Plan's*** statistically credible mortality experience for ***its*** union population."  Rather, he looked at data compiled by Ernst & Young ("E&Y") for ***four*** union plans, only one of which was the Plan.  Terry Tr. 168:3–170:12.  If the study had only used data from the Plan, it would not have met the requirements for statistical credibility.  *Id.* at 171:10–172:8. Moreover, even as to all four plans, the experience study only had sufficient numbers for full credibility with respect to the ***male*** population.  *Id.* at 172:9–17.

74.  Contested.  Serota testified that a company's annual audited financial statements must include an estimate of its pension liabilities, reported under GAAP, and that the actuarial assumptions used in these estimates represent the plan actuaries' "best estimate" of appropriate actuarial assumptions at the time the estimate is made. Serota Am. Decl. at 19.  While Terry used the 4.19 percent interest rate from the Plan's 2012 715 Report (which is correct), he did ***not*** use the mortality table from the same report.  Instead, he used the mortality table from a much ***later*** 715 Report, which was based on a 2017 experience study.  *See* Terry Decl. ¶ 173.  Terry also weighted the male to female ratio in the table 95/5, which Serota testified is improper.  Serota Rebuttal ¶¶ 34–35.  Finally, both Terry and Serota agree it would be improper for the Plan to use its GAAP mortality table to calculate actuarial equivalence.  Serota Am. Decl. at 19–22; Terry Decl. ¶¶ 62, 102–04, 107–08.

75.  Contested, for the same reason as paragraph 74.

76.  Contested.  Serota testified that Terry's "plus or minus five percent" standard is not common among actuaries and makes no economic sense.  Serota Rebuttal ¶¶ 13–14.

77.  Contested and Irrelevant.  The "approximately equal" standard in the disclosure regulations is not the same as the "actuarially equivalent" requirement.  Serota Rebuttal ¶ 15.  Terry confirmed that "[a]ctuarial equivalence is not the concept underlying the relative value regulations" and "the relative value regulations do not force actuarial equivalence." Terry Tr. 151:22–152:10; 153:7–11.

78.    Contested. Serota testified that the appropriateness of a conversion factor can only be determined by the reasonableness of the assumptions used to produce it, and the conversion factor is unreasonable if it is the product of unreasonable assumptions. Serota Tr. 62:2–63:12; 111:13–112:7.

79.    Contested, for the same reason as paragraph 78.

80.    Contested. Serota testified that while he could not say exactly when it ceased to be reasonable for the Plan to use the 1971-GAM mortality table, it was not reasonable now, or at any point during the Class Period. Serota Tr. 36:14–37:4; Serota Am. Decl. at 10–11 and 23–24.

81.    Contested for the same reason as paragraph 80. Further, Serota testified "I cannot think of a 40-year-old table that is reasonable." Serota Tr. 37:6–21.

82.    Contested. While Serota did not contest whether Terry's math was correct, Serota contested the interest rates and mortality tables Terry used in his computations. Serota Rebuttal ¶¶ 12, 18–23, 24–42 and 43–52.

84.    Incomplete. As Serota testified, there are only three participants in his Plan, no-one has ever retired from it, and he intends to amend it before anyone does. Serota Tr. 161:1–19.

## III.  <u>ARGUMENT</u>

### A.  Defendants Cannot Use Actuarial Assumptions That No Longer Reflect Reality

Defendants' initial arguments, at pages 15–18 of their brief, merely repeat, in condensed form, their argument in support of their Motion to Dismiss. Plaintiff has addressed these arguments at length in his opposition to that motion ("MTD Opp.", ECF No. 20), which are incorporated herein by reference. In brief:

*First,* Defendants wrongly argue that actuarial assumptions stated in plan documents must remain unchanged in perpetuity (Def. Br. at 15–16). The tax code only requires that actuarial assumptions be stated in plan documents; it "places no constraint whatsoever on an employer's discretion to amend the plan for any reason." *Smith v. Rockwell Automation,* No. 19-C-0505, 2020 WL 620221, * 4 (E.D. Wisc. Jan. 10, 2020) ("*Rockwell*"); *see also* MTD Opp. at 9–10.

Furthermore, ERISA requires alternative benefit forms to be the actuarial equivalent of a single-life annuity ("SLA"), which means that each form of benefit must have the same present value. MTD Opp. at 5–6. The relevant calculation is done when the participant selects benefits immediately prior to retirement. *Id.* at 6; *see also Rockwell,* 2020 WL 620221, at * 7 ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination."). Actuarial assumptions that do not remotely reflect reality as of the date of the calculation defeat the purpose of the requirement. *Rockwell,* 2020 WL 620221, at * 6 ("there is simply no reasonable interpretation of the statutory language under which 'actuarial equivalent' could mean 'actuarial equivalent as of the date the plan adopted its actuarial assumptions.'"); *see also* MTD Opp. at 6–7. Using outdated assumptions could also permit a forfeiture of accrued benefits in violation of the anti-forfeiture provisions in Section 203(a) of ERISA. MTD Opp. at 8. Thus, the actuarial assumptions in the Plan not only **can** be amended, if they cease to be reasonable, they must be. *Id.* at 7–8 (discussing how Defendants' argument would undermine the purpose of requiring actuarial equivalence) (citing cases); *see also Rockwell,* 2020 WL 620221, at * 7 (benefit payments must be calculated with actuarial assumptions that are reasonable at the time the benefit is calculated); *Cruz v. Raytheon Co.,* No. CV 19-11425-PBS, 2020 WL 254848, at *3 (D. Mass. Jan. 17, 2020) ("assessing the "reasonableness" of actuarial assumptions could plausibly include consideration of the age of those assumptions").

***Second,*** Defendants wrongly argue that "the absence of any statutory or regulatory requirement to 'update' the actuarial equivalence factors for the annuity benefits that *are* at issue here, when Congress did require updates to such factors for other benefit forms, is dispositive." Def. Br. at 16. Congress amended ERISA to address specific issues regarding lump sum distributions; the fact that it did not address other annuity forms in the same amendment says

precisely **nothing** about the meaning of the actuarial equivalence when ERISA was adopted.[1]  This

is a case of Defendant "read[ing] too much into congressional silence."  *Michigan v. U.S. Army*

*Corps of Engineers,* 667 F.3d 765, 775–76 (7th Cir. 2011).  As the *Rockwell* court explained,

> [W]hen Congress passed the Retirement Equity Act of 1984, it was
> concerned with a specific problem: employers using unrealistically high
> interest rates to compute lumpsum distributions. . . . Thus, Congress
> legislated with that problem in mind: it adopted a cap on interest rates for
> lump-sum distributions. Congress's adopting this cap without also
> addressing the actuarial assumptions used to calculate annuities does not
> suggest that Congress intended that plans be permitted to use outdated
> actuarial assumptions in connection with annuities. Rather, the most this
> suggests is that, in 1984, Congress did not think that legislation was needed
> to prevent plans from using unrealistic actuarial assumptions when
> converting single life annuities into alternative annuities. Accordingly, this
> provision of the Retirement Equity Act is not relevant to the meaning of the
> term "actuarial equivalent."

*Rockwell,* 2020 WL 620221, at * 5.  Defendants' argument also ignores the many cases that

enforced ERISA's actuarial equivalence rules with respect to lump sum payments **before** ERISA

was amended to specify factors relating to lump sum distributions.  *See* MTD Opp. at 13–14 (citing

cases).  Thus, where Congress has not specified particular actuarial assumptions, but required that

they be "reasonable," courts can, have, and should enforce these laws as written.

    **Third,** Defendants' argument that updating actuarial assumptions would violate ERISA's

anti-cutback rule (Def. Br. at 17) misreads the statute.  This rule does not lock in **formulas** for

determining benefits, it locks in **benefit amounts** accrued as of the date of the amendment.  MTD

Opp. at 10–12.  The "accrued benefit" is a **dollar amount,** "expressed in the form of an annual

benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(a); 26 U.S.C. § 411(a)(7).

---

[1] Defendants' argument is based on "post-enactment legislative history," which the Supreme Court
has noted is a "contradiction in terms" and "not a legitimate tool of statutory interpretation."
*Bruesewitz v. Wyeth LLC,* 562 U.S. 223, 242 (2011)

Thus, a plan amendment cannot reduce the **_dollar amount_** that a participant is entitled to receive **_on the date that the plan amendment occurs_**.[2]

To address the possibility that a plan amendment **_could_** generate a lower dollar value benefit at the time of retirement, plans grandfather existing benefit amounts, ensuring that monthly benefits are calculated as the greater of the dollar value of the accrued benefit at the time of the plan amendment or the accrued benefit under the amended plan as of the date the benefit is calculated. 26 C.F.R. § 1.411(d)-3(a), example 2; _accord, Rockwell,_ 2020 WL 620221, at * 5. Plans can also adopt variable assumptions that automatically track changes in mortality and interest rates; changes resulting from variations in the tracked indexes do not require plan amendment, and thus the anti-cutback rule does not apply. _See_ MTD brief at 11–12 (discussing Rev. Rul. 81-12, 1981-1 C.B. 228 (1981), at Example 2); _see also Rockwell,_ 2020 WL 620221, at * 6.

**_Finally,_** Defendants argue that a court cannot determine that their benefit calculations are unreasonable during the Class Period without pinpointing precisely when their 40-year-old actuarial assumptions became outdated, or how often they should update them. Def. Br. at 18.

---

[2] How this works in practice is spelled out in the regulations. MTD Opp. at 11 (discussing 26 C.F.R. § 1.411(d)-3, 26 C.F.R. § 1.411(d)-3(a), examples 1 and 2, 26 C.F.R. § 1.411(d)-3(b) and Rev. Rul. 81-12, 1981-1 C.B. 228 (1981)). In the context of a plan amendment that changed the assumptions used to convert a single life annuity into an optional form of benefit, a plan administrator would first determine the dollar value of a retiree's single life annuity **_as of the day preceding the effective date of the plan amendment_** and calculate the dollar amount of the optional benefit using the pre-amendment formula. The administrator would then determine the dollar amount of the single life annuity the retiree was entitled to **_as of the date he was going to begin receiving benefits_** and calculate the dollar amount of the optional form using the post-amendment formula. The participant would receive the greater of the two dollar amounts thus calculated. If the dollar amount of the current benefit was higher, the anti-cutback rule would not apply at all, which would be increasingly likely the longer the participant continued to accrue benefits following the amendment. _See Rockwell,_ 2020 WL 620221, at * 6 (noting that the limitations of the anti-cutback rule are only likely to apply if "the participant happens to retire or stop accruing benefits shortly after the amendment is adopted," because, as benefits accrue under the new plan assumptions, "the total payout on the date of retirement under the new assumptions will exceed his accrued benefit as of the date of the plan amendment under the old assumptions").

That is simply wrong. Plaintiff has established that the assumptions are unreasonable throughout the Class Period, which is all that is required. Courts make determinations about reasonableness all the time, as well as assess whether benefits are actuarially equivalent. MTD Opp. at 12–14. They can do so here. *Rockwell,* 2020 WL 620221, at * 7. If, as Plaintiff has demonstrated, Defendants' actuarial assumptions were not reasonable during the entirety of the Class Period that begins in 2013, Defendant is liable. *Id.* It does not matter whether the actuarial assumptions first became unreasonable in 1990, 2000, 2010 or 2012. "As for how often a plan must revisit its assumptions, that will depend on the totality of the circumstances, as does any legal standard based on reasonableness." *Id.*

### B. Defendants Cannot Hide Behind Union Negotiations

Defendants suggest that Plaintiff cannot "unilaterally renegotiate terms of a collectively-bargained for Plan." Def. Br. at 18. The argument is wrong as a matter of law. As numerous courts have held, Plans "cannot contract around" ERISA's statutory requirements. *Esden v. Bank of Boston,* 229 F.3d 154, 173 (2d Cir. 2000) (ERISA quite explicit that plan provisions are "circumscribed by statutory requirements and restrictions" — including actuarial equivalence requirements — and "may only be enforced insofar as they 'are consistent with'" ERISA) (quoting 29 U.S.C. § 1104(a)(1)(D)); *West v. AK Steel Corp.,* 484 F.3d 395, 408 (6th Cir. 2007) (citing *Esden*). In *Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp.,* 617 F.3d 54 (1st Cir. 2010), the court held that an employer's compliance with a collective bargaining agreement could not foreclose plan participants from bringing suit to enforce ERISA's requirements, which were "independent of whatever arrangements private agreements may contemplate." *Id.* at 62 (citing *Hughes Aircraft,* 525 U.S.

432, 442 (1999) and *Esden*).[3]  As the court reasoned, "[w]ere the rule otherwise, parties could elude ERISA's commands by the simple expedient of sharp bargaining.  This result, intolerable in itself, also would frustrate one of ERISA's primary goals: to ensure that covered pension plans provide employees promised retirement benefits."  *Id.*[4]

Defendants essentially admit that happened here.  During the 2017 contract negotiations, the Steelworkers' Union requested that the Plan "[m]odify surviving spouse reduction factors to reflect updated 2014 mortality tables."  EMS Decl. Exh. Q, at HII-0000133725.  But the Union was fighting more than one battle; it had to address issues ranging from wage increases to health insurance premiums to job classifications to pensions.  EMS Decl. Exhs. Q and R.  As the President of the Local explained to his members:

> Budget issues in Washington and uncertainty about future contracts with
> the Navy hung over our heads.  Health care inflation and risk throughout
> the American insurance system affect us as it affects everyone.  Nearly 200
> of our members have been laid-off and know the realities of work at the

---

[3] This is not unique to ERISA.  Collectively bargained labor contracts cannot be used to "deprive employees of their statutory rights."  *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America,* 325 U.S. 161, 165 (1945) (collective bargaining agreement does not relieve employer of obligation to pay overtime); *Brooklyn Sav. Ank v. O'Neil.,* 324 U.S. 697, 707 (1945) ("No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the [FLSA]. We are of the opinion that the same policy consideration which forbid waiver of basic minimum and overtime wages under the act also prohibit waiver of the employee's right to liquidated damages.").  Rather, collective bargaining operates above a floor of other state and federal laws.  *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1 (1987) (state statutes imposing minimum labor standards, such as severance pay, are enforceable even when a collective bargaining agreement does not provide employees severance pay); *Connell Constr. Co., Inc. v. Plumbers & Steamfitters,* 421 U.S. 616 (1975) (NLRA does not supersede federal antitrust laws).

[4] Even the authorities cited by Defendants support the proposition that the terms of collective bargaining agreements cannot supersede ERISA's statutory requirements.  *UMW of Am. Health & Ret. Funds v. Robinson*, 455 U.S. 562, 576 (1982) ("jointly administered employee benefit plans must comply with the detailed and comprehensive standards of the ERISA"); *White v. Distribs. Assoc. Warehousemen's Pension Trust,* 751 F.3d 1068, 1071 (9th Cir. 1985) ("It is, of course, unlawful for an employer and union to reach an agreement that violates applicable federal laws").  *cf, Bakery & Confectionary Union & Industry Int'l Pension Fund v. Just Born II, Inc.,* 888 F.3d 696, 705 (ERISA's statutory requirements are "distinct from the collective bargaining process between an employer and union").

shipyard.   ***It's no surprise that the Company came into bargaining looking to take advantage of us.***

EMS Decl. Exh. R, at HII-0000135042 (emphasis added).  The Union got what they could get, and — as Defendants boast in their motion — they were not able to fix Defendants' suppression of survivor benefits through use of outdated actuarial assumptions.  Def. Br. at 18.  But the Committee can, and must, amend the Plan to conform to the law.  *Id.* at 7, ¶ 29.  Since employees are not required to bargain for what the law already requires, Defendants' contrary argument is frivolous.

### C. Defendants' Use of a 40-Year-Old Mortality Table Is Not Reasonable

Although Defendant's expert did not defend the Plan's 40-year-old mortality table, Defendants argue the "the factors used to calculate J&S benefits by the Plan are objectively reasonable."  Def. Br. at 19.  In fact, the only competent evidence demonstrates that Defendants' actuarial assumptions are ***not*** reasonable.

### 1. The Reasonableness of Conversion Factors Cannot Be Determined Without Reference to Actuarial Assumptions

Defendants argue that their outdated assumptions are permissible so long as the conversion factors are "reasonable."  Def. Br. at 20.  The argument fails as a legal and a factual matter.

From a legal standpoint, Plans can meet the tax code's requirement of being "definitely determinable" by having the retirement plan specify either a table of conversion factors ***or*** actuarial assumptions (which can be either fixed or variable).  Rev. Ruling 79-90, 1979 WL 51516.  The Plan made the latter choice and specified fixed actuarial assumptions.  The reasonableness of these stated assumptions, not the reasonableness of factors not even stated in the Plan, must be assessed.  Serota unequivocally testifies that the Plan's use of the 1971 GAM mortality table is unreasonable (Serota Am. Decl. at 23–24), while Defendant's expert does not even ***offer*** a contrary opinion.  However, Terry did not use the 1971 GAM mortality table, he created the "Terry Table."  Moreover, he did not use the Plan's fixed interest rate assumption of 6%.  Indeed, the Plan's six

percent interest rate was 100 basis points higher than the highest interest rate in the extremely broad range of rates he identified as being "reasonable." Terry Tr. 128:2–7. Thus, while Terry was not asked to opine on the reasonableness of using the 1971 GAM to calculate actuarial equivalence, his opinion necessarily indicates that it was ***not*** reasonable.[5]

Defendant's argument would not even make sense if the Plan ***did*** provide a table of conversion factors rather than fixed actuarial assumptions. As Terry testified, a conversion factor is simply a mathematical calculation based on a participant mortality assumption, a beneficiary mortality assumption, and an interest rate. Terry Tr. 57:19–58:10. It is just a number. Serota testified that the only way to determine whether a conversion factor is "reasonable" is to compare it to a conversion factor that would result from use of reasonable actuarial assumptions. Serota Tr. 62:2–63:12; 111:13–112:7. Unlike arbitrary conversion factors, the reasonableness of actuarial assumptions about mortality and interest rates can be tested against current, real-world data.

While Terry opined at his deposition that a conversion factor could be reasonable in the abstract (Terry Tr. 140:2–14), he admitted that he himself would not take that approach. He testified that he would not simply use any actuarial assumptions, regardless of whether they were reasonable, so long as the conversion factor was "reasonable;" instead, he would develop reasonable assumptions based on current economic and demographic conditions. Terry Tr. 79:9–80:14. Indeed, Terry's report does not even offer an opinion on conversion factors "in the

---

[5] This follows from Terry's opinion that the "reasonable range" for interest rates was no higher than 5%. Terry got results that were close to the Plan's conversion factors by coupling his mortality table with a 3.5% interest rate rather than the Plan's unreasonably high 6% rate. This result could only be achieved if the mortality rates in the 1971 GAM were just as unreasonably high as the Plan's interest rate. If the Terry Table's mortality rates were as high as the mortality rates in the 1971 GAM, his conversion factors would have been much lower than those calculated by the Plan, since (as Defendants admit), a lower interest rate assumption will lower JSA conversion factors if mortality rates are held constant. Def. Br. at 5, ¶ 15. Terry had to manufacture a low interest rate to reverse engineer a conversion factor consistent with the Plan.

abstract," but instead compares the factors generated by the Plan with a set of conversion factors he developed using what he argues (wrongly) are reasonable actuarial assumptions — the same approach Serota takes.[6] Terry further testified that, if asked how to comply with the requirement that a QJSA be as valuable as any other optional form of benefit, he would advise using reasonable actuarial assumptions. Terry Tr. 110:18–114:2.

Defendants' argument that the reasonableness of conversion factors can be determined without reference to reasonable actuarial assumptions is without support. At best — and this would require accepting Terry's opinion that conversion factors can be reasonable "in the abstract" while ignoring both his contrary testimony ***and*** his actual methodology — there would be a conflict between the opinions of Plaintiff's and Defendants' experts. Battles of experts "should not be resolved at summary judgment." *Reyazuddin,* 789 F.3d at 417; *accord, Thomas v. Carmeuse Lime & Stone, Inc.,* No. 7:12-CV-00413-GEC, 2017 WL 1216614, at *7 (W.D. Va. Mar. 31, 2017); *Torkie-Tork v. Wyeth,* 739 F. Supp. 2d 895, 901 (E.D. Va. 2010).

### 2. Terry's Actuarial Analysis Is Not Credible

Defendants' argument that the Plan's actuarial factors are "reasonable in the context of Plan-specific demographic experience and current economic conditions" is based on modeling done by Defendant's expert that is so deeply flawed as to be inadmissible. Plaintiff is, accordingly, filing a *Daubert* motion concurrently with the filing of this Memorandum of Law. Even if the Court elects to admit the study, which it should not, the Court should give it little weight. In no event does it provide grounds for summary judgment.

---

[6] *See* Terry Tr. 146:6-21 (concluding that the plan's conversion factor for plaintiff's benefits was reasonable "because it was very close to the factor I calculated using the Terry Mortality Table and 3 and a half percent interest, which I independently established").

**a. Terry's Mortality and Interest Rate Assumptions are Inadmissible**

The Class Period in this case is May 20, 2013 to the present.  *See* Plaintiff's Motion for Class Certification ECF No. 46, at 1.  All plan participants who retired during that period and selected a JSA at ***any*** time during that almost 7-year period are members of the class.  Mr. Herndon, for example, retired in 2013.  As Terry's report acknowledges, a JSA conversion factor is calculated as the ratio of two "present values."  Terry Decl. ¶ 75.  Under ERISA, a "present value" is the value of a liability — here, the present value of the Plan's obligation to pay a monthly benefit — "adjusted to reflect anticipated events."  ERISA § 3(27), 29 U.S.C. 1002(27).  Herndon, and all members of the class, were entitled to receive a JSA that was actuarially equivalent to an SLA, based on assumptions a reasonable actuary would use ***at the time of the benefit determination.*** *See supra* p. 5.  Terry's analysis is ***irrelevant*** because he based his actuarial assumptions on "conditions as of the fourth quarter of 2019."  Terry Tr. 57:6–18; Terry Decl. ¶ 16.  As explained more fully in Plaintiff's Motion to Exclude the Opinions of Defendants' Expert Thomas Terry, filed concurrently, Terry's analysis is improper because it attempts to judge the reasonableness of benefit calculations made years ago based on data that did not even exist at the time.[7]  And, the analysis is based on 2019 conditions, not the 2013 conditions that apply to Plaintiff's benefits. The mortality assumptions a reasonable actuary might have selected in late 2019, based on 2019 mortality and data and economic conditions, are irrelevant to the case.  Accordingly, the Court

---

[7] For example, in constructing his "Terry Table" for mortality assumptions, Terry used a reference table from the Society of Actuaries that was not available until October of 2014, modified by data from a 2017 experience study by E&Y.  Terry Decl. ¶¶ 94, 173 and App. B, p. 6; Terry Tr. 173:6-16; Serota Rebuttal ¶ 22.  Similarly, Terry's 3.5 percent interest rate was based on the midpoint of the highest and lowest rates shown on several indices Terry selected during the period from 2012 to 2019.  Terry Decl. ¶¶ 152-53; Serota Rebuttal ¶ 48.  Thus, Terry proposes to evaluate whether the conversion factor used to calculate Herndon's benefits in 2013 was reasonable based on data that did not exist at the time.

should disregard Terry's analysis of "reasonable" mortality and interest rate assumptions altogether.

Even if the Court decides to consider Terry's analysis, it should be accorded little weight. Terry's methodology for selecting both mortality and interest rate assumptions is deeply flawed.

### b.  Terry's Mortality Table Is Flawed

Terry did not use a standard mortality table for his analysis, even though the Plan uses a standard table to calculate actuarial equivalence, and has for decades.  As Terry discusses in his report, Huntington Ingalls ("HII") went through a "rigorous" process to have a substitute mortality table, based on an E&Y experience study of participants in the Plan and three other union plans, approved by the IRS for determining minimum funding requirements.  Terry Decl. ¶¶ 98–99.  But Terry did not use HII's substitute mortality table in his analysis either, testifying that it would be improper both because it is not a unisex table, and because it is subject to "employer discretion" and thus would violate IRC § 401(a)(25)'s requirement that benefits be definitely determinable. Terry Decl. ¶¶ 102–03.  Instead, Terry created the "Terry Table." Since Terry used the same data for the Terry Table that E&Y used to construct the unusable HII substitute table, it is just as "subject to employer discretion" as the HII substitute mortality table.  *See* Serota Rebuttal ¶ 18. What constructing his own table permitted Terry to do, however, was to manipulate the data to suggest higher mortality rates than HII's substitute table.   This results-driven exercise, unsurprisingly, helps Defendants.

Terry made improper modifications to the tables E&Y and HII selected through the "rigorous" process Terry discusses.  Terry improperly used a headcount-based mortality table from the Society of Actuaries ("SOA") as his reference table, but headcount-based tables are only appropriate when retirees are receiving the same benefit, such as for health-care plans, not for

pension plans where benefit amounts vary.  Serota Rebuttal ¶ 30.  Terry acknowledged that "it is generally thought to be the case" that using a benefits-adjusted table, rather than a headcount based table, tends to show lower mortality rates."  *Id.* at 181:5–9.  Furthermore, Terry's table did not include a projection scale for mortality improvements.  Serota Rebuttal ¶ 30.  As Terry testified, the IRS requires the inclusion of a mortality improvement scale in order to approve the use of a substitute mortality table for financial reporting.  Terry Tr. 183:15–184:3; *see also* Serota Rebuttal ¶ 38 (noting that ASOP 35, ¶ 3.5.3, directs pension actuaries to incorporate future changes in mortality when selecting a mortality table).  In contrast to the Terry Table, HII's substitute mortality table was benefits weighted ***and*** included a projection scale for mortality improvements.  Serota Rebuttal ¶ 30.  Terry's willingness to omit or modify standard elements of the analysis to favor his client's position demonstrates that his analysis was results-oriented.[8]

These modifications of the data HII submitted to the IRS allowed Terry "to overstate male mortality rates relative to female mortality rates" which "causes conversion factors to drop, which makes it appear that the antiquated assumptions are more favorable than modern ones."  Serota Rebuttal ¶ 32.  As an example, using Terry's assumptions, males in the group had mortality rates that were 11.61% above the RPH-2006 scale for blue-collar workers, but female retirees only show a 3.33% higher mortality rate relative to their blue-collar counterparts.  As Serota notes, "Mr. Terry's analysis never explained the plausibility of the different pattern; he just accepted it because the numbers worked in his favor."  Serota Rebuttal ¶ 31.

Having tweaked the methodology HII presented to the IRS for its "rigorous" review in ways that increase mortality of male retirees relative to females, Terry compounded his error by

---

[8] Terry testified that he made other modifications to the data that were inconsistent with the approach E&Y and HII used in preparing the substitute mortality table, but he couldn't remember what they were.  Terry Tr. 181:22–182:19.

weighting his mortality table for participants 95 percent male and 5 percent female, and weighting his mortality table for beneficiaries 5 percent male and 95 percent female. With a high male percentage in the "retiree" category, a high female percentage in the "beneficiary" category, and a mortality table that artificially decreases male life expectancy relative to female life expectancy, the conversion factor for JSAs necessarily goes down.[9]

Terry did not base his 95/5 ratio on the gender breakdown of participants in the Plan. Instead, he based his male/female ratio only on the subset of participants *who chose JSAs* in the years 2011–2015. Terry Decl. App. B. This implies that the Plan should use different assumptions about male-to-female ratios to calculate the present values of every form of benefit based on how many people "typically" select that benefit. But even Defendants acknowledge that 26 C.F.R. § 1.401(a)-11(b)(2) requires using *consistently applied* actuarial factors. *See,* Defendants' Memorandum in Support of Motion to Dismiss, ECF No. 11, at 4. Furthermore, a QJSA "must be as least as valuable as *any* other optional form of benefit payable under the plan at the same time." 26 C.F.R. § 1.401(a)-20, Q & A-16 (emphasis added). Yet Terry did not even consider the male-to-female ratios of plan participants who selected forms of benefits *other* than the QJSA. Terry Tr. 65:3–66:8. It is not possible to ensure that the present value of the QJSA is at least as high as the present value of *any* other benefit form by applying only the male-to-female ratio of participants who selected to QJSA, which Terry did not deny. Terry Tr. 192–96.

Even though Terry's 95/5 weighting violates the legal requirement of using consistent actuarial assumptions and ensuring the QJSA is at least as valuable as any other plan option, Terry

---

[9] Decreasing life expectancy for retirees causes the conversion factor for JSAs to go down, as does *increasing* beneficiary life expectancy. Def. Br. at 5, ¶¶ 13 and 14. Thus, Terry's manipulation of the HII substitute mortality table ensured that the Terry Table's mortality assumptions for both retirees *and* beneficiaries lowered the JSA conversion factor.

claims it is justified because of "selection effect" — men *choose* to take the JSA option because "males generally are subject to higher mortality than females" and "retirees who have a sense that their health is poorer than average will also tend to find the J&S annuity relatively more attractive than a single life annuity." Terry Decl. ¶ 121. This is pure conjecture and flies in the face of the facts. First, the 50% JSA is the *default* benefit for all married plan participants; "selecting" this benefit form does not even require a decision. Serota Rebuttal ¶ 33. Moreover, the hypothesis that men select a JSA because they think it likely that their spouses will outlive them is contradicted by the fact that over half of those who select a JSA also select a "pop-up" option that pays lower benefits to the retiree upfront, but will increase to full amount of the single-life annuity the retiree could have selected *if their spouse dies first.* Serota Rebuttal ¶¶ 34–35.

The "Terry Table," accordingly, is irrelevant and methodologically flawed. It is inadmissible because it is based on Terry's view of what a reasonable actuary would have selected as a mortality assumption in the final quarter of 2019. Even if Terry had not used data that did not exist during the Class Period, his Table is riddled with methodological flaws. As Terry admitted, in the absence of credible information on Plan-specific mortality experience, standard tables must be used. Terry Decl. ¶ 145. Terry does not do so; Serota does. Even if the Court admitted Terry's analysis of "reasonable" conversion factors based on his "Terry Table," it would need to resolve a "battle of experts," which cannot be done at summary judgment. *Reyazuddin,* 789 F.3d at 417.

### c. Terry's Interest Rate Assumptions Are Implausible

Terry also used a back-of-the envelope, implausible approach to selecting an interest rate. Terry picked a 3.5 percent interest rate simply because it "sits roughly in the middle" of the high and low points of a handful of bonds, rates and indices that Terry cherry-picked, some of which touch a high rate of 5%, while others occasionally hit a low of 1.5 percent, during an eight-year

17

period from 2012 to 2019.  Terry Decl. 152–53; Serota Rebuttal ¶ 48.  Terry's approach is not a reasonable actuarial methodology.  Serota Rebuttal ¶ 48.

First, Terry inappropriately included Treasury Securities in his cherry-picked data, which is the only way that he found *any* interest rate nearly as low as 1.5 percent.  Terry Decl. ¶ 152.  As shown in figure 4 of the Terry Declaration, the IRS Applicable Segment Rate, the selected FTSE rate and the IRS rate all fluctuate in a fairly narrow band between 3.5 percent to 4.5 percent for most of the period from 2012 to 2019.  The Segment Rate in Terry's chart is based on rates for corporate bonds with 5–20 years' maturity; the FTSA rate also is corporate bond index.  Terry Tr. 114:8–116:6.  The high for the IRS rate touched 5 percent in late 2013, and the low for the FTSE rate appears to go just below 3 percent in late 2019.  *Id.*  The 10- and 30- year Treasury rates, on the other hand, are consistently lower, and the 10-year Treasury rate appears to hit 1.5 percent on three occasions over the eight-year period.  *Id.*  The Treasury rates are the lowest because they are considered "risk-free rates," as the federal government is the most credit-worthy issuer of debt in the country.  Terry Tr. 118.  Even though HII is responsible for ensuring that the Plan's pension liabilities are paid (and is liable if the Pension's trust fund runs out for any reason), Terry did not even consider HII's credit worthiness relative to the credit worthiness of the federal government, when he chose to include Treasury rates in his model.  *Id.* at 119:4–21.  While it would be appropriate to include Treasury securities when selecting interest rate assumptions for a federal government retirement plan, it is not appropriate for a corporate plan.  Serota Tr. 108:22–109:8.

In contrast to Terry's back-of-the-envelope approach, when E&Y selected interest rates for the company's GAAP-compliant valuation of the Plan's liabilities by creating an index of high-quality corporate bonds and matched the projected cash flows of the bonds to the projected benefit payments of the Plan.  Terry Tr. 123:4–125:15.  HII tested the reasonableness of E&Y's rates by

18

comparing them to indices published by Willis Towers Watson, Citigroup, Mercer and Milliman. Serota Rebuttal ¶ 47. Terry was not even *familiar* with E&Y's analysis. Terry Tr. 123:4–12. By inappropriately including Treasury rates, Terry substantially expanded the lower bound of his interest rate "range" compared to the reasonable range considered by E&Y and HII to generate a lower conversion factor. Terry's inclusion of the government rates allowed him to "justify" a low rate and reverse engineer a conversion factor consistent with the factors wrongly applied to Plaintiff.

The next step of Terry's analysis was even worse. He selected an interest rate that was "roughly in the middle" of the highest and lowest points of *any* of his cherry-picked interest rates over the entire 8-year period, and applied that "middle" number to benefit calculations during the *entire* class period. Most of the data that Terry relied upon did not exist during earlier portions of the class period, which (as discussed above) is reason enough to exclude Terry's analysis altogether. Even apart from that, however, Terry's selection of a rate that sits "roughly in the middle" of the high and low points of several widely divergent indices does not amount to an "analysis." Serota Rebuttal ¶ 48. "While two actuaries can and do debate which discount rate is correct, to even have such a debate assumes that both actuaries used a reasonable method when selecting their respective rates. Mr. Terry's 'eyeball' approach is not a reasonable actuarial method." *Id.*

If Terry did not want to use the rates that HII itself used, or the Mercer index that tracks those rates, he could have used the rates that HII uses for its relative value disclosures to Plan Participants, which are the same rates the IRS requires to be used for lump-sum benefit calculations. *Id.,* ¶ 49. This is, after all, the information that retirees are supposed to rely upon in selecting their benefits. Instead, Terry picked the high and low points of a handful of different

indexes over the course of eight years, found that the delta between these two points was ***350 basis points,*** and simply split the difference.   The court should place ***no*** weight on this opinion.

### 3.    The Plan Does Not Provide Actuarial Equivalence

Plaintiff's expert has presented an opinion detailing (1) that the 1971 GAM mortality table used by the Plan to calculate alternative forms of benefit was unreasonable throughout the Class Period; and (2) that the Plan's use of this outdated table, in conjunction with the Plan's 6% interest rate, resulted in the calculation of benefits that were less than the actuarial equivalent of an SLA. Defendants present several arguments, which are unsupported in law, fact or both, to induce the Court to ignore these opinions.  But Serota's opinions are credible and more than sufficient to defeat a summary judgment motion.

### a.  Defendants' Legal Arguments for Disregarding Serota's Report Are Without Merit

Amazingly, Defendants claim that Plaintiff has "no factual or legal basis" for suggesting that the use of the 1971 GAM is unreasonable.  Def. Br. at 22–23.  Plaintiff has proffered the testimony of Serota on this very point.  As he explained:

> The 1971 Group Annuity Mortality table, published in 1971, was based on the mortality experience of group insurance and four large deferred annuity contracts from the years 1964 to 1968.  The use of the GAM 71 table is not approved by the Internal Revenue Service as an appropriate mortality assumption for determining liabilities under ERISA.  Nor is it approved by the AICPA as an appropriate mortality assumption for disclosing pension liabilities under ASC 715-30.  In fact, the GAM 71 table has not been used for ERISA funding purposes for years.  That the GAM 71 table is antiquated in not a source of debate.

Serota Am. Decl. at 23–24.  Plaintiff has, moreover, provided ample legal authority for the proposition that actuarial assumptions must be reasonable, and outdated and inaccurate mortality assumptions are not.  MTD Opp. at 4–9; *see also Rockwell,* 2020 WL 620221, at * 7, *Raytheon,* 2020 WL 254848, at *3.  Thus, Plaintiff has a "factual and legal basis" for suggesting that the use

of the 1971 GAM is unreasonable.  Moreover, Defendants' expert did not even offer a contrary

opinion.  Instead, he constructed a new mortality table out of whole cloth.[10]

Defendants' only argument for disregarding Serota's testimony as to the unreasonableness

of using this outdated mortality table is that the "the 1971-GAM table still is listed as a 'standard

mortality table' under the regulations (26 C.F.R. § 1.401(a)(4)-12) . . . ." Def. Br. at 23.  But "the"

regulations they cite have nothing to do with actuarial equivalence or the calculation of alternative

forms of benefits.  This argument has been resoundingly rejected:

> [T]he regulation does not state that the 1971 GAM table is a standard
> mortality table for all purposes. Instead, the regulation applies only to the
> Internal Revenue Code's requirement that pension plans not discriminate in
> favor of highly compensated employees. *See* 26 U.S.C. § 401(a)(4)
> (nondiscrimination requirement); 26 C.F.R. § 1.401(a)(4)-12 (explaining
> that definitions apply to regulations relating to the nondiscrimination
> requirement). The regulation prescribes the use of standard mortality tables
> to ensure that actuarial equivalence is "determined in a uniform manner for
> all employees" during testing for nondiscrimination. *See* 26 C.F.R.
> § 1.401(a)(4)-3(f)(7). For this purpose, it does not matter whether the
> mortality table is up to date; all that matters is that the same table is used to
> compare benefits for all employees. Thus, the Treasury's listing the 1971
> GAM table as a standard mortality table for purposes of testing for
> nondiscrimination does not imply that the Treasury deems the 1971 GAM
> table a reasonable table to use when paying benefits.

*Rockwell,* 2020 WL 620221, at * 9; *accord, Torres v. American Airlines,* No. 4:18-cv-00983-O,

2019 WL 7756076, at * 7 (N.D. Tex. Aug. 7, 2019) (26 C.F.R. § 1.401(a)(4)-12 has "no application

to the ERISA provisions at issue in this matter, which focus on whether employees receive the full

amount of benefits to which they are entitled").[11] *See,* MTD Opp. at 15–16.

---

[10] As noted above, even the "Terry Table" is not as bad as the 1971 GAM.  In order to get results
that were as unfavorable to plan participants as the 1971 GAM, he had to justify using an interest
rate that was ***250 basis points*** lower than the Plan's 6% interest rate.  *See supra* ftn. 5.

[11] In a footnote, Defendants attempt to undercut Serota's view of the 1971 GAM by noting that the
defined benefit plan for Serota's firm uses a mortality table from 1994.  Def. Br. at 23 n.4.
Defendants fail to mention that there are only three participants in Serota's plan and none have

Defendants next argue, again, that it doesn't matter whether the GAM 1971 table is unreasonable; all that matters is whether "the [conversion] *factors* are *unreasonable.*" Def. Br. at 23. Plaintiff has addressed the legal shortcomings of this argument above. *See supra* pp. 10–12. In short, the Plan lists assumptions, not factors, and if these are not reasonable, the Plan is deficient. Moreover, even if the Plan simply listed conversion factors, the reasonableness of those factors can only be judged by the reasonableness of the assumptions on which they are based.

Defendants also argue that the regulations governing disclosure of relative benefit values provide that benefits are "approximately equal" if they are within five percentage points of each other. Def. Br. at 26. Defendants' own expert, however, correctly testified that the disclosure regulations do *not* govern actuarial equivalence, and that actuarial equivalence "is not the concept underlying the relative value regulations." Terry Tr. 152:9–10. Indeed, Terry emphatically testified that "approximately equal" is a "completely different matter" than actuarial equivalence. *Id.* at 159:8–18.

The disclosure regulations only govern the information plans provide to participants and their beneficiaries to assist them in selecting the form of benefit that they prefer.[12] A QJSA "must

---

ever retired. Serota Tr. 160:21–161:9. Thus, there has never been a need to update it. If no-one had ever retired from the HII Plan, there would be no basis for the present suit.

[12] ERISA requires that pension plans pay benefits to married participants as a QJSA unless the participant's spouse consents in writing. ERISA §§ 205(a)(1) and 205(c), 29 U.S.C. §§ 1055(a)(1) and 1055(c). Accordingly, plans must provide a written explanation of the "terms and conditions" of the QJSA and any QOSAs in accordance with regulations prescribed by the Treasury Secretary. ERISA § 205(c)(3)(A)(i), 29 U.S.C. § 1055(c)(3)(A)(i). The Tax Code contains parallel provisions. 29 U.S.C. §§ 401(a)(11) and 417(a). The Treasury Regulations that implement these statutory mandates require that plans provide a written explanation of the relative values of optional benefits. 26 C.F.R § 1.417 (a)-20 Q & A-36. The explanation must contain a "general description" of the "material features of the optional forms of benefit" and "sufficient information to explain the relative values of the optional forms of benefit available under the plan (e.g. the extent to which optional forms are subsidized relative to the normal form of benefit or interest rates used to calculate the optional forms.)" Disclosure of Relative Values of Optional Forms of Benefit, 68 Fed. Reg. 70141 at 42. (Dec. 17, 2003). It must also describe the "'relative value' of

be as least as valuable as any other optional form of benefit payable under the plan at the same time." 26 C.F.R. § 1.401(a)-20, Q & A-16. However, ERISA permits plans to subsidize a QJSA so it is more valuable than an SLA, which creates potential differences in "relative value" between the SLA, the QJSA and other forms of benefit.[13] The Disclosure Regulation requires plans to tell participants the relative value of benefit options which, as a result of subsidies, are ***not*** actuarially equivalent. There were concerns that spouses could not compare alternative distribution forms without professional advice (68 Fed. Reg. 70141 at 41–42), and thus the regulations permit simplified disclosures that "us[e] more readily understandable information" and "without having to make calculations using interest or mortality assumptions." 26 C.F.R. § 1.417(a)(3)-1(c)(2); *see also* 68 Fed. Reg. 70141 at 42. One simplification is grouping benefits that have "approximately equal value" including, where the percentage method is used, options that do not "vary in relative value in comparison to the value of the QJSA by more than 5 percentage points." *Id.; see also* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iii).[14]

---

the optional form of benefit compared to the QJSA" to "give the participant and the spouse a 'numerical comparison' of the relative values between the optional benefit . . . and the value of the QJSA." *Miller v. CBS Ret. Plan,* No. 12-cv-3697, 2013 WL 864610, at *5 (S.D.N.Y. Mar. 7, 2013). The purpose of the explanation is "provide a spouse with a written explanation as to what is being waived" if an alternative form of benefit is being selected. *Id.*

[13] *See* Preamble to Disclosure Regulation, 68 Fed. Reg. 70141 at 41; *see also, Retirement Committee of DAK Americas LLC v. Brewer,* 867 F.3d 471, 483 (4th Cir. 2017) (early retirement subsidy must apply to the QJSA but did not have to apply to the lump-sum option).

[14] The Disclosure Regulation's text and structure confirm that it is not intended to water down the actuarial equivalence requirement. And, the preamble to the Disclosure Regulation says that actuarial equivalence determinations "***must be made using reasonable actuarial assumptions***." 68 Fed. Reg. 70141 at 41 (emphasis added). Moreover, Subpart (c)(2)(iv)(B) provides that, for purposes of making the numerical comparison, optional benefits must be compared with the "QJSA using a single set of interest and mortality assumptions that are reasonable." *Id.* This calculation is distinct from, and antecedent to, the issue of how those values are summarized for plan participants and spouses. A plan must first calculate the present value of each option offered using the same reasonable mortality and interest assumptions. Terry does not dispute this. Terry Tr. 229:15-231:8. After, and only after, those calculations are complete, the Regulations provide several ways to present the data to participants and spouses; the method of disclosure does not

23

As the *Rockwell* court rightly noted, "[f]or purposes of converting annuities, ERISA requires actuarial equivalence, not something that ***approximates*** actuarial equivalence." 2020 WL 620221, at * 7, n.5 (rejecting defendants' claim that a 3.5 percent variance was "actuarial equivalent").[15] The disclosure regulation does not even require plans to use the same actuarial assumptions for purposes of determining whether benefits are "approximately equal" as the plans use to calculate benefits payments. 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B); *see also* Terry Tr. 226:21–227:2. Indeed, this fact saves Defendants from a *per se* violation of law, since they use the Treasury Department's updated actuarial assumptions for lump sum benefits as the basis of their "relative value" disclosures, providing the illusion of actuarial rigor, while in fact the Plan calculates benefits using assumptions that have been out of date for decades. Serota Rebuttal ¶ 21.

Defendants argue that reasonableness is a range, not a point. Def. Br. at 20. Since an annuity is a fixed income instrument, the range is measured in a few basis points. Serota Rebuttal ¶¶ 13, 47. It is not ***1000*** basis points (plus-or-minus 5%), as Defendants suggest.

### b. Serota Uses Sound Actuarial Assumptions

Defendants present several incorrect factual arguments for disregarding Serota's opinions. Defendants first argue that Terry found Plaintiff could not demonstrate any damages if his JSA were calculated using the 4.19 percent interest rate that Serota testified was reasonable, coupled with a unisex version of the "GAAP mortality table." Def. Br. at 23–24. Defendant suggests that this disposes of the claim because Serota testified that the GAAP table was the "best estimate" of mortality. *Id.* There are numerous problems with this argument. First, both Terry and Serota

---

change the underlying relative value calculation (much less the actual amount of the benefit the participant will receive under each option).

[15] *See also, Stephens v. U.S. Airways Group,* 644 F. 3d 437, 439, 442-43 (D.C. Cir. 2011) (0.75% shortfall ($5,043.25/$672,162.79) not actuarially equivalent); *Raytheon,* 2020 WL 254848, at *2, n. 2 (2.79% shortfall not actuarially equivalent).

agreed that the GAAP table **could not** be used for calculation of actuarial equivalence.[16]   More importantly, however, Terry did not even use the right GAAP table.   Serota testified that a company's annual audited financial statements must include an estimate of its pension liabilities, reported under GAAP, and that the actuarial assumptions represent the plan actuaries' "best estimate" at the time the estimate is made.   Serota Am. Decl. at 19.   Although Terry used the **interest rate** from the Plan's GAAP-compliant valuation report for 2012 — the last report prior to Plaintiff's retirement in 2013 — he inexplicably used the mortality table from a much **later** valuation report, based on a **2017** E&Y experience study, which obviously had not even been conducted when Herndon retired.   *See* Terry Decl. ¶ 173.[17]   Far from being an approach that Serota supported, it is irrelevant and inadmissible for the same reason as the Terry Table. Terry also weighted the male to female ratio in the table 95/5, which Serota testified is improper.   Serota Rebuttal ¶¶ 34–35.

Defendants next argue that the Court should disregard Serota's Amended Declaration because it was based on a "changed theory."   Def. Br. at 24.   This is false.   Serota initially intended to use the IRS's applicable mortality table with a 50/50 male female blend, which should be used when there is no credible plan-specific demographic data.[18]   In his Amended Declaration, Serota

---

[16] Terry Decl. ¶¶ 62 (noting that use of the GAAP table would be "inappropriate and illegal"), 102-04, 107-08; Serota Am. Decl. at 19-20.   Terry suggests in a footnote that a unisex version of the GAAP table could be created (Terry Decl. note 6), but does not explain how this would be any less improper, since he opines that use of the GAAP table would **also** violate the definitely determinable benefits rule — an opinion he reaffirmed in his deposition.   Terry Decl. ¶ 108; Terry Tr. 176:13–177:3.

[17] The estimate of the company's pension plan liability in the 2012 10-K report used the 2013 IRS mortality table, which was based on the RP 2000 table with a mortality improvement scale projected to 2013.   *See* Huntington Ingalls Industries, Inc., December 31, 2012 Proposed FAS Assumptions Final Year End Reporting, HII- 0000005922, at 5924, MPK Decl. Exh. B.

[18] As Defendants point out, the original calculations inadvertently used a different ratio.   This error was corrected prior to Serota's deposition and Defendants suffered no prejudice.   Correcting an

used a 71/29 male to female blend based on data in the 2014 E&Y experience study he reviewed after filing his original report because (a) the IRS permits modifications to the Applicable Mortality Table if they are supported by specific demographic circumstances; (b) the E&Y experience study provided some support for the higher, 71 percent, male participant rate; and (c) using the higher male-to-female blend for retirees gave HII the "benefit of the doubt." Serota Am. Decl. at 26. Using the 71/29 blend, rather than the Applicable Mortality Tables' baseline of 50/50, decreased conversion factors and thus damages. Plaintiff did not change his "theory;" he simply adjusted the male/female blend in Defendant's favor based on his review of additional data.

Defendants finally argue that this change was not sufficient, and that use of the 71/29 ratio was incorrect because "in fact," the E&Y study showed that the male to female ratio for plan participants was *only* was 86/14 rather than 71/29. Def. Br. at 24. However, Defendants received a clarification on this point from E&Y after Serota filed his report, and only showed it to him at his deposition. *See* Serota Tr. 83:22–84:10 (Defendant's counsel explains that the information hadn't been produced because it was generated after Serota filed his report). In an email, E&Y states that the 71,308 persons included in the E&Y mortality study included beneficiaries as well as plan participants, noting that "the original documentation does not explicitly indicate this." MPK Decl. Exh. C, at 1.[19] Indeed, the original E&Y report suggested just the opposite. The study states that the percentage of men in the "blue collar" data set is 71 percent overall, and the data overview indicates that data set represents "the *annuitant participant* data by year of study," not "the annuitant participant *and beneficiary* data by year of study." E&Y Report, HII-0000011551,

_____

error in a calculation prior to an expert's deposition scarcely constitutes grounds for throwing out an opinion.

[19] The attachment to the email is the same one that Defendants have provided together with a declaration from Ms. Brewer authenticating it. *See* EMS Decl. Exh. Y.

at HII0000011602-03 (emphasis added).  In essence, Defendants argue that the Court should throw out Serota's opinion because he used a male/female ratio for his table that was expressly indicated in the E&Y report, which E&Y has subsequently revised.  Defendants should not be allowed to claim a failure of proof because Plaintiff's expert relied on language in the E&Y report that E&Y did not walk back until after his report was filed.

Serota testified that the proper methodology for determining whether, and to what extent, plan participants have been injured is to compare the benefits that they are receiving, which were based on the actuarial assumptions in the Plan, to the benefits they would be receiving if the benefits had been calculated with actuarial assumptions that were reasonable as of the date their benefits were calculated.  *See, e.g.,* Serota Am. Decl. at 31–32.  The male/female blend is simply one input on a spreadsheet, and it can be changed with a few keystrokes to reflect E&Y's confirmation that the correct ratio, based on its experience study, is 86/14.  While making this change lowers damages relative to the calculation using a 71/29 split, it does not make them disappear.  *See* Supplemental Declaration of Mitchell I. Serota ("Serota Supp. Decl."), MPK Exh. D, ¶¶ 9–10.  Accordingly, contrary to Defendants' argument, Plaintiff *does* have credible evidence of injury and damages.

### D.  Plaintiff's Legal Claims Do Not Fail

The final section of Defendants' Brief repeats more of the legal arguments from their Motion to Dismiss briefing.  For the reasons set forth in Plaintiff's objection to that motion, and amplified below, these arguments are without merit.

### 1.     Plaintiff Has a Valid Claim for Reformation of the Plan in Count II

Defendants argue that the equitable remedy of reformation cannot be used to correct an ERISA violation unless there is evidence of "mutual mistake" or "fraud."  Def. Br. at 27.  The Second Circuit forcefully rejected this contention, finding that "fraud, mutual mistake, or *terms*

27

*violative of ERISA* [are] independent bases that justify the equitable remedy of reformation under § 502(a)(3)." *Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739, 748 (2d Cir. 2019) (internal quotations omitted; emphasis in original). The plain language of ERISA Section 503(a)(3) authorizes participants to obtain equitable relief to redress violations of ERISA, reformation is a traditional equitable remedy, and the Supreme Court has held that courts are to be guided by "'equitable principles, as modified by the obligations and injuries identified by ERISA itself'" in crafting remedies under Section 503(a)(3). *Id.* (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 445 (2011)). Moreover, the *Laurent* court noted that the result Defendants are advocating here, "that even where employees prove an ERISA violation, they have no remedy — is inconsistent with the "maxim of equity . . . that '[e]quity suffers not a right to be without a remedy.'" *Id.* (quoting *Amara,* 563 U.S. at 440).[20]

Defendants' cases do not hold otherwise. Defendants cite language from *Helton v. AT&T Inc.,* 709 F.3d 343, 360 (4th Cir. 2013) that "a court may not reform or alter the terms of a benefit plan in crafting a remedy for an ERISA violation" (Def. Br. at 27), but omit the introductory clause of the sentence — "Finally, AT&T argues". *Helton,* 709 F.3d at 360. The cited language did not reflect the Court's holding or even its reasoning; it was a contention of one of the parties. Nor did the *Helton* court address AT&T's contention, because it found that the district court's remedy had not *involved* reformation. *Id.* Defendants' reliance on *Cross v. Bragg,* 329 F. App'x 443, 449 (4th Cir. 2009), *Moon v. BWX Techs., Inc.,* 956 F. Supp. 2d 711, 716 (W.D. Va. 2013), *aff'd and*

---

[20] Even outside of the ERISA context, courts permit reformation of contracts that contain illegal terms. *See, e.g., Boeing Co. v. United States,* 143 Fed. Cl. 298, 312 (2019); *GHS Health Maint. Org., Inc. v. United States,* 76 Fed. Cl. 339, 376 (2007), *aff'd,* 536 F.3d 1293 (Fed. Cir. 2008); *Kleinberg v. Radian Grp., Inc.,* No. 01CIV.9295(RMB)(GWG), 2002 WL 31422884, at *8 (S.D.N.Y. Oct. 29, 2002), *report and recommendation adopted,* 240 F. Supp. 2d 260 (S.D.N.Y. 2002); *Johnson Mgmt. Grp. CFC, Inc. v. Martinez,* 308 F.3d 1245, 1260 (Fed. Cir. 2002).

*remanded,* 577 F. App'x 224 (4th Cir. 2014), *Amara v. CIGNA Corp.,* 775 F.3d 510, 532 (2d Cir. 2014), *Pearce v. Chrysler Grp. LLC Pension Plan,* 893 F.3d 339, 348 (6th Cir. 2018), *Gabriel v. Alaska Elec. Pension Fund,* 773 F.3d 945, 952–53 (9th Cir. 2014) and *Morales v. Intelsat Glob. Serv. LLC,* 554 F. App'x 4, 5 (D.C. Cir. 2014) is similarly misplaced.  None of the cases involved plan terms that violated ERISA; at most, they involved claims that plan administrators should be estopped from enforcing plan terms because of misleading representations made about them.[21]

## 2.    Plaintiff Has a Valid Claim for Breach of Fiduciary Duty

Defendants wrongly argue that neither the company nor the members of the Committee can be liable for a breach of fiduciary duty because they paid the benefits in accordance with the terms of the Plan, and — they claim — the terms of the Plan are not "plainly inconsistent with ERISA."  Def. Br. at 28–29.  ERISA requires fiduciaries to discharge their duties in accordance with plan documents only "insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D). As the U.S. Supreme Court has made clear, "the duty of prudence trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014). Where the Plan document is inconsistent with ERISA, the fiduciary is obligated to exercise fiduciary discretion and either not follow the Plan, or amend it. *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 472

---

[21] Even if Defendants were correct that reformation requires a showing of "fraud" or "mistake" (which they are not) the meaning of those terms is considerably broader than Defendants suggest, as discussed in detail in one of the cases Defendants themselves cite.  "'Fraud . . . in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another . . . .'" *Pearce,* 893 F.3d at 348 (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963)).  The allegations in this case clearly cover an "act" which "involves a breach of legal duty" — the duty to provide actuarially equivalent benefits — that is injurious to Plaintiff and the class. *See* MTD Opp. at 21-23.

U.S. 559, 568 (1985); *Laborers Nat. Pension Fund v. Northern Trust Quantitative Advisors, Inc.,* 173 F.3d 313, 322 (5th Cir. 1999).

Plaintiff's claim is not, as Defendants suggest, that Defendants violated their fiduciary duties in making individual calculations (for which it did not have discretion), but, rather, that they violated their fiduciary obligations to ignore or amend a Plan provision violative of ERISA. *Cf Krumme v. WestPoint Stevens Inc*., 143 F.3d 71 (2d Cir. 1998) (assumptions at the creation of the Plan can be amended). Where the question is whether the Plan's benefit levels set forth in the "governing plan documents are excessive, the . . . Defendants may not avoid their fiduciary duties to Members by hiding behind documents which are inconsistent with ERISA" and are subject to claims "for breach of fiduciary duties." *Gruby v. Brady*, 838 F. Supp. 820, 829 (S.D.N.Y. 1993); cited with approval by *Laborers Nat. Pension Fund v. Northern Trust Quantitative Advisors, Inc*., 173 F.3d 313, 322 (5th Cir. 1999).[22]

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the motion should be denied and the case should go to trial on the merits.

Dated: February 14, 2020                              Respectfully submitted,


                                                      <u>/s/ Gregory Y. Porter</u>
                                                      **BAILEY & GLASSER LLP**
                                                      Gregory Y. Porter (VSB # 40408)
                                                      1055 Thomas Jefferson Street, NW, Suite 540
                                                      Washington, DC 20007
                                                      Tel: (202) 463-2101
                                                      Fax: (202) 463-2103
                                                      Email: gporter@baileyglasser.com

---

[22] Defendants' suggestion that IRS determination letters somehow insulate it from ERISA liability ignores the very language of those letters, which expressly note that the IRS determination "relates only to the status of your plan under the Internal Revenue Code.  It is not a determination regarding the effect of other federal or local statutes."  Def. Exhs. N and O, ECF Nos. 55-3 and 55-4.

Mark G. Boyko (to be admitted *pro hac vice*)
**BAILEY & GLASSER LLP**
8012 Bonhomme Avenue, Suite 300
Clayton, MO 63105
Tel: (202) 463-2101
Fax:(202) 463-2103
mboyko@baileyglasser.com

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (to be admitted *pro hac vice*)
Mark P. Kindall (to be admitted *pro hac vice*)
Seth R. Klein (to be admitted *pro hac vice*)
Douglas P. Needham
Oren Faircloth
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  sklein@ikrlaw.com
Email:  dneedham@ikrlaw.com
Email:  ofaircloth@ikrlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 14, 2020, I caused a copy of the foregoing to be electronically filed through this Court's CM/ECF system.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

_/s/ Gregory Y. Porter_____
  Gregory Y. Porter