**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| ROGER A. HERNDON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:19-CV-00052-HCM-DEM |
| | ) |
| HUNTINGTON INGALLS INDUSTRIES, | ) |
| INC. AND THE HII ADMINISTRATIVE | ) |
| COMMITTEE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**<u>REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## INTRODUCTION

Plaintiff brought this lawsuit because he thought he would receive *more* money if Defendants changed or "updated" the mortality table used to calculate his JSA benefit.  But that belief is demonstrably untrue.  The undisputed facts confirmed in discovery demonstrate that the assumptions used by the Plan[1] (the 1971-GAM mortality tables with a 6% interest rate) to convert the benefit actually result in *higher* benefits for Plaintiff, and the class he represents, than using Plan-specific demographic experience and current interest rates.  And Plaintiff has no competent evidence the Plan's conversion factors are *unreasonable* because his "expert" provides no opinion that the factors themselves are unreasonable.  Thus, Plaintiff's entire theory crumbles, and Defendants are entitled to judgment as a matter of law.

## REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants respectfully submit the following replies in support of the material facts disputed in Plaintiff's Opposition (ECF No. 64 (hereinafter, "Opposition" or "Opp.")).  For the reasons stated below, none of Plaintiff's disputes create  a genuine issue of material fact.

- Facts 13-15, and 18: Plaintiff disputes these facts "in part," but does not cite any evidence that contradicts these facts.  Opp. at 1-2.  Instead, Plaintiff's response simply restates these facts.  *Id.*  Furthermore, Serota admitted facts 13-15 during his deposition.  ECF No. 54-3, Serota Dep. at 63:13-64:5.  Accordingly, facts 13-15 and 18 should be deemed admitted.  Finally, Plaintiff's characterization of paragraph 85 of the Terry Declaration is wrong.  The document speaks for itself in this regard.

- Facts 16-17: The evidence cited by Plaintiff does not contradict these facts.  Opp. at 2.  Instead, as Plaintiff's disputes make clear, even Plaintiff's expert admits that decreasing the mortality rates for both participants and beneficiaries would not, in every instance, increase the conversion factor.  *Id.* (citing Serota Dep. at 65:5-66:1).  Accordingly, facts 16-17 should be deemed admitted.

- Fact 19: Plaintiff claims this fact "is not supported by the record."  Opp. at 2.  However, fact 19 is supported—word for word—by the Declaration of Thomas Terry.  ECF No. 54-2, Ter. Dec. ¶ 86.  Accordingly, fact 19 should be deemed admitted.  Plaintiff's non-

---

[1]      Capitalized terms have the same meaning ascribed in the Memorandum of Law in Support of Defendants' Motion for Summary Judgment (ECF No. 54, "Memorandum" or "Mem.").

responsive comments regarding deposition testimony of Messrs. Terry and Serota should not be considered by the Court.  Furthermore, fact 19 is supported by the Complaint and Serota's reports.  *See, e.g.,* Compl. ¶ 3; ECF No. 54-4, Serota Am. Dec. at p. 18.

- Fact 40: The evidence cited by Plaintiff does not contradict this fact.  Opp. at 2.  Instead, Plaintiff simply adds an additional non-material fact regarding the favorable determination letters received for the Plan.  *Id.*[2]  Accordingly, fact 40 should be deemed admitted.

- Facts 42-43: The evidence cited by Plaintiff does not contradict these facts.  Opp. at 2.  Instead, Plaintiff's non-responsive argument regarding the Union Letter (ECF No. 55-7) should not be considered by the Court.  The document speaks for itself in this regard.  Accordingly, facts 42-43 should be deemed admitted.

- Fact 60: Plaintiff fails to show how this fact is not material.  Serota's opinions depend on his use of the "Applicable Mortality Table" under ERISA § 205(g) (Mem. at 24), and Terry's opinion in fact 60 is that the IRS would consider an amendment to the Plan to use this table as violating the anti-cutback rule in IRC § 411(d)(6) (ECF No. 54-2, Ter. Dec. ¶ 64).  Thus, this fact shows the irrelevance and unreliability of Serota's opinions.  Accordingly, fact 60 should be deemed admitted.

- Fact 61: Plaintiff relies on data available after submission of Terry's declaration to argue that "life expectancy improved in 2018."  Opp. at 3.  However, Plaintiff does not dispute that the three most recent years of data available at the time of Terry's declaration show life expectancy decreasing, as stated in fact 61.  Thus, there is no dispute that life expectancy decreased in 2015, 2016, and 2017.  Further, Plaintiff's non-responsive argument regarding life expectancy over the past 100 years and since 1971 should not be considered by the Court.

- Fact 68: Plaintiff expressly admits that "different, but still reasonable, assumptions could produce outcomes that fall within a range" and merely contests "the scope of the range."  Opp. at 3.  Accordingly, fact 68 should be deemed admitted.  Further, Plaintiff's non-responsive argument regarding Serota's opinions on the scope of the range should not be considered by the Court.

- Fact 69: Plaintiff does not actually contest this fact, which states that that the Terry Table was created from mortality experience data for HII's "union population."  *See also* ECF No. 54-2, Ter. Dec. ¶ 146; Opp. at 3.  Thus, the evidence cited supports this fact.  Mem. at 12.  Accordingly, fact 69 should be deemed admitted.

- Fact 74-75: The evidence cited by Plaintiff does not contradict these facts.  Opp. at 3.  Instead, Plaintiff simply misstates additional facts.  *Id.*  Terry used the 4.19% interest rate

---

[2]     The additional fact is non-material because, while IRS determination letters relate "only to the status of [the Plan] under the Internal Revenue Code" (Opp. at 2), such Code sections include the requirements of ERISA that Plaintiff contends were violated.  *See* irs.gov/pub/irs-pdf/p794.pdf.  Accordingly, Plaintiff's argument that the determination letter "is not a determination regarding the effect of other federal or local statutes" (Opp. at 2) is irrelevant and a red herring.

"because that is the rate that Mr. Serota selected." ECF No. 54-2, Ter. Dec. ¶ 161. Further, the GAAP Table used by Terry "was developed directly from the 2012 to 2016 mortality experience study conducted by Ernst & Young in 2017" for HII. *Id.* at ¶ 173. Plaintiff's non-responsive argument regarding Terry's and Serota's opinions should not be considered by the Court. Accordingly, facts 74-75 should be deemed admitted.

- <u>Fact 76</u>: Serota's opinions are not admissible for the reasons stated in the concurrently filed motion to exclude. Thus, Plaintiff does not cite any admissible evidence that contradicts this fact. Accordingly, fact 76 should be deemed admitted.

- <u>Fact 77</u>: The evidence cited by Plaintiff does not contradict this fact. Opp. at 3. Instead, Plaintiff simply makes a *different* argument regarding the significance of the fact. *Id.* Toward that end, Terry's deposition testimony is taken out of context (*see, e.g.,* ECF No. 65-1, Terry Dep. at 151:5-165:21) and Serota's opinions are not admissible for the reasons stated in the concurrently filed motion to exclude. Further, this fact is relevant for its analysis of the regulation providing guidance on "approximately equal" in the context of disclosures comparing benefit options. Accordingly, fact 77 should be deemed admitted.

- <u>Fact 78</u>: The evidence cited by Plaintiff does not contradict this fact or support Plaintiff's dispute. Opp. at 4 (citing ECF No. 54-3, Serota Dep. at 62:2-63:12; 111:13-112:7). Serota clearly testified that he did not render an opinion as to the reasonableness of the Plan's conversion factors. *E.g., id.* at 62:9-14 (answering "I don't believe I did" in response to question whether "you rendered an opinion as to the reasonableness of the conversion factors themselves, as opposed to the reasonableness of the inputs"); 111:13-112:7 ("… a conversion factor being reasonable or not is nothing that I'm looking at…"). Accordingly, fact 78 should be deemed admitted.

- <u>Fact 79</u>: Plaintiff's dispute to fact 78 is not relevant to fact 79. Opp. at 4. The evidence cited by Defendants clearly supports fact 79 (Mem. at 13 (citing ECF No. 54-3, Serota Dep. at 63:8-12)), and Plaintiff does not cite any evidence that contradicts this fact. Accordingly, fact 79 should be deemed admitted.

- <u>Facts 80-81</u>: The evidence cited by Plaintiff does not contradict these facts. Opp. at 4. Plaintiff's non-responsive argument regarding different opinions of Serota should not be considered by the Court. As stated in fact 81, Serota expressly declined to opine that all 40-year-old mortality tables would necessarily be unreasonable. ECF No. 54-3, Serota Dep. 37:6-21. Accordingly, facts 80-81 should be deemed admitted.

- <u>Fact 82</u>: Plaintiff admits that "Serota did not contest whether Terry's math was correct." Opp. at 4. Plaintiff's non-responsive argument regarding different opinions of Serota should not be considered by the Court. Accordingly, fact 82 should be deemed admitted.

- <u>Fact 84</u>: The evidence cited by Plaintiff does not contradict this fact. Opp. at 4. Instead, Plaintiff simply adds additional non-material facts regarding Serota's defined benefit plan. *Id.* Accordingly, fact 84 should be deemed admitted.

## **ARGUMENT**

I.   **There is no legal requirement under ERISA to "update" actuarial assumptions specified in a plan document.[3]**

*First,* Plaintiff does not, and cannot, point to any provision of ERISA that requires plan sponsors to "update" actuarial assumptions specified in a plan document.  Opp. at 4-8.[4]  As explained in Defendants' Memorandum, the plain text of ERISA does not require updates to the conversion factor and/or actuarial assumptions used to calculate actuarial equivalence for the benefits at issue here.  Mem. at 15-18.  Instead, Congress made clear that such actuarial factors must be put in the plan document, and expressly "precluded" future employer "discretion" with regard to such factors.  26 U.S.C. § 401(a)(25).  Requiring these factors to be put in the plan document and remain unchanged gives participants the certainty and comfort that they will receive the contractually defined benefit they expect, and prohibits employers from later manipulating that contractual promise.  *Brengettsy v. LTV Steel Hourly Pension Plan*, 241 F.3d 609, 612 (7th Cir. 2001) ("The Internal Revenue Code does not require that the defined benefit be fixed, but only that it be determinable according to criteria specified in advance that do not permit the plan to play favorites.");  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 206-207 (2d Cir. 2007) ("The

---

[3]      Plaintiff cites several out-of-circuit decisions from district courts denying motions to dismiss in similar cases.  *E.g.,* Opp. at 4-5.  However, these decisions were issued during the liberal pleading stage and, in any event, are non-precedential.  Similarly, Judge Morgan's recent denial of the motion to dismiss in this case does not prevent the Court from deciding these issues on summary judgment.  *See, e.g., Burice v. Nationstar Mortg. LLC*, No. 3:14cv837, 2016 U.S. Dist. LEXIS 105104, at *17 (E.D. Va. Aug. 9, 2016) ("[I]t is well settled that the 'denial of a motion to dismiss remains subject to reconsideration until the Court enters final judgment in the case.'") (quoting *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 523 (E.D. Va. 2013)).  In fact, the foregoing decisions conflict with the Second Circuit's decision in *McCarthy v. Dun & Bradstreet Corp.*—which was decided on summary judgment.  482 F3d 184, 206 (2d Cir. 2007).

[4]      Plaintiff argues, without supporting authority, that "[u]sing outdated assumptions could also permit a forfeiture of accrued benefits in violation of the anti-forfeiture provisions in Section 203(a) of ERISA."  Opp. at 5.  Plaintiff does not (and cannot) cite any provision in Section 203(a) of ERISA that has allegedly been violated in this case.

court recognizes the concern expressed in the relevant provisions of Title 26, Title 29, and the related regulations, that employers should not be able to manipulate actuarial assumptions to their benefit and to the detriment of employees."); *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013). Thus, judgment should be entered for Defendants because, as a matter of law, ERISA does not require actuarial conversion factors to be "updated" once drafted into the plan document.

**Second**, Plaintiff disregards the fact that Congress imposed specific requirements to update the actuarial equivalence factors for lump sums, while not imposing any similar requirements for JSA benefits. Opp. at 5-6. Toward that end, Plaintiff's reliance on *Smith v. Rockwell Automation, Inc.*—a motion to dismiss ruling—is not persuasive. Opp. at 5-6. In *Rockwell*, the district court completely disregarded the legislative history of ERISA, in particular, the amendments to ERISA through the Retirement Equity Act of 1984, finding Congress' past actions and inactions irrelevant to the court's analysis. No. 19-C-0505, 2020 U.S. Dist. LEXIS 22406, at *13 (E.D. Wis. Feb. 10, 2020). The court's reasoning is contrary to the long line of Supreme Court precedent that Congress' actions (and inactions) are significant and dispositive. Mem. at 15-17. This is particularly true with respect to ERISA. The Supreme Court has repeatedly observed that ERISA is a "comprehensive and reticulated statute," and has been loath to interfere with Congressional action, or inaction, with respect to that statute. *See, e.g., Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251 (1993); *Great-West Life & Annuity Ins. Co. v. Knudson et al.*, 534 U.S. 204, 217 (2001) ("It is . . . not our job to find reasons for what Congress has plainly done; it *is* our job to avoid rendering what Congress has plainly done. . . devoid of reason and effect."). Moreover, *Rockwell* directly conflicts with the Second Circuit's opinion in *McCarthy v. Dun & Bradstreet Corp.*, which *did* properly account for the legislative history Defendants cited and acknowledged that *nothing* in ERISA requires an employer to "periodically adjust" the actuarial assumptions at issue. 482 F.3d

at 206.  The Second Circuit's analysis in that regard is more persuasive.

*Third*, Plaintiff incorrectly contends that the law requires a plan to constantly reevaluate its factors, and conduct a present value calculation every time "a participant selects benefits immediately prior to retirement."  Opp. at 5.  Because the Plan covers thousands of participants, and interest rates are constantly in flux, Plaintiff's proposed rule would effectively require that the Plan's actuarial assumptions be updated, or at least reevaluated, *constantly*.  Plaintiff's contention presents a classic game of *heads I win, tails you lose*.  A change in one direction increases the JSA benefit amount, which must then be preserved when there is a change in the other direction. Plaintiff's novel theory would be an administrative and practical nightmare, and would discourage employers from ever offering such benefit plans in the first place.  *See Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

Plaintiff then dismisses the impact of the anti-cutback rule on such a  requirement.  Opp. at 6-7.  If there were a requirement for plan sponsors to change factors constantly (as Plaintiff advocates), the factors could only be adjusted *upward*, consistent with the anti-cutback rule in ERISA and the IRC.  *See* 29 U.S.C. § 1054(g); 26 U.S.C. § 411(d)(6)(B)(ii); 26 C.F.R. § 1.411(d). There is no indication Congress intended such an extraordinary result.  Indeed, when combined with the anti-cutback rule, Plaintiff's requirement would produce *unreasonable* results as interest rates rise and fall.  For example, suppose the interest rate increased to 10% and then went back down to 5%.  Each participant's JSA benefit would be stuck at the dollar amount determined using the 10% interest rate, even though that would no longer be "reasonable."  A participant with an accrued benefit of $1,000 per month might start with a JSA factor of .85, and a JSA benefit of $850, at the 5% interest rate.  When the interest rate goes up to 10%, the accrued JSA benefit for this participant would increase to $900 under Plaintiff's theory.  Then, when the interest rate falls

again to 5%, that participant's "reasonable" JSA benefit should again be $850, but it will not be— it will be stuck at $900, due to the anti-cutback rule.  Even though the resulting factor—.9—is no longer "reasonable," it will be compelled by the anti-cutback rule.[5]

*Finally*, Plaintiff dismisses the fact that he does not even attempt to identify *when* the 1971-GAM table supposedly became outdated, *when* Defendants should have changed it in the Plan, or *how often* Defendants should have updated it.  And his expert refused to do so either.  SOF ¶¶ 78-81.  Instead, Plaintiff simply claims that "[i]t does not matter whether the actuarial assumptions first became unreasonable in 1990, 2000, 2010 or 2012."  Opp. at 8.  As explained in Defendants' Memorandum, this only highlights the fundamental flaw in Plaintiff's theory.  Mem. at 17-18.  In enacting the requirement to annually update actuarial assumptions for lump sums, but not annuities, Congress demonstrated that development of such a detailed system is a legislative matter.  And Congress has amended that system three times since it was put in place in 1984, demonstrating *both* that it is capable of filling in gaps and fixing problems, *and* that it does not need or expect the judiciary to take on that task.[6]  Plaintiff offers no compelling reason why this

---

[5]    Plaintiff suggests that this problem could be solved by adopting "variable assumptions that automatically track changes in mortality and interest rates."  Opp. at 7.  However, Plaintiff has cited no case, regulation, provision of ERISA, or legally viable theory that requires a variable set of actuarial assumptions.  And, Plaintiff has not alleged that, at the time the actuarial assumptions were entered in the Plan, there was a mortality table that was periodically updated.  Furthermore, implementation of variable actuarial assumptions would require a grandfathering provision, locking in the current assumptions, due to the anti-cutback rule.  Accordingly, from time to time, when the grandfathering rule applied, the actuarial assumptions would again be unreasonable by Plaintiff's definition.  Thus, Plaintiff's "solution" is of no help to Defendants or other employers.

[6]    *See e.g.*, Retirement Equity Act of 1984, Pub. L. No. 98-397, § 203(b), 98 Stat. 1426, 1441 (codified as 26 U.S.C. § 417 (1984)); Tax Reform Act of 1986, Pub. L. No. 99-514, § 1139(b)-(c), 100 Stat. 2085, 2487-2488 (1986); Retirement Protection Act of 1994, Pub. L. No. 103-465, §§ 751(a)(7), 761(a)(7), 767(a)(2), 767(c)(2), 108 Stat. 4809, 5015-5016, 5028, 5038-5039 (1994); Pension Protection Act of 2006, Pub. L. No. 109-280, §§ 102, 112, 302, 120 Stat. 780, 797-798, 800, 834-837, 920-921 (2006).

Court (or any court) should assume this legislative function, and the Court should grant Defendants' Motion for Summary Judgment.

## II.   Plaintiff should not be permitted to unilaterally renegotiate terms of a collectively bargained Plan.

Plaintiff discounts the fact that his Union made a deliberate choice on behalf of its membership to keep the 1971-GAM table in the Plan in exchange for receiving increased minimum monthly benefits. Opp. at 8-10; Mem. at 18-19. Plaintiff cites a line of cases, none of which are applicable here.[7] Both *Esden* and *West* involve factually distinguishable "whipsaw calculations" for cash balance plans that were *not* collectively bargained. For example, *Esden* simply held that where a plan has an account balance, and the plan provides that certain credits to the account balance will be no less than 5.5% per year, it is unreasonable to assume those credits will be only 4%. 229 F.3d at 167 n.18. *Gastronomical Workers Union Local 610* stands for the rather unremarkable conclusion that parties cannot elude ERISA's minimum funding requirements by contracting for less in employer contributions than required by ERISA. 617 F.3d at 62.

Plaintiff's argument relies entirely on proving that it was illegal for Defendants to use the 1971-GAM table. Opp. at 8-10. For the reasons discussed herein and in Defendants' Memorandum, that argument is incorrect and should be rejected.

## III.   The conversion factor used to calculate JSA benefits under the Plan provides an actuarially equivalent benefit.

As Plaintiff concedes, "Plans can meet the tax code's requirement of being 'definitely determinable' by having the retirement plan specify either a table of conversion factors *or* actuarial assumptions (which can be fixed or variable)." Opp. at 10 (citing Rev. Ruling 75-90, 1979 WL

---

[7]   Opp. at 8-10 (citing *Esden v. Bank of Boston*, 229 F.3d 154, 173 (2d Cir. 2000); *West v. AK Steel Corp.*, 484 F.3d 395, 408 (6th Cir. 2007); *Gastronomical Workers Union Local 610 v. Dorado Beach Hotel Corp.*, 617 F.3d 54 (1st Cir. 2010). Plaintiff also cites a string of non-ERISA cases that are wholly inapplicable. Opp. 9 at n.3.

51516).  Plaintiff has also previously admitted that it is the conversion *factors*—*i.e.*, the combined result of both mortality and interest rate—that would be subject to any reasonableness requirement. *See* ECF No. 20, Pls.' Opp. to Mot. to Dismiss at p. 17 n.14 ("Plaintiff's claim is not simply that 'old mortality tables are bad' . . . but rather that the 'conversion factor' resulting from the Plan's use of an old mortality table, coupled with its use of a 6% interest rate, harms participants who select Non-SLA Annuities."); *see also id.* at 1 ("[E]quivalence must be determined using reasonable actuarial assumptions (or at the very least, that the combined assumptions produce a reasonable result.")); 26 C.F.R. § 1.401(a)-11(b)(2) (actuarial "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*. . .") (emphasis added).

Although Plaintiff now attempts to argue that "[t]he reasonableness of these stated assumptions [mortality table and interest rate], not the reasonableness of factors" is the relevant inquiry, there is no legal support for such line drawing.  Opp. at 10.  Indeed, Plaintiff's theory— that increasing life expectancy, in general, should result in larger benefits—is fundamentally wrong because (i) increasing life expectancy of beneficiaries, if reflected in the factors, would result in smaller benefits, and (ii) reduced interest rates, if reflected in the factors, would result in smaller benefits.  SOF ¶¶ 11, 14-15.  Thus, Plaintiff's theory necessarily *requires* an expert opinion that the *factors* are *unreasonable*.  Regardless, the 1971-GAM table is still listed as a "standard mortality table" under the regulations (26 C.F.R. § 1.401(a)(4)-12), and is still "considered reasonable" by the Commissioner for certain non-discrimination testing purposes (26 C.F.R. § 1.401(a)(4)-3(f)(7)).  Absent any further change by the Commissioner, there is no basis for this Court to conclude that the 1971-GAM table is "outdated" or "unreasonable" just because of its

age.[8]

Plaintiff's sole focus on the 1971-GAM table (while acknowledging that the Plan's 6% interest rate is "unreasonably high" (Opp. at 11 n.5)) likely stems from his recognition that the Plan's conversion factor—which is actually used to calculate the JSA benefits at issue—is unquestionably reasonable.  As Plaintiff acknowledges, "the only way to determine whether a conversion factor is 'reasonable' is to compare it to a conversion factor that would result from use of reasonable actuarial assumptions."  Opp. at 11.  ***This is exactly what Defendants' expert, Thomas Terry, did.***  Terry compared the Plan's conversion factor against conversion factors determined from multiple, different reasonable mortality tables created from mortality experience data for participants of HII's union plans (including the Plan) and employed a reasonable range of interest rates.  ECF No. 54-2, Ter. Dec. ¶¶ 160-169.  Thus, Terry ran multiple reasonable calculations, all of which confirmed that the Plan's conversion factor is well within a reasonable range.[9]  *Id.;* Mem. at 21-22.

---

[8]     This definition of "standard mortality table" expressly grants the Commissioner the authority to change the definition of "standard mortality table" through revenue rulings and notices.  26 C.F.R. § 1.401(a)(4)-12.  Although this definition was last updated by the Commissioner in 2001, it expressly does *not* include reference to the 1994 GAR or the RP-2000. Nondiscrimination Requirements for Certain Defined Contribution Retirement Plans, 66 Fed. Reg. 34,535, 34,545 (June 29, 2001).  And it has not been updated since to incorporate reference to the RP-2014.  Thus, even the Commissioner of the IRS does not take the position that "newly published" mortality tables by the SOA render the older ones "outdated" or "unreasonable."

[9]     Plaintiff does not (and cannot) dispute that reasonableness is a range, not a point. *McCarthy,* 482 F.3d at 203 ("We conclude, as did the district court, that the regulations do not specify a rate or range of discount rates that qualify as 'reasonable actuarial reductions' for payment of early retirement benefits."); *see also Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.,* 888 F.3d 696, 706 (4th Cir. 2018) ("[r]easonableness is a zone, not a point") (quoting *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund,* 971 F.2d 1346, 1351 (7th Cir. 1992)); ECF No. 73, Motion to Dismiss Order at p. 7 ("reasonableness is a range, not a point").  Indeed, actuaries understand that there is not just one single, "correct" assumption about the future; rather, there will often be a range of reasonable methods and assumptions.  SOF ¶¶ 64-65.  For this reason, it is well-understood in the actuarial community that

Plaintiff claims that there is a "battle of experts" that should not be resolved at summary judgment (Opp. at 12), but there is no real battle. Plaintiff's expert (Mitchell Serota) should be excluded for the reasons stated in the concurrently filed motion to exclude. Accordingly, Serota's opinions are not admissible and do not create an issue of fact.

## IV.   Plaintiff's criticisms of Defendants' expert (Terry) are misplaced and unsupported.

Plaintiff devotes over seven pages of his Opposition to misplaced and unsupported criticisms of Defendants' expert (Thomas Terry). Opp. at 12-20. Separately, Plaintiff moves to exclude Terry's opinions (only *in part*). ECF Nos. 61-62. Defendants will address Plaintiff's motion to exclude in their forthcoming opposition, due by March 20, 2020. *See* ECF No. 74. However, in short, Plaintiff's criticisms of Terry's calculations are wholly inconsistent with his own theories for this case and should be rejected.

### A.   The Terry Table and GAAP Table are appropriate comparisons for purposes of confirming the reasonableness of the Plan's conversion factor.

Plaintiff criticizes Terry for using the Terry Table and GAAP Table (which Serota describes as the actuary's "best estimate" of Plan mortality) because these mortality tables are based on current mortality experience data (rather than only data in existence at the time of Plaintiff's retirement in September 2013). Opp. at 13-14. However, Plaintiff's whole theory for this case is that the Plan's mortality tables are *outdated due to the passage of time due to improvements in mortality*. Compl. ¶¶ 51, 52, 54, 65, 90. If, as Plaintiff claims, mortality tables continue to get "better" for participants over time, then how can Plaintiff disclaim Terry's use of currently updated mortality tables? And, how could the Plan's factors be *reasonable* in 2019, but *outdated due to the passage of time* six years earlier? Further, both the Terry Table and GAAP

---

two actuaries could both use reasonable methods and assumptions, and reach *different*—but still *reasonable*—results. *Id.*; *see also* ASOP # 1 § 2.10.

Table are based on mortality experience data from 2012 to 2016.  ECF No. 54-2, Ter. Dec. ¶ 173. Plaintiff's retirement in September 2013 is in the middle of that range, and thus the data accurately reflects the Plan's mortality when Plaintiff retired.  SOF ¶ 45.  While neither the Terry Table nor GAAP Table could have been used back when Plaintiff retired in September 2013, it is entirely permissible to use those tables *today* to determine whether the conversion factor used to calculate Plaintiff's JSA benefit was reasonable at that time—which these tables confirm in the affirmative.

Plaintiff's additional criticisms are similarly unfounded.  For example, Plaintiff criticizes the 95% male and 5% female participant ratio used by Terry.  Opp. at 15-17 and 25.  However, as Plaintiff admits, this ratio reflects "participants ***who chose JSAs*** in the years 2011-2015."  Opp. at 16.  Plaintiff's suggestion that there is something illegal or improper in using the actual ratio of participants who selected a JSA is belied by generally accepted opinions in the actuarial community.  Indeed, this exact methodology is endorsed by the Gray Book,[10] which Plaintiff's expert admits was a "new fact" learned during his deposition that may cause him to "reconsider" his criticisms of Terry's methodology.  ECF No. 54-3, Serota Dep. at 166:1-20.[11]  Thus, the Terry Table—which is based on actual selections by Plan participants—is a reasonable methodology and not "pure conjecture" as Plaintiff suggests.  Opp. at 17.

---

[10]     As explained by Serota, "the Gray Book is answers from the Internal Revenue Service for issues that have been brought up by enrolled actuaries that they are confused and would like some guidance, and the questions are published and the answers are published in the Gray Book."  ECF No. 54-3, Serota Dep. at 149:18-150:1.  Serota admits the authors of the Gray Book are qualified actuaries whose "opinions carry weight in the profession."  *Id.* at 149:8-152:10.

[11]     Plaintiff also criticizes Terry for not "consider[ing] the male-to-female ratios of plan participants who selected forms of benefits ***other*** than the QJSA."  Opp. at 16.  However, both parties' experts appropriately focused their calculations only on the JSA benefits at issue in this lawsuit.  *See, e.g.,* ECF No. 54-4, Serota Am. Dec. at 6 n.4 (acknowledging "I have not been asked to calculate the damages associated with" Certain and Life Annuity option).

Similarly unavailing is Plaintiff's criticism of Terry for not relying on the substitute mortality table approved by the IRS for determining minimum funding requirements. Opp. at 14. Terry did calculate Herndon's JSA benefit using the substitute mortality table at various interest rates, showing a range of results from slightly less than Herndon's current benefit to slightly more. ECF No. 54-2, Ter. Dec. ¶ 170 (figure 10.).  When combined with the results from the GAAP Table (the "best estimate" according to Serota) and the Terry Table, Terry's calculations show that the Plan's factor for Herndon falls within a range of reasonableness.  And, it is entirely disingenuous for Plaintiff to complain that Terry failed to use the substitute mortality table when, not only did Terry show those results, but Plaintiff's own expert, Serota, didn't even mention it in his reports (undoubtedly because it would have shown little or no damages).

Further, as Plaintiff admits, "Terry used the same data for the Terry Table that E&Y used to construct the unusable HII substitute table" (Opp. at 14), and thus Terry appropriately relied on the "rigorous" work to obtain a substitute mortality table while creating a unisex table in compliance with legal requirements.  Contrary to being a "results-driven exercise", the Terry Table simply reflects the Plan's actual mortality experience as well as participants' actual election choices with respect to the JSA.  There is nothing improper about relying on the Plan's actual data to assess the reasonableness of the Plan's conversion factor.  Terry has done exactly this—and his analysis confirms that the Plan's conversion factor is reasonable as a matter of law and fact.  *See also* Mem. at 19-26.[12]

---

[12]     Plaintiff also criticizes Terry's use of a headcount-based mortality table and lack of a projection scale.  Opp. at 14-15.  However, there was nothing improper with these decisions. Indeed, Plaintiff's expert likewise used a headcount-based mortality table in creating his version of the Applicable Mortality Table with a 71% male population of participants.  ECF No. 54-3, Serota Dep. 92:18-93:4.  Furthermore, Plaintiff does not (and cannot) argue that that using a projection scale would increase Terry's calculations beyond what Herndon is already receiving.

**B. Terry used appropriate interest rates for purposes of confirming the reasonableness of the Plan's conversion factor.**

Plaintiff also criticizes the 3.5% interest rate used in certain of Terry's calculations, but notably does not criticize Terry's alternative calculations using a 4.19% interest rate. Opp. at 17-20. Indeed, Plaintiff cannot criticize the 4.19% interest rate "because that is the rate that Mr. Serota selected." ECF No. 54-2, Ter. Dec. ¶ 161. Further, Plaintiff's criticisms of the 3.5% rate are unfounded.

As explained by Terry, his "methodology for this [3.5%] rate was to look at the array of rates that [he] believe[d] actuaries would generally pick or consider to be reasonable and [his] attempt was to find a rate that was comfortably within that range." ECF No. 65-1, Terry Dep. at 121:14-21; *see also id.* at 129:18-130:6 ("My purpose in selecting the 3.5 was to come up with an illustrative rate that was representative of what I believe to be the array of possible reasonable rates that actuaries could use in determining or coming up with a reasonable interest rate."). Plaintiff does not, and cannot, point to any admissible evidence or authority disputing this methodology. Indeed, Terry's methodology for selecting the 3.5% interest rate from a range of reasonable interest rates comports with the accepted principle that reasonableness is a range. *See, e.g., McCarthy*, 482 F.3d at 203 *Bakery & Confectionary Union & Indus. Int'l Pension Fund,* 888 F.3d at 706.

Furthermore, Terry reasonably considered a variety of interest rates in calculating this reasonable range. ECF No. 54-2, Ter. Dec. ¶¶ 151-157. Toward that end, there was nothing impermissible with including Treasury Securities among the rates he considered and Plaintiff has not offered any admissible evidence to the contrary. Opp. at 18-19. Indeed, "when U.S. pension

---

In fact, adding a projection scale to the GAAP Table increases Herndon's monthly benefit from $98.51 to $98.52 (using 3.5% interest rate) or from $99.42 to $99.47 (using 4.19% interest rate), both of which are still lower than the Plan benefit that he is currently receiving of $100.14. Second Supplemental Declaration of Thomas A. Terry ¶¶ 3-5, attached hereto as Exhibit A.

actuaries consider current interest rates, they frequently look to the rates on U.S. high-quality bonds, including both corporate and Treasuries." ECF No. 54-2, Ter. Dec. ¶ 152. And Plaintiff's expert admitted that it would be reasonable to use an interest rate somewhere between the 30-year treasury rate and the 10-year treasury rate. ECF No. 54-3, Serota Dep. at 45:4-49:19. As of December 31, 2012, these interests rates were 1.78% and 2.95%—both of which are worse for Herndon than Terry's interest rate of 3.5%.[13] Thus, the rates of Treasury Securities were reasonably considered by Terry—along with a variety of other rates—in calculating a reasonable range of interest rates for purposes of considering the Plan's conversion factor in this case.[14]

Most significantly, the 3.5% interest rate is not critical to Defendants' case or Terry's analysis. Instead, the Plan's conversion factor remains reasonable whether judged against the lowest or highest (1.5% or 5%) interest rates across the reasonable range identified by Terry. ECF No. 54-2, Ter. Dec. ¶¶ 160-169. Furthermore, the Plan's conversion factor is also reasonable when judged against the 4.19% interest rate endorsed by Plaintiff's expert (which Plaintiff does not criticize). *See id.* at ¶ 161; Opp. at 17-20. Thus, while Terry's 3.5% interest rate is fully supported, his alternative calculations provide undisputed evidence that the Plan's conversion factor is reasonable as a matter of law and fact. *See also* Mem. at 19-26.

**V.**     **Plaintiff has no evidence or admissible expert opinion that the actuarial factors used for calculating benefits under the Plan are *un*reasonable.**

As made clear from Plaintiff's Opposition, Plaintiff has placed all of his eggs in Serota's basket. However, calculations using Serota's endorsed assumptions confirm that the Plan's

---

[13]     https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView .aspx?data=yieldYear&year=2012

[14]     Plaintiff vaguely suggests that Treasury Securities are inappropriate for purposes of this case because of HII's creditworthiness compared to the creditworthiness of the federal government. Opp. at 18. However, there is no evidence to suggest that HII's credit worthiness is at risk, and Herndon's Plan benefit is guaranteed by the Pension Benefit Guaranty Corporation in any event. *See, e.g.,* https://www.pbgc.gov/wr/benefits/guaranteed-benefits.

conversion factor is reasonable.  Specifically, applying: (1) a unisex version of the table Serota describes as the actuary's "best estimate" mortality, and (2) the 4.19% interest rate Serota describes as a reasonable interest rate, Terry calculated that Plaintiff's JSA benefit is $99.42, which is *lower* than the $100.14 benefit he is currently receiving under the terms of the Plan.  SOF ¶¶ 46, 75. Plaintiff's criticisms of such calculations are unfounded for the reasons discussed above.  *See* supra at Section IV.

While the reasons mandating exclusion of Serota's opinions are more fully addressed in the concurrently filed motion to exclude, Plaintiff's Opposition does nothing to save the opinions. First, Plaintiff falsely contends that Serota has not actually changed his theory for this case.  Opp. at 25.  In fact, Serota has issued multiple expert reports with ever-changing theories regarding the mortality table that he believes should be used for purposes of this case.  Indeed, Plaintiff acknowledges that "Serota initially intended to use the IRS's applicable mortality table with a 50/50 male female blend" but "inadvertently used a different ratio" (90 female/10 male).  Opp. at 25 n.18.  In his Amended Declaration, Serota "used a 71/29 male to female blend" and has now changed that again to a 86/14 male to female blend in a Supplemental Declaration.  Opp. at 26-27. These moving target opinions are precisely the type of unreliable opinions that should be rejected under *Daubert*.  *See, e.g., In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*, No. 1785, 2009 U.S. Dist. LEXIS 83849, at *43 (D.S.C. Aug. 26, 2009) ("Dr. Cohen's changing opinions, and willingness to abandon or qualify her opinions when faced with further facts, undermines the reliability of her opinions."); *Nucor Corp. v. Bell*, 251 F.R.D. 191, 200 (D.S.C. 2008) ("When an expert arrives at his final theories only because the opposing party's expert discredits all previous theories (resulting in an ad hoc trial-and-error method of analysis), a court should rightly be concerned with the reliability of the final theories as well.").

Second, Serota does not opine on the reasonableness of the Plan's conversion factor—the key issue in this case. *See, e.g.,* ECF No. 54-3, Serota Dep. 62:9-14, 111:22-112:7.[15]   Indeed, Serota admits that he has not investigated whether there could be a reasonable set of actuarial assumptions that would produce the same conversion factor for Plaintiff as the Plan's conversion factor.   ECF No. 54-3, Serota Dep. at 63:8-12.   Serota's failure to opine on the Plan's conversion factor renders his opinions irrelevant and unhelpful.   For these and many other reasons, Serota's opinions are inadmissible under Fed. R. Evid. 702, and should be disregarded on summary judgment.[16]   Thus, Plaintiff has no expert testimony to support the primary contention of his Complaint—*i.e.,* that he is not being paid enough.

Even if Serota's opinions are not disregarded, summary judgment should still be granted in Defendants' favor.   In his latest report, Serota contends that "reasonable assumptions" would produce a $104.23 JSA benefit for Plaintiff (compared to the $100.14 JSA benefit that he is currently receiving).   ECF No. 65-4, Serota 2d. Am. Dec. ¶ 9.   This is a difference of less than 4.1%.   Even Plaintiff agrees that $100/month and $106/month are "roughly the same" (SOF ¶ 57)—a bigger difference than calculated by Serota.   Less than a 4.1% difference is not only

---

[15]   Instead, Serota only opines regarding the reasonableness of the Plan's mortality tables. However, such opinions are incomplete and thus similarly irrelevant. Serota admits that he does not know when the 71-GAM table allegedly became unreasonable. ECF No. 54-3, Serota Dep. 35:3-17; 36:17-37:4. Serota also admits that more than one mortality table may qualify as a "best practice." *Id.* at 131:20-24-132:3. Given Serota's failure to offer opinions or testimony controverting the calculations of Defendants' expert, Thomas Terry, these admissions are fatal to Serota's opinions. *See generall*y ECF No. 55-12, Serota Rebuttal Dec.

[16]   *See, e.g.*, *Belville v. Ford Motor Co.*, 919 F.3d 224, 228 (4th Cir. 2019) (affirming grant of summary judgment where district court granted *Daubert* motions as to expert opinions that were "critical to the remaining summary judgment issues," and without which plaintiff's theory was "largely hypothetical"); *see also Ruffin v. Shaw Indus.*, 149 F.3d 294, 300 (4th Cir. 1998); *Holmes v. Wing Enters.*, No. 1:08-cv-822, 2009 U.S. Dist. LEXIS 53108, at *22 (E.D. Va. June 23, 2009).

reasonable, but is considered "approximately equal" under the very regulations cited in Plaintiff's

Complaint.  *See* Mem. at 25-26.[17]

## VI.   **Plaintiff's specific claims under ERISA fail as a matter of law.**

### A.   **Plaintiff's reformation claim fails.**

Plaintiff relies on the Second Circuit's decision in *Laurent v. PricewaterhouseCoopers*

*LLP* to argue that reformation is not limited to cases of "mutual mistake" or "fraud."  Opp. at 27-

29.   However, that Second Circuit decision is contrary to on-point authority from the Fourth

Circuit.  Mem. at 27 (citing *Cross v. Bragg*, 329 F. App'x 443 (4th Cir. 2009)).[18]  Plaintiff does

not cite any Fourth Circuit authority expanding reformation in ERISA cases beyond the limited

cases of mutual mistake or fraud.[19]

Toward that end, Plaintiff's Opposition does not attempt to argue that there was mutual

mistake, nor can he argue fraud.  Opp. at 27-29; Mem. at 27.  Plaintiff expressly disclaimed fraud

or intentional misrepresentation in his deposition testimony.  SOF ¶ 54.  Absent fraud, the relief

sought by Plaintiff  (an award of money damages for benefits that were allegedly underpaid),

---

[17]       While Plaintiff seeks to distinguish such "disclosure regulations [as] only govern[ing] the
information plans provide to participants and beneficiaries to assist them in selecting the form of
benefit that they prefer" (Opp. at 22), such regulations establish what the IRS considers as
approximately equal.   Further, this regulation is deemed to be authoritative guidance in the
actuarial  community that alternative forms of benefit that are within 5% of the value of the SLA
benefit are "approximately equal," where "approximately equal" is used in the context of allowing
participants to make informed choices about their benefit options.  SOF ¶ 77.  In other words, this
Treasury regulation, considering the variability and uncertainty of individual mortality and other
circumstances, defines "approximately equal" to be a plus or minus 5% range.  *Id.*

[18]       PricewaterhouseCoopers LLP is seeking Supreme Court review of the Second Circuit's
decision.  *See* https://www.law360.com/articles/1248222.

[19]       Plaintiff attempts to distinguish Defendants' cases by arguing that they involve dissimilar
factual circumstances.  Opp. at 29.  However, that case law was not cited for its factual similarity,
but rather for the Fourth Circuit's rule in ERISA cases that the equitable remedy of reformation is
only available in cases of mutual mistake or fraud.  Mem. at 27.  Plaintiff does not cite any case
law from the Fourth Circuit contradicting this mandate.  Plaintiff's citations to out-of-circuit, non-
ERISA cases (Opp. 28 n.20) are wholly inapplicable in light of the Fourth Circuit's ruling.

simply does not align with any of the forms of *equitable relief* available under ERISA § 502(a)(3). As such, Plaintiff's claim for reformation necessarily fails.[20]

### B.  Plaintiff's breach of fiduciary duty claim fails.

As discussed in Defendants' Memorandum, Plaintiff's fiduciary breach claim fails because the act of setting the Plan's mortality assumption was not a fiduciary decision that can result in a fiduciary breach.  Mem. at 28-29 (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) and *Lockheed Corp v. Spink*, 517 U.S. 882 (1996)).  Plaintiff does not dispute this argument. Instead, Plaintiff simply claims that Defendants breached their fiduciary duty because the Plan terms are (allegedly) not "consistent with" ERISA.   Opp. at 29-30 (citing 29 U.S.C. § 1104(a)(1)(D)).   But, as discussed above, the Plan's terms do not violate ERISA; therefore, carrying out those terms cannot be a violation of any fiduciary duty.

Plaintiff also seeks to discount the impact of the Plan's IRS determination letters by nothing that they relate "only to the status of [the Plan] under the Internal Revenue Code."  Opp. 30 n. 22. However, such Internal Revenue Code sections include the requirements of ERISA that Plaintiff contends were violated.   *See* irs.gov/pub/irs-pdf/p794.pdf.   Thus, the Committee breached no fiduciary duty by enforcing the express terms of the Plan—which was approved by both the Union (assisted by its own legal counsel and actuaries) and the IRS.  Mem. at 28-30.

Even if the Plan's use of the 1971-GAM table did somehow violate ERISA, this Court should decline Plaintiff's invitation to construe *any* ERISA violation as a *per se* fiduciary breach that is compensable with make-whole relief under § 502(a)(3).  This is particularly true here, where Defendants, in 2013, could not have reasonably anticipated a future ruling that conflicted with the

---

[20]     Although Plaintiff argues the statutory scheme may leave him without a remedy (Opp. at 28), the Supreme Court has acknowledged that there are situations where there is simply no judicial remedy available under ERISA's civil enforcement scheme.  *Great-West*, 534 U.S. at 220-221.

only on-point case (*McCarthy*). There is a vast body of legal requirements contained in ERISA, the Code, DOL and Treasury regulations, and the agency guidance documents that interpret those requirements. Fiduciary breaches simply do not occur anytime someone makes a technical error involving an ERISA plan. *Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 184 (E.D.N.Y. 2005), *aff'd* 199 F. App'x 29 (2d Cir. 2006) (fiduciaries "do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions"). If ERISA plaintiffs could repackage any complaint about a plan's design into a fiduciary breach claim for the administrator merely implementing that plan design, then virtually every plan design error would turn into a fiduciary breach case. The Supreme Court has already concluded that, "without exception," plan design decisions cannot be the subject of a fiduciary breach claim because designing a plan is *not* a fiduciary function. *Hughes Aircraft*, 525 U.S. at 444-45; *see also Lockheed*, 517 U.S. at 890. For all these reasons, Plaintiff's fiduciary breach claim fails.

### C. **Plaintiff has no reliable evidence of damages to the Plan or its participants**.

As discussed in Defendants' Memorandum and not specifically responded to by Plaintiff, it is well-established that in order to prevail on any fiduciary breach claim, Plaintiff must prove he was harmed by the alleged breach. *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 220 (4th Cir. 2011) ("the plaintiff bears the burden of at least making a prima facie showing that there was a breach of fiduciary duty and that there was some sort of loss to the Plan"). For the reasons stated in the concurrently filed motion to exclude Serota's opinions, Serota's opinions are not admissible. Accordingly, Plaintiff has not carried his burden of proving damages.

### **CONCLUSION**

For the reasons set forth above and in Defendants' Motion and Memorandum in Support, judgment should be entered for Defendants on all claims.

February 28, 2020                              Respectfully submitted,

                                 /s/ *Robert W. McFarland*
                                 Robert W. McFarland (VSB No. 24021)
                                 rmcfarland@mcguirewoods.com
                                 Jeanne E. Noonan (VSB No. 87863)
                                 jnoonan@mcguirewoods.com
                                 MCGUIREWOODS LLP
                                 World Trade Center
                                 101 West Main Street, Suite 9000
                                 Norfolk, Virginia 23510-1655
                                 Tel: (757) 640-3716
                                 Fax: (757) 640-3730

                                 Cari K. Dawson (admitted *pro hac vice*)
                                 cari.dawson@alston.com
                                 H. Douglas Hinson (admitted *pro hac vice*)
                                 doug.hinson@alston.com
                                 Emily Hootkins (admitted *pro hac vice)*
                                 emily.hootkins@alston.com
                                 ALSTON & BIRD LLP
                                 1201 W. Peachtree Street
                                 Atlanta, GA 30309
                                 Tel: (404) 881-7000
                                 Fax: (404) 881-7777

                                 Emily Seymour Costin (admitted *pro hac vice*)
                                 emily.costin@alston.com
                                 David R. Godofsky (admitted *pro hac vice*)
                                 david.godofsky@alston.com
                                 ALSTON & BIRD LLP
                                 950 F Street, NW
                                 Washington, D.C. 20004-1404
                                 Tel: (202) 239-3300
                                 Fax: (202) 239-3333

                                 *Counsel for Defendants Huntington Ingalls Industries,*
                                 *Inc. and the HII Administrative Committee*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 28th day of February, 2020, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system, and on the following counsel via email:

Mark G. Boyko (to be admitted *pro hac vice*)
mboyko@baileyglasser.com

Seth R. Klein (to be admitted *pro hac vice*)
sklein@ikrlaw.com

Oren Faircloth (to be admitted *pro hac vice)*
ofaircloth@ikrlaw.com

          /s/ *Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
rmcfarland@mcguirewoods.com
Jeanne E. Noonan (VSB No. 87863)
jnoonan@mcguirewoods.com
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Tel: (757) 640-3716
Fax: (757) 640-3730

Cari K. Dawson (admitted *pro hac vice*)
cari.dawson@alston.com
H. Douglas Hinson (admitted *pro hac vice*)
doug.hinson@alston.com
Emily Hootkins (admitted *pro hac vice)*
emily.hootkins@alston.com
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777

Emily Seymour Costin (admitted *pro hac vice*)
emily.costin@alston.com
David R. Godofsky (admitted *pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Tel: (202) 239-3300
Fax: (202) 239-3333

*Counsel for Defendants Huntington Ingalls Industries, Inc. and the HII Administrative Committee*