**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| ROGER A. HERNDON, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) Case No. 4:19-CV-00052-HCM-DEM |
| HUNTINGTON INGALLS INDUSTRIES, INC. AND THE HII ADMINISTRATIVE COMMITTEE, | ) ) ) ) |
|     Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
<u>OPINIONS OF PLAINTIFF'S EXPERT MITCHELL I. SEROTA</u>**

## INTRODUCTION

The opinions of Plaintiff's expert Mitchell I. Serota ("Serota") should be excluded from consideration for the following reasons:

- He admits that he has not investigated or opined on the question of whether there is a reasonable set of actuarial assumptions that would produce the same or lower conversion factors as the factors in the Steelworkers Plan[1] of which Plaintiff Roger Herndon ("Herndon") complains. Thus, his opinions are irrelevant to this matter.

- His calculations have been riddled with errors, and he has been forced to revise or disavow his numbers repeatedly after Defendants pointed out his errors. After admitting that all of the numbers in his original report were wrong, and *then* admitting that all of the numbers in his amended report were based on an incorrect premise, his second amended report *still* has obvious and significant errors.

- Each of his revisions has brought his numbers closer to the annuities actually paid by the Steelworkers Plan, yet for no good reason he still refuses to use the mortality table that he himself describes as the "best estimate"—a table that would show that the Steelworkers Plan's annuity benefits are reasonable.

- His various reports are also riddled with misleading and irrelevant statements that overstate or exaggerate Plaintiff's contentions.

- His theories as to which actuarial assumptions constitute "the best practice" are unsound, illogical, inconsistent, and contrary to accepted actuarial practice. In fact, as he admits, his claimed *best practice* is not even a *practice* that is in use, *anywhere*.

---

[1] The Huntington Ingalls Industries, Inc. Newport News Operations Pension Plan for Employees Covered by United Steelworkers Local 8888 Collective Bargaining Agreement (the "Steelworkers Plan" or "Plan").

Each of these points is explained in detail below. For the reasons stated herein, the Court should grant Defendants' motion to exclude Serota's opinions.

## STANDARD OF REVIEW

Under Federal Rule of Evidence 702, a qualified expert may present opinion testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 requires trial judges, as gatekeepers, to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) ("The touchstones for admissibility under *Daubert* are two: reliability and relevancy.").

The Supreme Court has identified four non-exhaustive factors to assist judges in evaluating the reliability of expert opinion evidence:

> (1) whether the theory or technique used by the expert can, and has been tested;
> (2) "whether the theory or technique has been subjected to peer review and publication;"
> (3) "the known or potential rate of error" of the technique or method used; and
> (4) the degree of the method's or conclusion's general acceptance within the relevant scientific community.

*United States v. Fultz*, 18 F. Supp. 3d 748, 756 (E.D. Va. 2014) (Morgan, J.) (quoting *Daubert*, 509 U.S. at 593-94). The same *Daubert* standard applies to the opinions of non-scientific experts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

"The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *see also Fultz*, 18 F.

Supp. 3d at 756 (Morgan, J.) ("The proponent of the evidence bears a significant burden in proving reliability…").

## ARGUMENT

### I. Serota's opinions are not reliable, and thus should be excluded pursuant to Fed. R. Evid. 702.

#### A. Serota's opinions have been a moving target, and thus are not reliable.

Serota has issued multiple expert reports with ever-changing theories regarding what he believes would be a "reasonable" benefit for Herndon and the mortality table that he believes should be used for purposes of this case. These moving target opinions are precisely the type of unreliable opinions that should be rejected under *Daubert*. *See, e.g., In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*, No. 1785, 2009 U.S. Dist. LEXIS 83849, at *43 (D.S.C. Aug. 26, 2009) ("Dr. Cohen's changing opinions, and willingness to abandon or qualify her opinions when faced with further facts, undermines the reliability of her opinions."); *Nucor Corp. v. Bell*, 251 F.R.D. 191, 200 (D.S.C. 2008) ("When an expert arrives at his final theories only because the opposing party's expert discredits all previous theories (resulting in an ad hoc trial-and-error method of analysis), a court should rightly be concerned with the reliability of the final theories as well.").

#### 1. *Serota's moving target opinions of a "reasonable" annuity for Herndon.*

In his original expert report ("Original Report"), Serota opined that Herndon's annuity must be increased by **$7.13 per month** to be reasonable. Declaration of Mitchell I. Serota ("Serota Dec.") at p. 27, attached hereto as Exhibit A.[2]

---

[2] Serota's table on page 27 shows that Herndon's current annuity is $100.14 per month, and that Serota's "reasonable assumptions" would produce an annuity of $107.27 per month—a difference of $7.13. The table incorrectly states that Herndon's annuity is a "joint and 100%

- 3 -

Serota then amended his expert report ("Amended Report") opining that Herndon's annuity must be increased by **$4.73 per month**. Amended Declaration of Mitchell I. Serota ("Serota Am. Dec. ") at pp. 28-29, attached hereto as Exhibit B.

On February 14, 2020 (after the close of expert discovery) Serota again amended his report ("Second Amended Report") opining that Herndon's annuity must be increased by **$4.09 per month**. Supplemental Declaration of Mitchell I. Serota dated February 14, 2020 ("Serota 2d. Am. Dec.") ¶ 9(d), attached hereto as Exhibit C.

Even on his third try, Serota was unable to avoid obvious mathematical errors. Paragraph 9(b) of his Second Amended Report shows that Serota believes that "reasonable assumptions" require Retiree #778's annuity to be increased from $1,870.36 to $1,914.34, *an increase of $43.98*. Yet only two paragraphs down (at paragraph 9(d)) he says that Retiree #778's annuity must be *increased by $81.66* to $1,952.02. Ex. C, Serota 2d. Am. Dec. ¶¶ 9(b), (d). Thus, his estimate of damages for Retiree #778 increased by a stunning 85% over the space of two paragraphs, with no disclosed change in methodology or assumptions.

Serota's moving target opinions of what he believes at that moment would be a "reasonable" annuity for Herndon are not reliable and, thus, should be excluded. *See, e.g., In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 83849, at *43; *Nucor Corp.*, 251 F.R.D. at 200.

### 2. *Serota's moving target opinions of a "reasonable" mortality table.*

Similar to his moving target opinions of what would be a "reasonable" annuity for Herndon, Serota has offered ever-changing theories regarding the mortality table that he believes

---

survivor annuity" although the text above correctly indicates that it is a 50% joint and survivor annuity ("JSA").

should be used for purposes of this case. In his Original Report, Serota opined that the mortality table used by the Plan for purposes of its financial statements (the "GAAP Table") is the Plan actuary's "best estimate" mortality table. Ex. A, Serota Dec. at p. 19. However, Serota did not use the GAAP Table to calculate alleged damages—likely because he realized that using this mortality table would mean that there have been no damages. *See* Declaration of Thomas A. Terry ("Terry Dec.") ¶ 53 ("I have calculated the 50% J&S annuity for Mr. Herndon using a conversion factor based on (i) a unisex version of the table that Serota describes as the Plan's actuary's 'best estimate' mortality and (iii) 4.19% interest, which Serota describes as a reasonable interest rate. That annuity is $99.42, which is lower than the annuity the Steelworkers Plan is actually paying to Mr. Herndon, which is $100.14."), attached hereto as Exhibit D.

Instead of using the "best estimate" GAAP Table (which would have resulted in zero damages), Serota *attempted* to use the Internal Revenue Service ("IRS") Applicable Mortality Table, which has a 50% male / 50% female blend. Deposition of Mitchell Serota ("Serota Dep.") at 131:5-11; 142:11-143:7, attached hereto as Exhibit E. However, Serota *accidentally* used a revised version of the Applicable Mortality Table that assumes a 10% male population. *Id.* at 139:14-140:15; 142:11-143:7; *see also* Supplemental Declaration of Thomas A. Terry ("Terry Supp. Dec.") ¶¶ 4-6 (explaining that Serota erroneously used 10% male / 90% female version of the Applicable Mortality Table), attached hereto as Exhibit F.

After Defendants' *counsel* identified these errors, Serota amended his expert report ("Amended Report") and again changed his theory entirely regarding the appropriate mortality table for this case. Email dated December 21, 2019 from Godofsky to Kindall, attached hereto as Exhibit G; Ex. B, Serota Am. Dec. at pp. 26-32.

In his Amended Report, Serota claims that the proper mortality table would be a version

of the Applicable Mortality Table with a 71% male population of participants, and a 71% female population of beneficiaries. Ex. E, Serota Dep. at 66:5-22; 68:21-69:19; 143:10-144:8; Ex. B, Serota Am. Dec. at pp. 30-32. Then, admitting these population percentages were also incorrect, he later again revised his numbers to reflect an 86% male population of participants and an 86% female population of beneficiaries.[3] Ex. C, Serota 2d. Am. Dec. ¶ 9(c).

Serota's moving target opinions of the "reasonable" mortality table for the Plan are not reliable and, thus, should be excluded. *See, e.g., In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 83849, at *43; *Nucor Corp.*, 251 F.R.D. at 200.

### B. Serota's opinions are not generally accepted or supported by peers in the actuarial community, and thus are not reliable.

Serota's shifting opinions regarding the proper mortality table for this case are not generally accepted or supported by peers in the actuarial community. *See Daubert*, 509 U.S. at 593-94.

Specifically, Serota's criticisms of Defendants' expert (Thomas Terry) are contrary to generally accepted opinions in the actuarial community. Serota criticizes Terry's creation of mortality tables based on the percentage of the Steelworkers Plan's retirees (male versus female) who actually elected a joint and survivor annuity. Rebuttal Declaration of Mitchell I. Serota ("Serota Rebuttal Dec.") ¶¶ 36-37, attached hereto as Exhibit H. Serota opines that such a methodology "makes no sense", is "unsupportable" and "does not represent a viable option by which Conversion Factors might be calculated." *Id*. However, when confronted with an excerpt

---

[3] Serota's third set of numbers is still inaccurate, as the beneficiary population is 95% female, not 86% female. Ex. D, Terry Dec. ¶ 33. In addition, his contention that reasonable assumptions would give Retiree #778 an annuity of $1,914.34 (in paragraph 9(b)) but would *also* give him an annuity of $1,952.02 (in paragraph 9(d)) is inexplicable and raises questions about his ability to get *any* numbers right. *See*, Ex. C, Serota 2d. Am. Dec. ¶¶ 9(b), (d).

from the Gray Book[4] supporting Terry's methodology, Serota admitted that he may "reconsider" such criticisms based on learning the "new fact" of the Gray Book's support for Terry's methodology. Ex. E, Serota Dep. at 166:1-20. This admission highlights both that Serota's criticisms are contrary to generally accepted opinions in the actuarial community, and also underscores Serota's lack of expertise regarding the specific opinions at issue in this case. As a result, Serota's opinions should be excluded. *See, e.g., Ruffin v. Shaw Indus.,* 149 F.3d 294, 299 (4th Cir. 1998) (affirming exclusion of expert where, *inter alia*, expert's methodology was not supported by peer review or publication and not generally accepted in the relevant community); *Marsh v. W.R. Grace & Co.*, 80 F. App'x 883, 887-88 (4th Cir. 2003) (same).

### C. Serota's opinions are based on incorrect assumptions, and thus are not reliable.

As discussed above, Serota's second shifting opinion of the proper mortality table is a version of the Applicable Mortality Table with a 71% male population of participants, and a 71% female population of beneficiaries. Ex. E, Serota Dep. at 66:5-22; 68:21-69:19; 91:2-7; 143:10-144:8. Serota acknowledges that this mortality table is entirely dependent on the fundamental premise that the Steelworkers Plan's participant ratio is 71% male, and the beneficiaries are 71% female. *Id.* at 66:5-22; 68:21-74:3; 91:2-7; 143:10-144:8; 158:18-160:4. *However, this premise is demonstrably wrong.* The Steelworkers Plan's participant ratio is, in fact, 86% male / 14% female, while the population of participants who elect the JSA form of benefits is 95% male, and

---

[4] As explained by Serota, "the gray book is answers from the Internal Revenue Service for issues that have been brought up by enrolled actuaries that they are confused and would like some guidance, and the questions are published and the answers are published in the gray book." Ex. E, Serota Dep. at 149:18-150:1. As admitted by Serota, the authors of the gray book are qualified actuaries whose "opinions carry weight in the profession." Ex. E, Serota Dep. at 149:8-52:10.

the beneficiaries are 95% female.[5] In this regard, Serota admitted at his deposition that all of the calculations in his Amended Report would be different if a different male percentage were used, and that he intended to use the actual percentage of participants in the Plan that are male (which is 86%, not 71%). Ex. E, Serota Dep. at 69:20-74:3. *Thus, all of the numbers in Serota's Amended Report are wrong.*

In his Second Amended Report, Serota revised his numbers to reflect the Plan's participant ratio of 86% male / 14% female. Ex. C, Serota 2d. Am. Dec. ¶¶ 4-9. However, Serota's Second Amended Report incorrectly sets the beneficiary ratio as 86% female / 14% male. *Id.* In fact, the Plan's beneficiary population is 95% female / 5% male. Ex. D, Terry Dec. ¶ 33. *Thus, all of the numbers in Serota's Second Amended Report are still wrong.* Due to Serota's repeated reliance on incorrect assumptions, his opinions are unreliable and should be excluded. *See, e.g., Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2011 U.S. Dist. LEXIS 147633, at *60 (E.D.N.C. Dec. 22, 2011) ("A damages model premised on a false assumption is not reliable.").

In addition to his second version of the Applicable Mortality Table being unreliable because it does not accurately reflect the Steelworkers Plan's male/female ratio, it is also unreliable because it reflects both white collar and blue collar worker mortality, while the Steelworkers Plan's population is blue collar. Ex. F, Terry Supp. Dec. ¶ 14. Here, the Steelworkers Plan has statistically credible mortality experience which shows significantly different mortality than the IRS's generic Applicable Mortality Table. Ex. D, Terry Dec. ¶ 36. Thus, it is unreliable for Serota to rely on the Applicable Mortality Table, even if adjusted to correctly reflect the Plan's male

---

[5] Ex. D, Terry Dec. ¶¶ 33, 34, 102 n.5, 167, Appendix B, p. 3; 2014 mortality study (HII-0000011593-11627), attached hereto as Exhibit I; Affidavit of Carrie Brewer (HII-0000168031-34), attached hereto as Exhibit J. Since women on average live longer than men, using a higher percent female mortality table overstates the life expectancy of the retiree and thus makes the single life annuity appear more valuable in comparison to a JSA. Ex. F, Terry Supp. Dec. ¶ 5.

versus female ratio.

### D. Serota's opinions are riddled with mistakes and misleading assertions, and thus are not reliable.

As discussed above, Serota issued his Amended Report after Defendants' *counsel* identified his error of using a revised version of the Applicable Mortality Table that assumed a 10% male population. Ex. E, Serota Dep. at 139:14-140:15; 142:11-143:7. This was a significant and obvious error.[6] Then, in his Amended Report, he switched to 71% male, thinking (incorrectly) that the Steelworkers Plan was 71% male, despite the fact that he had *already* read Terry's Report showing the Steelworkers Plan to be 86% male and the JSA retirees to be 95% male. *See*, Ex. D, Terry Dec. at Appendix B, p. 3. Serota now admits that the Steelworkers Plan is 86% male and has provided a third set of numbers using 86% male for retirees and 86% female for beneficiaries. Ex. C, Serota 2d. Am. Dec. ¶¶ 4-9. However, for no particularly good reason, he continues to reject the use of the mortality table that he himself describes as the "best estimate," and he continues to resist the simple fact that the population in question—retirees who select the JSA form—is 95% male and their beneficiaries are 95% female, not 86% female.

In addition to these glaring mistakes, Serota's opinions are riddled with other errors and misleading assertions—which demonstrate that Serota has not "reliably applied the principles and methods to the facts of the case," Fed. R. Evid. 702(d), and has not employed "the same level of intellectual rigor" expected of a practicing actuary. *Kumho*, 526 U.S. at 152. For example:

- Serota erroneously cut-off the mortality table for beneficiaries at the retiree's age 120. Ex.

---

[6] Ex. F, Terry Supp. Dec. ¶ 19 ("The use of a 10% male table for retirees and a 90% male table for beneficiaries is a clear error. The error was significant and fairly obvious. Even a cursory check of his work would have shown that his numbers were off and should have led him to spot his error. I was able to discern that his numbers could not be replicated, using assumptions Serota stated in his declaration, even without the benefit of seeing his work papers, and noted this in my declaration of December 17.").

F, Terry Supp. Dec. ¶ 9; Ex. E, Serota Dep. 142:14-143:2. For example, if the retiree commences benefits at age 62 with an 18-year-old beneficiary (which is a real example from the data), then the beneficiary's table is cut off at age 76 (when the retiree would have reached age 120). In other words, Serota assumes that the beneficiary's probability of being alive at age 76 or any age thereafter is zero. This substantially understates the life expectancy of the beneficiary, with the result of overstating the conversion factor. Ex. F, Terry Supp. Dec. ¶ 10.

- Serota erroneously included 111 individuals who retired prior to May 20, 2013 in his damages calculations, even though the putative class members are limited to those who retired after May 20, 2013. Ex. F, Terry Supp. Dec. ¶ 17.

- In his Original Report, Serota relies on a table to erroneously opine that "a 65-year old person has a reasonable expectation to live 6 more years in 2019 than he or she could expect in 1971." Ex. A, Serota Dec. at p. 11. Terry pointed out an obvious error in this statement in his Declaration.[7] Nevertheless, Serota subsequently repeated the same erroneous talking point in his Amended Report. Ex. B, Serota Am. Dec. at p. 11. When questioned whether he still believed that statement was true, Serota admitted that the number was based on a faulty comparison of a 90% male table to a 50% male table, and that he did not actually know the correct number. Ex. E, Serota Dep. at 121:7-9, 141:12-20.

- Serota relies on a table in his Amended Report to erroneously opine that "annuity values

---

[7] Ex. D, Terry Dec. ¶ 41 ("I disagree that the table on page 11 of Mr. Serota's declaration shows a 6-year increase in life expectancy. Mr. Serota arrives at the 6-year number by comparing a population that is 90% male / 10% female (the first entry on the table) to a population that is 50% male / 50% female (the last entry on the table). (Serota Report, Page 11) This 'apples to oranges' comparison is incorrect and misleading, as it fails to account for the fact that a significant portion of the 6-year difference is a consequence of women living longer than men on average, not on changes in mortality over time.").

shown in the chart above have increased over 22% from 1971 to 2019, strictly on the basis of mortality improvement (because the discount rate has been fixed)." Ex. B, Serota Am. Dec. at p. 11. During his deposition, Serota admitted that this statement is "not strictly accurate." Ex. E, Serota Dep. at 124:9-125:2, 141:12-23.

- Serota asserts in his Original Report that using the 50% male "applicable mortality table" is "the optimal solution" and "the best practice." Ex. A, Serota Dec. at p. 22. In his Amended Report, he uses modified versions of applicable mortality table, adjusted to be 71% male for retirees and 71% female for beneficiaries. Ex. B, Serota Am. Dec. at p. 26. Despite this change in methodology, he then describes his new approach as "the optimal solution" and "the best practice." Ex. B, Serota Am. Dec. at p. 22.

- When questioned about his use of the phrase "*the* best practice," Serota admitted that there could be many "best practices" and that, if he had it to do over again, he would say "*a* best practice." Ex. E, Serota Dep. at 130:5-132:7.

- When asked if he was aware of *any* pension plan that used his "best practice" with respect to selecting the interest rate, he responded, "No." Ex. E, Serota Dep. at 130:6-131:4. Thus, his supposed *best practice* is not even a *practice*.

- Serota's entire methodology is premised on the idea that the Steelworkers Plan's mortality tables *must* be updated every year, but he concedes that *other* plans might reasonably be updated every five, six or ten years (or presumably even longer, but not every 40 years), and that for the Steelworkers Plan, an annual update "*might* make very good sense going forward…" Ex. E, Serota Dep. at 58:8-19 (emphasis added).

- Serota states in his Original Report and again in his Amended Report that the 1971 Group Annuity Mortality table ("1971-GAM") table is not approved by the IRS as an appropriate

mortality assumption for determining liabilities under ERISA. Ex. A, Serota Dec. at p. 23; Ex. B, Serota Am. Dec. at p. 23. The obvious purpose for making this statement is to confuse the Court into thinking the IRS has refused to approve the 1971-GAM table for purposes of computing the conversion factors at issue in this litigation, and that such refusal is of significance to this litigation. However, Serota admits that this statement refers to funding calculations, not the calculation of conversion factors, and further that *his proposed table is also not approved by the IRS for funding purposes*. Ex. E, Serota Dep. at 132:10-133:5. His statement (in both reports) is also highly misleading because the IRS *has* approved the Steelworkers Plan document, which includes the 1971-GAM table, for purposes of calculating the actuarial conversion factors at issue here. 2016 IRS Determination Letter (HI-0000172590-92), attached hereto as Exhibit K.

- Even *after* all of these errors were pointed out to him, in his Second Amended Report (which is only 5 pages), Serota inexplicably shows the damages for Retiree #778, based on his "reasonable assumptions", to be $43.98 in paragraph 9(b) and then $81.66 in paragraph 9(d), *a difference of more than 85%*.[8]

Significantly, all of Serota's many errors result in overstating the conversion factor and thus the potential damages, or exaggerating Plaintiff's contentions in this litigation. *See, e.g.,* Ex. F, Terry Supp. Decl. ¶ 20 ("The fact that each and every one of his errors went in the same direction – overstating the J&S conversion factors – is also troubling, and made it easier to see that the calculations were wrong."). Given his many errors, Serota's opinions are not reliable and, thus, should be excluded. *See, e.g., EEOC v. Freeman*, 778 F.3d 463, 467-68 (4th Cir. 2015) ("The

---

[8] Ex. C, Serota 2d. Am. Dec. ¶¶ 9(b), (d), showing an increase from $1,870.36 to $1,914.34 (or $43.98) in paragraph 9(b) and an increase of $81.66 in paragraph 9(d).

sheer number of mistakes and omissions in Murphy's analysis renders it 'outside the range where experts might reasonably differ.' We therefore cannot say the district court abused its discretion in ultimately excluding Murphy's expert testimony as unreliable.") (citation omitted).

### E. Serota's rejection of the "best estimate" mortality table defies logic.

Serota uses an interest rate of 4.19%, based on the interest rate used by HII for its financial statements under Generally Accepted Accounting Principles ("GAAP Interest Rate"). Ex. B, Serota Am. Dec. at p. 28. However, he rejects the use of the mortality table (the "GAAP Table") prepared by HII's actuaries and used by HII for its financial statements. Ex. B, Serota Am. Dec. at pp. 19-22. The GAAP Table is based on the specific mortality of the Steelworkers Plan for the period from 2012 to 2016, which is the period of time during which Herndon retired. Ex. D, Terry Dec. ¶¶ 93-95. Serota's explanation for his rejection of the GAAP Table is merely that it is not a unisex table. Ex. B, Serota Am. Dec. at pp. 19-22. However, in his deposition, Serota admitted that *any* mortality table can be converted to a unisex table. Ex. E, Serota Dep. at 107:13-17. So, his logic in rejecting the mortality table that he himself describes as the "best estimate" is entirely implausible. His real reason for not using this table is patently transparent: when combined with his 4.19% interest rate, it would produce a benefit for Herndon of $99.42—less than his $100.14 Steelworkers Plan benefit, not more. Ex. D, Terry Dec. ¶ 170, figure 9.

### II. Serota's opinions are not relevant or helpful, and thus should be excluded pursuant to Fed. R. Evid. 702.

As discussed above, Serota's opinions are unsupported, based on incorrect assumptions, riddled with errors, and otherwise wrong. As a result, Serota's opinions are not relevant or helpful to the finder of facts and should be excluded. Furthermore, Serota's opinions are not relevant or helpful because he fails to opine on the central issue in this case—whether the Plan's conversion factor is unreasonable and, if so, when it became unreasonable.

According to Plaintiff, "Plaintiff's claim is not simply that 'old mortality tables are bad' . . . but rather that the 'conversion factor' resulting from the Plan's use of an old mortality table, coupled with its use of a 6% interest rate, harms participants who select Non-SLA Annuities." ECF No. 20, Pls.' Opp. to Mot. to Dismiss at p. 17 n.14 (citing Compl. ¶¶ 3, 63). Indeed, Rev. Rul. 79-90 provides that the plan can *either* specify the interest rate and mortality tables, *or alternatively* can simply include a table of conversion factors (referred to in the revenue ruling as "adjustment factors"). *See, e.g.*, Rev. Rul. 79-90. Thus, there is no requirement to include mortality tables in a plan document, much less that such tables, by themselves, be "reasonable." Rather, it is the conversion *factors*—*i.e.*, the combined result of both mortality tables and interest rate—that would be subject to any reasonableness requirement.

Despite the foregoing, Serota does not opine regarding the reasonableness of the Plan's conversion factor. *See, e.g.,* Ex. E, Serota Dep. 62:9-14, 111:22-112:7.[9] Indeed, Serota admits that he has not investigated whether there could be a reasonable set of actuarial assumptions that would produce the same conversion factor for Plaintiff as the Plan's conversion factor. Ex. E, Serota Dep. at 63:8-12. Serota's failure to opine on the Plan's conversion factor renders his opinions irrelevant and unhelpful. Accordingly, Serota's opinions should be excluded. *See, e.g., Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 577 (4th Cir. 2017) (affirming exclusion of expert testimony on the basis that it was irrelevant).

---

[9] Instead, Serota only opines regarding the reasonableness of the Plan's mortality tables. However, such opinions are incomplete and thus similarly irrelevant. Serota admits that he does not know when the 1971-GAM table allegedly became unreasonable. Ex. E, Serota Dep. 35:17-3; 36:17-37:4. Serota also admits that more than one mortality table may qualify as a "best practice." *Id.* at 131:20-24-132:3. Given Serota's failure to offer opinions or testimony controverting the calculations of Defendants' expert, Thomas A. Terry, these admissions are fatal to Serota's opinions. *See generally* Ex. H, Serota Rebuttal Dec.

### III. Serota lacks the specific experience necessary to qualify as an expert in this case.

Finally, Serota's background and experience make clear that his opinions in this case are uncharted territory for him. A review of his curriculum vitae and court appearances confirms that his prior experience has been primarily in divorce cases. *See* Ex. B, Serota Am. Dec., Exhibits A and C. Serota's criticisms of the 1971-GAM table are not based on any specific prior experience or experience with other retirement plans. Indeed, Serota still uses a mortality table from 1994 for his own defined benefit plan, and he knows of no pension plan that uses his "best practice." Ex. E, Serota Dep. at 93:13-96:9, 130:6-131:4. As a result of his lack of prior experience specific to the opinions in this case, Serota is not qualified and his opinions and testimony should also be excluded for that reason. *See, e.g., Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 1998 U.S. App. LEXIS 38866, at *9 (4th Cir. Aug. 20, 1998) (affirming that expert was not qualified because his experience was not relevant to the specific issues in the case); *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 U.S. Dist. LEXIS 45668, at *43-44 (N.D. Ga. Feb. 25, 2019) (excluding expert who had certain "significant experience" in the retirement field but "lack[ed] the specific experience needed to offer an expert opinion on the reasonableness" of retirement plan expenses).

### CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their Motion and exclude the opinions by Mitchell I. Serota.

February 28, 2020                    Respectfully submitted,

                                              /s/ *Robert W. McFarland*
                                    Robert W. McFarland (VSB No. 24021)
                                    rmcfarland@mcguirewoods.com
                                    Jeanne E. Noonan (VSB No. 87863)
                                    jnoonan@mcguirewoods.com
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Tel: (757) 640-3716
Fax: (757) 640-3730

Cari K. Dawson (admitted *pro hac vice*)
cari.dawson@alston.com
H. Douglas Hinson (admitted *pro hac vice*)
doug.hinson@alston.com
Emily Hootkins (admitted *pro hac vice)*
emily.hootkins@alston.com
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777

Emily Seymour Costin (admitted *pro hac vice*)
emily.costin@alston.com
David R. Godofsky (admitted *pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Tel: (202) 239-3300
Fax: (202) 239-3333

*Counsel for Defendants Huntington Ingalls Industries, Inc. and the HII Administrative Committee*

## **CERTIFICATE OF SERVICE**

I certify that on this 28th day of February, 2020, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system, and on the following counsel via email:

    Mark G. Boyko (to be admitted *pro hac vice*)
    mboyko@baileyglasser.com

    Seth R. Klein (to be admitted *pro hac vice*)
    sklein@ikrlaw.com

    Oren Faircloth (to be admitted *pro hac vice)*
    ofaircloth@ikrlaw.com

                   /s/ *Robert W. McFarland*
           Robert W. McFarland (VSB No. 24021)
           rmcfarland@mcguirewoods.com
           Jeanne E. Noonan (VSB No. 87863)
           jnoonan@mcguirewoods.com
           MCGUIREWOODS LLP
           World Trade Center
           101 West Main Street, Suite 9000
           Norfolk, Virginia 23510-1655
           Tel: (757) 640-3716
           Fax: (757) 640-3730

           Cari K. Dawson (admitted *pro hac vice*)
           cari.dawson@alston.com
           H. Douglas Hinson (admitted *pro hac vice*)
           doug.hinson@alston.com
           Emily Hootkins (admitted *pro hac vice)*
           emily.hootkins@alston.com
           ALSTON & BIRD LLP
           1201 W. Peachtree Street
           Atlanta, GA 30309
           Tel: (404) 881-7000
           Fax: (404) 881-7777

Emily Seymour Costin (admitted *pro hac vice*)
emily.costin@alston.com
David R. Godofsky (admitted *pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Tel: (202) 239-3300
Fax: (202) 239-3333

*Counsel for Defendants Huntington Ingalls Industries, Inc. and the HII Administrative Committee*