**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| ROGER A. HERNDON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:19-CV-00052-HCM-DEM |
| HUNTINGTON INGALLS INDUSTRIES, INC. AND THE HII ADMINISTRATIVE COMMITTEE, | ) ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE (IN PART) EXPERT TESTIMONY OF THOMAS S. TERRY**

**INTRODUCTION**

The opinions of Defendants' expert Thomas Terry ("Terry") confirm the reasonableness of the Plan's actuarial factors and, therefore, are clearly relevant.[1]  In his Motion, Plaintiff Roger Herndon ("Plaintiff" or "Herndon") complains that certain of Terry's opinions are "irrelevant" because they are allegedly based on "conditions in 2019" and data from *after* 2013, and Herndon retired in 2013.  Plaintiff's criticisms are not only based on false premises, but also contradict virtually every position Plaintiff has taken in the Complaint, as well as the positions of his own expert, Mitchell Serota ("Serota").  Specifically:

- Contrary to Plaintiff's arguments (Pl.'s Mem. at 4-6), Terry's opinions are not based solely on 2019 conditions.  Terry used mortality data from 2012 to 2016, as well as a range of interest rates based on data from 2011 to 2019, as well as the interest rate – 4.19% – that Plaintiff's own expert selected for use as of 2013.  Declaration of Thomas S. Terry ("Terry Dec.") ¶¶ 93-95, 151-161, attached hereto as Exhibit A.  Thus, Terry's opinions and calculations are relevant as to reasonableness of the actuarial factors during the entire class period, including 2013 when Herndon retired.

- Plaintiff's fundamental theory of this case is that the Plan's mortality tables are *too old, antiquated, and out of date.  See, e.g.,* Compl. ¶¶ 6-7, 51-54, 58-59, 65, 90; Amended Declaration of Mitchell I. Serota ("Serota Am. Dec.") at pp. 4, 11, 17, 18, 21, 24, 26, 29, 30, attached hereto as Exhibit B.  As his own expert explains, the "crux of the [C]omplaint", is that "[a]ppropriate Conversion Factors, driven by a higher expectation

---

[1] Capitalized terms have the same meaning ascribed in prior briefing in this case, including Plaintiff Herndon's Memorandum of Law in Support of Motion to Exclude Expert Testimony of Thomas S. Terry (ECF No. 62, "Plaintiff's Memorandum" or "Pl.'s Mem.").

- 1 -

of living longer, have been increasing since the advent of ERISA…" Serota Am. Dec. at p. 18. Thus, under Plaintiff's theory of this case, 2019 conditions are *more* advantageous to participants than 2013 conditions. Accordingly, under Plaintiff's own theory, if the factors are *reasonable* in 2019, then they necessarily would be *more than reasonable* in 2013.

- To the extent that certain of the data used by Terry was unavailable when Herndon retired in 2013, it is entirely permissible to use such data *today* to determine whether the conversion factor used to calculate Plaintiff's JSA benefit was reasonable at that time.

- Plaintiff's own expert relies on data from after 2013 in calculating what he claims to be a "reasonable" benefit for Herndon, as well as all other class members. *See, e.g.,* Serota Am. Dec. at p. 26. Accordingly, Plaintiff has no basis to challenge Terry's use of post-2013 data.

- The Complaint relies on *at least ten* references to mortality tables published after 2013, including one purportedly showing life expectancy *in 2029*. *See, e.g.,* Compl. ¶¶ 42, 43, 45, 57 n.11. Thus, contrary to Plaintiff's contention now, tables cannot be irrelevant to evaluating Plaintiff's allegations merely because they were published after 2013.

- The certified class in this case includes individuals who retired as late as January 17, 2020. *See* Order Certifying Class, ECF No. 76 at ¶ 2(a). At a minimum, data based on 2019 conditions is relevant to evaluating the reasonableness of the actuarial factors used to calculate JSA benefits for participants who retired in 2019 and 2020.

For the reasons stated in further detail herein, the Court should deny Plaintiff's Motion to Exclude Expert Testimony of Thomas S. Terry ("Plaintiff's Motion", ECF No. 61).

- 3 -

## **STANDARD OF REVIEW**

Plaintiff challenges certain of Terry's opinions solely on the basis of relevance. *See generally* Pl.'s Mem. Under Federal Rule of Evidence 401, evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

*See also United States v. Katsipis*, 598 F. App'x 162, 164 (4th Cir. 2015) (citing *Daubert* as "instructing courts to look to Fed. R. Evid. 401 when analyzing relevance under 702"); *Davenport v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 1:15-cv-03751-JMC, 2018 U.S. Dist. LEXIS 57220, at *4-5 (D.S.C. Apr. 4, 2018) (evaluating whether expert testimony is relevant under *Daubert* by referencing Federal Rule of Evidence 401). As the Fourth Circuit has "often observed, relevance typically presents a low barrier to admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003). "Indeed, to be admissible, evidence need only be 'worth consideration. . .' or have a 'plus value.'" *Id.* (quoting *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997).

# ARGUMENT

I. **Terry's opinions are relevant for purposes of confirming the reasonableness of the Plan's actuarial factors.**

Plaintiff does not contend that Thomas Terry – a former President of the American Academy of Actuaries – lacks the experience, expertise or familiarity with the subject to provide appropriate expert testimony in this case. *See generally* Pl.'s Mem. Nor does Plaintiff contend that any of Terry's calculations are inaccurate or otherwise unreliable. *Id.*[2] Rather, Plaintiff challenges certain of Terry's opinions based solely on "relevance" because such opinions are allegedly "based solely on present-day assumptions rather than assumptions as of the date Herndon retired." *Id*. at 6. Plaintiff's criticisms misstate Terry's opinions and should be rejected for the reasons discussed below.

  A. **Contrary to Plaintiff's assertions, Terry's opinions are based on data from 2011 to 2019, and thus are clearly relevant.**

As an initial matter, Plaintiff mischaracterizes Terry's opinions as based solely on "conditions in 2019." Pl.'s Mem. at 6; *see also id.* at 3-4. While Terry's opinions are based on "*current demographic and economic conditions*" (*id.* at 3 (citing Terry Dec. ¶ 15)), the reference

---

[2] In this respect Terry stands in stark contrast to Plaintiff's expert. Plaintiff has never contended that any of Terry's calculations were inaccurate. In contrast, Serota has been forced to admit that all of the numbers in his Original Declaration were wrong, and then that all of the numbers in his Amended Declaration were wrong. *See, e.g.*, Deposition of Mitchell Serota ("Serota Dep.") at 139:14-140:15; 142:11-143:7, attached hereto as Exhibit C (admitting that he accidentally used the wrong mortality table); Declaration of Mitchell I. Serota ("Serota Dec.") at p. 27, attached hereto as Exhibit D (contending that Herndon's JSA benefit must be increased by $7.13 per month); Serota Am. Dec. at pp. 28-29 (contending Herndon's JSA benefit must be increased by $4.73 per month). Serota still has obvious errors in his Second Amended Declaration, which attempted to correct the errors in his first Amended Declaration. Supplemental Declaration of Mitchell I. Serota dated February 14, 2020 ("Serota 2d. Am. Dec.") ¶¶ 4-10, attached hereto as Exhibit E (contending Herndon's benefit must be increased by $4.09 per month, but also showing that Retiree # 778's JSA benefit must be increased by $43.98 in paragraph 9(b) and, contrary to that, by $81.66 in paragraph 9(d)).

- 4 -

to "current" is clearly in contrast to the time period when the factors were written into the Plan in the 1980s. Indeed, contrary to Plaintiff's suggestions (Pl.'s Mem. at 3-4), Terry did not testify that "current" conditions were *limited to* conditions in 2019 (*see* Deposition of Thomas S. Terry ("Terry Dep.") at 57:6-18), attached hereto as Exhibit F. Instead, Terry merely confirmed *when* he performed his analysis. *See id..*[3] In fact, it is undisputed that Terry used a range of interest rates based on data from 2011 to 2019, and three sets of mortality tables based on the Plan's mortality data from 2012 to 2016. Terry Dec. ¶¶ 93-95, 151-161. Thus, Plaintiff's contention that Terry's opinions are based *solely* on "conditions in 2019" is demonstrably untrue.

For similar reasons, Plaintiff's criticisms of Terry's calculations using the Terry Table, GAAP Table, and IRS Table are misplaced. Pl.'s Mem. at 5-7. Plaintiff contends that Terry's opinions are not relevant because "both the GAAP Table and the IRS Table were based on a mortality experience study conducted by Ernst & Young in 2017" and "the Terry Table was derived from actuarial experience as of 2019." Pl.'s Mem. at 7. In fact, it is undisputed that all three of these mortality tables are based on mortality experience data from 2012 to 2016. Terry Dec. ¶ 172-174. Herndon's retirement in 2013 falls within the range of such data,[4] and thus Terry

---

[3] In the full exchange, Plaintiff's counsel asked Terry a series of questions (with no answers in between), and at the end Terry answered merely that "I did my analysis in the last two to three months." Plaintiff's counsel finished by asking, "So, your report is based on conditions as of the fourth quarter of 2019, is that fair?" Terry answered "Yes." Terry Dep. at 57:6-18. Nothing in this exchange demonstrates that Terry believed the term "current" to be limited to the fourth quarter of 2019. Indeed, Plaintiff's own expert said that plans might be updated "every other year, every 10 years, every six years." Serota Dep. at 58:3-19. So, conditions from 2011 to 2019 could well be considered "current."

[4] Plaintiff has introduced no evidence, nor has he argued, that mortality became significantly worse in 2014-2016 than it was in 2012-2013. In fact, as discussed below, Plaintiff argues the opposite—that mortality gets better over time, not worse. *See, e.g.*, Compl. ¶ 44 ("actuarial tables must be adjusted on an ongoing basis to reflect in improvements in mortality"). Therefore, under Plaintiff's theory, the inclusion of later data should benefit him.

- 5 -

used data that provides an appropriate comparison for assessing the reasonableness of the Plan's conversion factor at the time of Herndon's retirement.

Likewise, Plaintiff's criticisms of Terry's interest rates should be rejected. Pl.'s Mem. at 6 n.3. While Plaintiff complains that "Terry's 3.5 interest rate" was based on data from 2012 to 2018 (*id.*), Terry also provided data confirming that interest rates ranged from 2% to 4% as of December 2012 (Terry Dec. ¶ 152, Figure 4). Thus, Terry's 3.5% interest rate was indisputably reasonable in 2013, and Terry used data that provides an appropriate comparison for assessing the reasonableness of the Plan's conversion factor at the time of Herndon's retirement. Indeed, Terry's opinions confirm the reasonableness of the Plan's actuarial factors under a range of interest rates based on data from 2011 to 2019. Terry Dec. ¶¶ 93-95, 151-161. Terry also showed that the Plan's actuarial factors are reasonable even when compared to Plaintiff's expert's preferred interest rate of 4.19%. *Id.*

In sum, Herndon's retirement in 2013 falls within the range of data considered by Terry, and therefore Terry used data that provides an appropriate comparison for assessing the reasonableness of the Plan's conversion factor at the time of Herndon's retirement. While certain of the data referenced by Terry was unavailable when Herndon retired in 2013, it is entirely permissible to use such data *today* to determine whether the conversion factor used to calculate Plaintiff's JSA benefit was reasonable at that time. Toward that end, Plaintiff has never contended that there is one single set of actuarial assumptions that ERISA requires for purposes of conversion factors. Rather, Plaintiff merely contends that the factors must be *reasonable. See, e.g.* Compl. ¶ 30, Serota Dep. at 131:20-24 ("There can be more than one best practice."). Therefore, in assessing the reasonableness of actuarial assumptions used in 2013, it is entirely appropriate to look at actual

mortality for the period of 2012 to 2016 and interest rates over a wide time period. Accordingly, Terry's opinions easily meet the standard for relevancy.

### B. Even if Terry's opinions were based solely on "conditions in 2019," such opinions would still be relevant.

As discussed above, Terry's opinions *are* based on data from the time period during which Herndon retired. However, even if based solely on "conditions in 2019" (which they are not), Terry's opinions would still be relevant for at least the three reasons discussed below:

1. Under Plaintiff's theory of this case, "conditions in 2019" are more advantageous to participants than conditions in 2013—and, thus, are clearly relevant.

Plaintiff's entire theory of this case is that the Plan's mortality tables are *outdated due to the passage of time due to improvements in mortality*. *See, e.g.,* Compl. ¶¶ 51, 52, 54, 65, 90.[5] Plaintiff has also taken the position that actuarial tables *must* reflect *future* improvement in mortality. *See, e.g.,* Compl. ¶¶ 44, 45; Serota Am. Dec. at p. 20 ("The actuary should reflect the effect of mortality improvement both before and after the measurement date.") (quoting ASOP 35 ¶ 3.5.3); *see also* Compl. ¶ 43 (referencing table with expected future mortality in 2029). Accordingly, Plaintiff's criticisms of Terry's alleged use of data based on "conditions in 2019" is fundamentally inconsistent with his entire theory of the case.

If, as Plaintiff claims, mortality tables continue to get "better" for participants over time, then Plaintiff cannot rationally complain of Terry's use of more recent mortality tables showing that the factors are *still reasonable*. How could the Plan's factors be *reasonable* in 2019, but *outdated due to the passage of time* six years earlier? Similarly, if (as Plaintiff's expert contends) reasonable factors "have been increasing since the advent of ERISA" (Serota Am. Dec. at p. 18),

---

[5] *See also* Pl.'s Mem. at 2; Compl. ¶¶ 7, 51, 54, 65, 90 ("outdated"), 48 ("antiquated"), 4, 52, 58, ("old" or "older"); Serota Am. Dec. at pp. 4, 11, 17, 18, 21, 24, 26, 29, 30 ("antiquated").

- 7 -

it follows that reasonable factors would be greater in 2019 than in 2013. Thus, using "conditions in 2019" to evaluate the reasonableness of the Plan's conversion factors should be more favorable to Plaintiff than using 2013 conditions under Plaintiff's theory of the case.

Furthermore, Plaintiff seeks for the Plan to be reformed and amended *now* based on expectations of how long into the *future* he and his wife will live. *See, e.g.,* Compl. ¶¶ 9, 79-84. It is entirely reasonable, based on the allegations in the Complaint and the contentions of Plaintiff's expert, to use current information to evaluate whether the actuarial factors in the Plan are *too old now*. Along those lines, if the actuarial factors were not *too old* in 2019, then they could not possibly have been *too old* in 2013.

2. *Plaintiff similarly relies on data after Herndon's retirement in 2013, and therefore cannot challenge Terry's opinion on that basis.*

In addition to the fact that Plaintiff's Motion contradicts his entire theory of this case, his relevancy challenge should also be rejected because both the Complaint and Serota's opinions are replete with allegations and reliance on data after 2013:

- The Complaint has no fewer than *ten* references to mortality tables that post-date 2013, demonstrating that a mortality table cannot be irrelevant to evaluation of the allegations in the Complaint merely because it post-dates 2013. Compl. ¶¶ 42, 43, 45, 57 n.11. Indeed, the Complaint even purports to show a table with mortality in 2029. *Id.* at ¶ 43.

- Serota's Amended Declaration also relies on mortality tables dating from 2014[6] and 2019.[7]

---

[6] Serota Am. Dec. at pp. 10, 21, 22, 27. The RP-2014 table was published in 2014. https://www.soa.org/globalassets/assets/files/research/exp-study/research-2014-rp-report.pdf

[7] Serota Am. Dec. at pp. 10, 11.

- In his Amended Declaration, Serota relies on demographic data through 2014, summarized by Ernst & Young in 2015 (the "E&Y Report"), to conclude that the Plan is 71% male / 29% female. Serota Am. Dec. at p. 26. All of Serota's calculations (including his assessment of Herndon's supposedly "reasonable" conversion factor), are based on this data — *which was not available in 2013*. Upon learning that he misread the E&Y Report, and that the actual male population percentage is 86%, Serota revised his reasonable conversion factor for Herndon and for every other class member. Serota 2d. Am. Dec. ¶¶ 4-10. Consequently, the conversion factor calculated by Serota for Herndon and every other class member is similarly based on data that was not available in 2013. *Id.*

Given Plaintiff's reliance on the same type of post-2013 data at issue in Plaintiff's Motion, he has absolutely no basis to challenge Terry's opinions in that regard. Indeed, if Terry's opinions are excluded as "irrelevant," then Serota's opinions must be excluded as well.[8]

3. *The certified class in this case includes participants who retired in 2019 and 2020, and thus "conditions in 2019" are clearly relevant.*

Finally, Terry's opinions would be relevant even if based solely on "conditions in 2019" (which they are not) because the class in this case consists of Plan participants and beneficiaries who commenced pension benefits during a period ending January 17, 2020. *See* Order Certifying Class, ECF No. 76 at ¶ 2(a). Thus, the certified class includes participants whose benefits commenced in 2019 and the first month of 2020. *Id.* As a result, reasonable actuarial factors based on "conditions in 2019" would, at a bare minimum, be *relevant* to evaluating the reasonableness of the conversion factors used to calculate such participants' JSA benefits, and therefore

---

[8] Serota's opinions should be excluded, but for the distinct reasons stated in Defendants' motion to exclude (ECF Nos. 78-79).

admissible. *See* Pl's. Mem. at 6 ("Herndon agrees that a 2019 calculation should use reasonable assumptions as of 2019.").

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion.

March 20, 2020

Respectfully submitted,

/s/ *Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3730
E-mail: rmcfarland@mcguirewoods.com

Cari K. Dawson (*pro hac vice*)
cari.dawson@alston.com
H. Douglas Hinson (*pro hac vice*)
doug.hinson@alston.com
Emily Hootkins (*pro hac vice*)
emily.hootkins@alston.com
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Emily Seymour Costin (*pro hac vice*)
emily.costin@alston.com
David R. Godofsky (*pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Telephone (202) 239-3300
Facsimile: (202) 239-3333

*Counsel for Defendants Huntington Ingalls Industries, Inc. and the HII Administrative Committee*

LEGAL02/39687251v2

## CERTIFICATE OF SERVICE

I certify that on this 20th day of March, 2020, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system, and on the following counsel via email:

    Mark G. Boyko (to be admitted *pro hac vice*)
    mboyko@baileyglasser.com

    Seth R. Klein (to be admitted *pro hac vice*)
    sklein@ikrlaw.com

    Oren Faircloth (to be admitted *pro hac vice*)
    ofaircloth@ikrlaw.com

    /s/ *Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
rmcfarland@mcguirewoods.com
Jeanne E. Noonan (VSB No. 87863)
jnoonan@mcguirewoods.com
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Tel: (757) 640-3716
Fax: (757) 640-3730

Emily Seymour Costin (admitted *pro hac vice*)
emily.costin@alston.com
David R. Godofsky (admitted *pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Tel: (202) 239-3300
Fax: (202) 239-3333

Cari K. Dawson (admitted *pro hac vice*)
cari.dawson@alston.com
H. Douglas Hinson (admitted *pro hac vice*)
doug.hinson@alston.com
Emily Hootkins (admitted *pro hac vice*)
emily.hootkins@alston.com

- 12 -

        ALSTON & BIRD LLP
        1201 W. Peachtree Street
        Atlanta, GA 30309
        Tel: (404) 881-7000
        Fax: (404) 881-7777

*Counsel for Defendants Huntington Ingalls Industries, Inc. and the HII Administrative Committee*

128656737_1

LEGAL02/39687251v2