## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Roger A. Herndon, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>Huntington Ingalls Industries, Inc., the HII Administrative Committee, and John/Jane Does 1–5,<br><br>        Defendants. | Civil Action No.: 4:19-cv-00052-HCM-DEM<br><br><br><br><br><br><br><br>CLASS ACTION |

### PLAINTIFF AND CLASS'S MEMORANDUM IN OPPOSITION TO MOTION TO EXCLUDE EXPERT TESTIMONY OF MITCHELL I. SEROTA

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Factual Background ................................................................................... 1

III.    Argument .................................................................................................... 5

    A. Legal Standard ....................................................................................... 5

    B. Serota's Testimony Is Relevant ........................................................... 6

    C. Serota's Testimony Is Reliable ............................................................ 9

        1.  Serota's Methodology Is Consistent ........................................... 9

            a.  Serota Properly Corrected Inputs Prior to His Deposition .................... 9

            b.  Serota Changed His Male-to-Female Ratio Assumption Based on New
                Information Defendants Did Not Provide Prior to the Deposition .................... 11

        2.  Serota's Choice of Mortality Table Was Correct ....................... 13

            a.  Even Defendants' Expert Agreed that Using the GAAP Table Was Improper
                14

            b.  Serota's Selection of an 86/14 Male-to-Female Blend Was Appropriate ....... 15

            c.  Serota Used the Same Mortality Table Defendants Use for their Relative
                Value Disclosures .......................................................................................... 19

        3.  Defendants' Overblown Claims of Error .................................... 19

            a.  Defendants' Arguments Concerning Best Practices Misconstrue
                Serota's Testimony ....................................................................................... 20

            b.  Serota's Testimony Concerning Annual Updates Is Correct .......................... 22

            c.  Serota's Statements Are Not Inaccurate Or Misleading ............................... 23

            d.  The Remaining Errors Are Harmless ........................................................... 26

    D. Serota Is More Than Qualified .......................................................... 27

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Abarca v. Franklin Cty. Water Dist.,* 761 F. Supp. 2d 1007 (E.D. Cal. 2011) ............................ 14

*Argonaut Ins. Co. v. Samsung Heavy Indus. Co.,* 929 F. Supp. 2d 159 (N.D.N.Y. 2013) .......... 13

*Balbed v. Eden Park Guest House, LLC,* No. 16-cv-0193, 2019 WL 3717582
    (D. Md. Aug. 7, 2019) ........................................................................................................ 18, 30

*Baltimore Aircoil Co., Inc. v. SPX Cooling Techs. Inc., No.* 13-cv-2053,
    2016 WL 4426681 (D. Md. Aug. 22, 2016), *aff'd,* 721 F. App'x 983 (Fed. Cir. 2018)............ 27

*Golsen v. Comm'r of Internal Revenue,* 54 T.C. 742 (1970) ........................................................ 7

*Columbia Gas Transmission, LLC v. Grove Ave. Developers, Inc.,* No. 2:17-cv-483,
    2018 WL 8334948 (E.D. Va. May 10, 2018)................................................................................ 6

*Crowley v. Chait,* No. CIV.85-2441(HAA), 2004 WL 5434953 (D.N.J. Aug. 25, 2004)........... 10

*EEOC v. Freeman,* 778 F.3d 463 (4th Cir. 2015)........................................................................ 27

*Emami v. Bolden,* 241 F. Supp. 3d 673 (E.D. Va. 2017) .............................................................. 7

*Emami v. Bolden,* No. 2:15-cv-34, 2016 WL 8232235 (E.D. Va. Dec. 20, 2016) .................... 7, 9

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.,* No. 13-cv-05038,
    2015 WL 13037241 (N.D. Cal. Dec. 21, 2015) ................................................................... 10, 12

*Esden v. Bank of Boston,* 229 F.3d 154 (2d Cir. 2000)................................................................ 26

*Fitzgerald v. Alcorn,* No. 5:17-cv-16, 2018 WL 312720 (W.D. Va. Jan. 5, 2018) ...................... 6

*Gillis v. Murphy-Brown, LLC,* No. 7:14-cv-185-BR, 2018 WL 5284607
    (E.D.N.C. Oct. 24, 2018)............................................................................................................. 5

*Golsen v. Comm'r,* 445 F.2d 985 (10th Cir. 1971) ...................................................................... 7

*Good v. Am. Water Works Co., Inc.,* No. 2:14-cv-01374, 2016 WL 5441517
    (S.D.W. Va. Sept. 26, 2016)...................................................................................................... 27

*I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants,* 2008 WL 2265269
    (E.D. Pa. June 3, 2008).............................................................................................................. 10

*In re Laurel Valley Oil Co.,* No. 05-cv-64330, 2015 WL 4555579
(Bankr. N.D. Ohio July 28, 2015) .................................................................. 13

*In re Minh Vu,* No. 12-cv-3184, 2013 WL 4804822 (D. Md. Sept. 6, 2013) .............................. 18

*Kaleta v. City of Anna Maria,* No. 8:16-cv-347, 2017 WL 6261526
(M.D. Fla. Oct. 6, 2017) ......................................................................... 10

*Kinlaw v. Nwaokocha,* No. 3:17-cv-772, 2019 WL 2288445 (E.D. Va. May 29, 2019).............. 12

*Kopf v. Skyrm,* 993 F.2d 374 (4th Cir. 1993) ........................................................ 6, 28

*Laurenzano v. Blue Cross & Blue Shield of Massachusetts, Inc. Ret. Income Tr.,*
134 F. Supp. 2d 189 (D. Mass. 2001) .............................................................. 7

*Law Debenture Tr. Co. of New York v. WMC Mortg., LLC,* No. 3:12-cv-1538,
2015 WL 13636425 (D. Conn. Aug. 11, 2015)..................................................... 10

*Lightfoot v. Arkema, Inc. Ret. Benefits Plan,* No. 12-cv-773, 2013 WL 3283951
(D.N.J. June 27, 2013)........................................................................... 16

*Marsh v. W.R. Grace & Co.,* 80 Fed. App'x 883 (4th Cir. 2003)................................... 18

*McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184 (2d Cir. 2007) ............................. 26

*Minh Vu Hoang v. Rosen,* 556 F. App'x 262 (4th Cir. 2014) ..................................... 18

*Moore v. Deer Valley Trucking, Inc.,* No. 4:13-cv-00046, 2014 WL 4956241
(D. Idaho Oct. 2, 2014) .......................................................................... 10

*Osberg v. Foot Locker, Inc., 1*38 F. Supp. 3d 517 (S.D.N.Y. 2015), *aff'd* 862 F.3d 198
(2d Cir. 2017). ................................................................................... 6

*Pledger v. Reliance Tr. Co.,* No. 1:15-cv-4444, 2019 WL 4439606
(N.D. Ga. Feb. 25, 2019).......................................................................... 30

*Ruffin v. Shaw Indus.,* 149 F.3d 294 (4th Cir. 1998) ............................................. 18

*Rybarczyk v. TRW, Inc.,* 235 F.3d 975 (6th Cir. 2000)............................................ 26

*Samaan v. St. Joseph Hosp.,* 744 F. Supp. 2d 367 (D. Me. 2010)................................. 14

*SEC v. Life Holdings,* 854 F.3d 765 (5th Cir. 2017).............................................. 28

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.,* No. 1-12-cv-00033-JRN,
2013 WL 12076554 (W.D. Tex. Nov. 5, 2013) .................................................. 16, 29

*SMD Software, Inc. v. EMove, Inc.,* 945 F. Supp. 2d 628 (E.D.N.C. 2013)...................... 6

*Smith v. Ray,* No. 2:08-cv-281, 2015 WL 13855539 (E.D. Va. Aug. 5, 2015) ............................ 5

*Smith v. Rockwell Automation, Inc.,* No. 19-cv-505, 2020 WL 620221
  (E.D. Wis. Feb. 10, 2020) ............................................................................... 8, 22, 23

*Stephens v. U.S. Airways Grp., Inc.,* 644 F.3d 437 (D.C. Cir. 2011) ......................................... 1, 6

*Swierczynski v. Arnold Foods Co.,* 265 F. Supp. 2d 802 (E.D. Mich. 2003) ............................. 14

*Thabault v. Chait,* 541 F.3d 512 (3d Cir. 2008) ...................................................................... 10

*United States v. Brown,* 415 F.3d 1257 (11th Cir. 2005) ............................................................ 6

*United States v. Ebron,* 683 F. 3d 105 (5th Cir. 2012) ............................................................. 30

*United States v. Forrest,* 429 F.3d 73 (4th Cir. 2005) ................................................................ 5

*United States v. Wilson,* 484 F.3d 267 (4th Cir. 2007) ............................................................. 18

*United States v. Wrensford,* No. 13-cv-0003, 2014 WL 3715036
  (D.V.I. July 28, 2014) ..................................................................................................... 10

*Wehling v. Sandoz Pharm. Corp.,* 162 F.3d 1158 (4th Cir. 1998) .............................................. 30

*Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999) ............................................... 5

## Rules

Fed. R. Civ. P. 26(e)(2) ......................................................................................................... 12, 13

Fed. R. Evid. 702 ....................................................................................................................... 5

Fed. R. Evid. 702(b)-(d) ............................................................................................................ 9

## Regulations

26 C.F.R. § 1.401-11(b)(2) ........................................................................................................ 17

26 C.F.R. § 1.401(a)-11(b)(2) .................................................................................................. 1, 6

26 C.F.R. § 1.401(a)(4)-12 ........................................................................................................ 17

26 C.F.R. § 1.411(d)-3(g)(1) .................................................................................................... 1, 6

26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ........................................................................................... 13

26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B) ...................................................................................... 19

## I.      Introduction

This case concerns whether Defendants are paying pension benefits to Huntington Ingalls

Industries' ("HII") retired employees that are less than the actuarial equivalent of a single-life

annuity ("SLA"). The parties rely on the opinions of actuarial experts to support their positions.

The competing experts used a common methodology:  They compared the benefits that Class

Members are receiving today, which were calculated using a 6 percent interest rate and a mortality

table published in 1971 (the "1971 GAM"), with benefits that they would be receiving if their

benefits were calculated using different actuarial assumptions.  Where the experts disagree is on

the actuarial assumptions that should be used for the comparison — the "inputs" to their models.

Defendants seek to exclude the testimony of Plaintiff's expert in its entirety, manufacturing

a fog of complaints with little substance.  The motion should be denied.

## II.      Factual Background

This case involves ERISA's requirement that retirees who select Joint and Survivor

Annuities ("JSAs") receive a benefit that is no less than the "actuarial equivalent" of the SLA they

could have selected instead.  As the Court determined in denying Defendants' Motion to Dismiss,

"[t]his means that the present values of the benefits received and benefits under a single life annuity

are 'equal under a given set of actuarial assumptions'" and the assumptions "must be 'reasonable.'"

Order, ECF No. 73, at 3 (quoting *Stephens v. U.S. Airways Grp., Inc.,* 644 F.3d 437, 440 (D.C.

Cir. 2011) and 26 C.F.R. §§ 1.401(a)-11(b)(2) and 1.411(d)-3(g)(1)). This "battle of the experts"

concerns the reasonableness of the assumptions that Defendants use.

Plaintiff's expert, Mitchell I. Serota ("Serota"), has been a member of the American

Academy of Actuaries ("AAA") for forty years, and, since 1983, both an Enrolled Actuary and a

Fellow of the Society of Actuaries.  Serota Am. Decl., Vita.  Serota served on the Pension

1

Committee of the AAA's Actuarial Standards Board when it wrote Actuarial Standards of Practice ("ASOPs") 27 and 35, which address the criteria for selecting actuarial assumptions for pension plans, including interest rates and mortality assumptions, which are the subject of this case. Serota Am. Decl. at 2. Serota literally helped to write the Actuarial Standards of Practice that apply in this case. Serota has run an actuarial consulting business for over 30 years, and has been involved in pension design and planning, including the preparation of actuarial valuation reports such as the ASC 715-30 (the actuarial report used for Generally Accepted Accounting Principles ("GAAP")). Serota Am. Decl., Vita. Serota has also testified before bankruptcy courts and state courts on actuarial issues involving tens of millions of dollars. *Id.*

Plaintiff offers Serota's testimony concerning two primary issues: (a) whether the Plan's actuarial assumptions are reasonable; and (b) whether the benefits calculated using those assumptions are lower than they would be if reasonable actuarial assumptions were used. To address the first issue, Serota evaluates the reasonableness of the Plan's mortality table (the 1971 GAM) based on the standards in ASOP 35 for selecting demographic and mortality assumptions when measuring pension liabilities. For the second issue, Serota compares the benefits that Class Members have received, and are receiving, to what they would receive if benefits were calculated using reasonable assumptions.

Serota's opinions were based, in part, on documents and information that Defendants provided in discovery. Because fact discovery was ongoing throughout the period when expert reports were due, Defendants produced documents both before and after Serota filed his Reports, necessitating minor changes to his primary and rebuttal Reports. But, at least by the end of fact discovery, Defendants provided information about each Class Member's benefits (*e.g.*, the amount each would have received as an SLA, the amount each is receiving as a JSA), as well as pertinent

2

actuarial and demographic data (*e.g.,* gender, years of service, age when benefits were calculated, age of beneficiary when benefits were calculated). Serota constructed a database that allowed him to compare Class Members' benefits calculated under the Plan's actuarial assumptions (the 1971 GAM weighted 90 percent male for retirees and 90 percent female for beneficiaries, and a six percent interest rate) to what their benefits would be if calculated with different assumptions. Defendants' expert, Thomas Terry, used the exact same methodology. *See* Declaration of Thomas Terry, ECF No. 79-4 ("Terry Decl."), at ¶¶ 141-45 & 151-52. The difference between Serota and Terry's opinions is the inputs they selected for their models to represent reasonable actuarial assumptions.

Serota uses a mortality table based on the table that the IRS mandates for calculating benefits for employees who take pension benefits as a lump-sum payment, which is referred to as the "Applicable Mortality Table." Amended Expert Declaration of Mitchell I. Serota, ECF No. 79-2 ("Serota Am. Rep."), at 20–22. The Treasury Department updates the Applicable Mortality Table every year (*id.* at 22) to ensure it is current. Defendants not only use the Applicable Mortality Table to calculate lump-sum payments (as they are required by law to do), they also use it for the disclosures to participants before they retire concerning the relative actuarial value of each of the Plan's benefit options, including the JSAs at issue in this case. Rebuttal Declaration of Mitchell I. Serota, ECF No. 79-8 ("Serota Reb. Rep.") at ¶ 21.

Serota modified the Applicable Mortality Table from his initial report to the Amended Report in Defendants' favor. The base Applicable Mortality Table assumes a population is 50 percent male and 50 percent female. Serota Am. Rep. at 26. However, because the IRS permits plan sponsors to modify mortality tables to account for the specific demographics of plan participants, Serota used a variation of the Applicable Mortality Table that was weighted 79

3

percent male for retirees and 79 percent female for beneficiaries based on the actual breakdown of HII's retirees, which he found in a study Ernst & Young prepared. *Id.*

Serota based his interest rate assumption on the interest rate that HII used each year to calculate its Plan liabilities in its annual audited financial reports prepared under GAAP. This choice also worked in Defendants' favor, since the Plan's interest rate for calculation of actuarial equivalence was 6 percent and HII's GAAP rates ranged from 3.85 percent in 2017 to 5.28 percent in 2013. *Id.* at 26. As Serota testified, the interest rate used for the HII's GAAP accounting represents the plan actuary's "best estimate" of the most reasonable interest rate to apply to determine the present value of the HII's pension liabilities as of the date of the report. *Id.* at 24. Ernst & Young based its interest rate determination on interest rates for a hypothetical bond portfolio, which Ernst & Young compared to bond indices published by Willis Towers Watson, Citigroup, Mercer and Milliman to confirm its reasonableness. Serota Reb. Rep. at ¶ 47.

Serota also prepared a Rebuttal Report that responded to Defendants' expert, Thomas Terry. Serota's Rebuttal Report also evaluated the effect of using different inputs to the model in Serota's Amended Report that were suggested by certain of Terry's criticisms. These changed inputs included using a blue-collar version of the Applicable Mortality Table beginning when such a table was first available (2015), as well as using the Mercer Above Mean AA interest rate (which closely tracked HII's GAAP rate, but determined by a wholly independent party). Serota Reb. Rep., at ¶¶ 50–53. While the different inputs changed the results of Serota's model, they did not change the fact that almost all Class Members would have received higher benefits had the Plan used up-to-date actuarial assumptions. *Id.* at 55.

During his subsequent deposition, Defendants presented Serota with an email from Ernst & Young to Defendants' counsel, dated after Serota had served both his Amended and Rebuttal

4

Reports and which had not been produced in discovery, or even before the middle of the deposition, that contradicted the language of Ernst & Young's study that Serota had relied on for the assumption that the Plan's retiree population was 71 percent male.  Video Deposition of Mitchell Serota, Ph.D., ECF No. 79-5 ("Serota Tr.") at 84.  Once he had an opportunity to review this new information, Serota agreed that a 71/29 male-to-female retiree blend was less appropriate. Accordingly, based on this newly provided information, Serota produced a Supplemental Report that used an 86/14 male-female retiree blend.  Supplemental Report of Mitchell I. Serota, ECF No. 79-3 ("Serota Supp. Rep."), at ¶¶ 4–7.  Serota's Supplemental Report provided updated figures for each of the calculations in the Amended Report and the Rebuttal Report, using exactly the same methodology as before, only substituting an 86/14 blend for the 71/29 blend that he previously used.

### III.   Argument

### A.  Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which requires that the proposed testimony be both *relevant* and *reliable.*  *United States v. Forrest,* 429 F.3d 73, 80 (4th Cir. 2005).  Rule 702 was intended to liberalize the practice of introducing relevant expert evidence.  *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999); *Smith v. Ray,* No. 2:08-cv-281, 2015 WL 13855539, at *1 (E.D. Va. Aug. 5, 2015).  Accordingly, "'the rejection of expert testimony is the exception rather than the rule.'"  *Id.* (quoting Fed. R. Evid. 702, Advisory Comm. Notes to the 2000 Amendments); *see also Gillis v. Murphy-Brown, LLC,* No. 7:14-cv-185-BR, 2018 WL 5284607, at *2 (E.D.N.C. Oct. 24, 2018) ("'[b]asically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'").  Exclusion of expert testimony is particularly rare where, as

here, the case will be decided by a judge rather than a jury. *See, e.g., Columbia Gas Transmission, LLC v. Grove Ave. Developers, Inc.,* No. 2:17-cv-483, 2018 WL 8334948, at *3 (E.D. Va. May 10, 2018) ("'There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'") (quoting *United States v. Brown,* 415 F.3d 1257, 1269 (11th Cir. 2005)). The possibility of jury confusion, which is the primary rationale for exclusion of expert testimony, is equally absent when the Court is considering a motion for summary judgment. *Fitzgerald v. Alcorn,* No. 5:17-cv-16, 2018 WL 312720, at *4 (W.D. Va. Jan. 5, 2018).

## B. Serota's Testimony Is Relevant

Relevant expert testimony simply must appear helpful to the trier of fact. *SMD Software, Inc. v. EMove, Inc.,* 945 F. Supp. 2d 628, 635 (E.D.N.C. 2013). "'Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror.'" *Id.* (quoting *Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir. 1993)).

As noted above, this case involves ERISA's requirement that JSAs be "actuarially equivalent" to the SLA participants could have selected, which "means that the present values of the benefits received and benefits under a single life annuity are 'equal under a given set of actuarial assumptions'" and the assumptions "must be 'reasonable.'" Order, ECF No. 73, at 3 (quoting *Stephens,* 644 F.3d at 440 and 26 C.F.R. §§ 1.401(a)-11(b)(2) and 1.411(d)-3(g)(1)). Serota's testimony directly addresses the reasonableness of the Plan's actuarial assumptions. Moreover, it addresses whether Class Members' benefits calculated using the Plan's assumptions are lower than they would be if reasonable actuarial assumptions were used. These issues are not within the everyday knowledge and experience of non-actuaries. *See, e.g., Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 540 (S.D.N.Y. 2015) (relying on expert testimony from actuaries to determine if a plan sponsor violated ERISA) *aff'd by* 862 F.3d 198 (2d Cir. 2017) (finding it would

6

take "a heroic chain of deductions to expect the average plan participant" to understand the applicable actuarial issues with their pension plan); *Laurenzano v. Blue Cross & Blue Shield of Massachusetts, Inc. Ret. Income Tr.,* 134 F. Supp. 2d 189, 197 (D. Mass. 2001) (testimony from experts would be helpful if the case were to require "complex, present value calculations"). Expert testimony is appropriate where "[t]he nature of the problem is one that the Court is obviously ill-equipped to handle without expert actuarial assistance." *Golsen v. Comm'r of Internal Revenue,* 54 T.C. 742, 753 (1970), *aff'd sub nom. Golsen v. Comm'r,* 445 F.2d 985 (10th Cir. 1971).

Defendants argue that Serota "fails to opine on the central issue in this case — whether the plan's conversion factor is unreasonable and, if so, when it became unreasonable." Def. Br. at 13. Defendants cite no authority for the proposition that expert testimony should be excluded unless it is directed to what a defendant argues is the "central issue" of a case, and Plaintiff is not aware of any. The test is whether the evidence is "helpful," not whether it is "dispositive." *Emami v. Bolden,* No. 2:15-cv-34, 2016 WL 8232235, at *5 (E.D. Va. Dec. 20, 2016) (testimony satisfies "helpfulness" if it assists the trier of fact in understanding highly technical requirements), report and recommendation adopted, 241 F. Supp. 3d 673 (E.D. Va. 2017).

Moreover, contrary to Defendants' argument, the assumptions *are* the central issue in the case. The Plan does not dictate the "conversion factors," it sets the actuarial assumptions, and, in particular, the grossly outdated 1971 GAM mortality table. As the Court has already held, those assumptions (not the resulting conversion factor) must be "reasonable" (Order, ECF No. 73, at 3) and Serota opines that they are not. Serota Am. Rep., at 23–25. Thus, Serota's testimony is directly related to the key issue in this case.

Second, even if the focus was the reasonableness of the Plan's "conversion factors," which it is not, Serota testified that the only way to assess this issue is to look at the actuarial assumptions

used to generate the factors.  Serota Tr. a 111:22–112:7.  A conversion factor is simply the numerical result of a mathematical calculation that uses as inputs both the retiree's relevant data (*e.g.,* retiree's age, beneficiaries' age, benefit option selected) and the plan's actuarial assumptions (mortality and interest rate assumptions).  A conversion factor cannot be reasonable in the abstract – it is a number produced by a calculation that is 100 percent driven by the inputs. The "GIGO" (garbage in, garbage out) principle applies, particularly with a 50-year-old mortality table. Accordingly, the reasonableness of the conversion factor can only be determined by comparison to a conversion factor that is calculated using reasonable actuarial assumptions.[1]

Even Defendants' expert, Thomas Terry, compared the benefits that Class Members were receiving to what they would have received if the Plan's conversion factors had been based on reasonable actuarial *assumptions.*  Terry Decl., ¶¶ 143-157.  At his deposition, Terry tried to avoid answering the question of whether it would be appropriate to use unreasonable actuarial assumptions, so long as the product of the assumptions was a "reasonable" conversion factor — an effort that consumes 12 pages of transcript.  Terry Tr. at 68:13–80:14.  In the end, Terry admitted that he would *not* do so, but would instead develop his own reasonable mortality and interest assumptions, based on current economic and demographic conditions, in order to develop a reasonable conversion factor.  *Id.* at 79:9–80:1. Thus, both experts agree that the

---

[1] Defendants are equally wrong about the relevance of the date on which the conversion factors, or the actuarial assumptions that produce them, became unreasonable.  Plaintiff alleges that they were unreasonable throughout the Class Period, and Serota's declaration supports that allegation; nothing more is required.  *Smith v. Rockwell Automation, Inc.,* No. 19-cv-505, 2020 WL 620221, at *7 (E.D. Wis. Feb. 10, 2020) ("*Rockwell*") ("At any given time, a plan participant will have the option to commence a lawsuit alleging that a fixed standard has become outdated, and then a court will determine whether the standard is actuarially reasonable.").

reasonableness of the Plan's conversion factors can only be assessed by focusing on the reasonableness of the actuarial assumptions used to generate those factors.

### C.  Serota's Testimony Is Reliable

"To be reliable, testimony must be based upon sufficient facts or data, and be the product of reliable principles and methods applied to the facts of the case." *Emami,* 2016 WL 8232235, at *5 (citing Fed. R. Evid. 702 (b)-(d)).  Defendants' challenges to the reliability of Serota's opinions at best amount to a disagreement between experts.  None merit exclusion.

#### 1.  Serota's Methodology Is Consistent

Serota has consistently testified that (a) Defendants' use of the 1971 GAM was unreasonable; and (b) Class Members' benefits are lower than they would be if Defendants had used reasonable actuarial assumptions.  To support the latter opinion, Serota used Defendants' data, which showed the benefits calculations for each Class Member.  He then examined how Class Members' benefits changed if reasonable actuarial assumptions were used instead of the Plan's. Serota corrected certain errors in inputs to the original model *before* his deposition, and he prepared a supplemental report to address new information he received *during* his deposition. These changes were entirely proper and non-prejudicial.  None of the adjustments that Serota made to the model's inputs changed his methodology, and while the adjustments necessarily changed the amount of damages that the Class suffered, none changed the *fact* of damages.

##### a.  Serota Properly Corrected Inputs Prior to His Deposition

Defendants make much of the fact that Serota corrected some of the model's inputs in his Amended Report.  Def. Br. at 1, 3–4 and 9–10.  In fact, however, there were only a few changes, none of which affected Serota's methodology.  Specifically, in his initial Report, Serota inadvertently used an incorrect male/female ratio of Plan participants, cut off the mortality table for beneficiaries at the retiree's age 120, and included certain individuals who began receiving

benefits prior to the beginning of the Class Period. *Id.* When Serota realized these problems, he fixed them and submitted an Amended Report. Defendants were not prejudiced by this; the amendment came well in advance of Serota's deposition. Courts have permitted corrections like this, even when made later in the discovery process:

> *Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes. . . . In fact, one of the very purposes of a Daubert hearing . . . is to give experts a chance to explain and even correct errors that they made in their reports. . . . There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report.

*United States v. Wrensford,* No. 13-cv-0003, 2014 WL 3715036, at *16 (D.V.I. July 28, 2014) (quoting *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants,* 2008 WL 2265269, at *2 (E.D. Pa. June 3, 2008)); *see also Kaleta v. City of Anna Maria,* No. 8:16-cv-347, 2017 WL 6261526, at *1 (M.D. Fla. Oct. 6, 2017) (plaintiff properly amended report to correct calculation errors); *Moore v. Deer Valley Trucking, Inc.,* No. 4:13-cv-00046, 2014 WL 4956241, at *2 (D. Idaho Oct. 2, 2014) (a rebuttal report that corrected an error in calculation did not amount to a change in methodology); *Crowley v. Chait,* No. CIV.85-2441(HAA), 2004 WL 5434953, at *11 (D.N.J. Aug. 25, 2004) (corrections and updated figures did not amount to a change in methodology), *aff'd sub nom. Thabault v. Chait,* 541 F.3d 512 (3d Cir. 2008); *Law Debenture Tr. Co. of New York v. WMC Mortg., LLC,* No. 3:12-cv-1538, 2015 WL 13636425, at *1–2 (D. Conn. Aug. 11, 2015) (even extensive corrections to report not problematic so long as opposing party had an opportunity to depose the expert following the submission of the corrections); *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.,* No. 13-cv-05038 , 2015 WL 13037241, at *1 (N.D. Cal. Dec. 21, 2015) (same).

**b. Serota Changed His Male-to-Female Ratio Assumption Based on New Information Defendants Did Not Provide Prior to the Deposition**

Throughout the Class Period, the Plan calculated actuarially equivalence using the 1971 GAM mortality table, blended 90 percent male and 10 percent female for retirees, with a 6 percent interest rate.  Serota Am. Rep. at 26.  Serota consistently testified that it would have been reasonable for Defendants to use the same mortality table they were required to use for calculation of lump-sum benefits (*i.e.* the Applicable Mortality Table).  *Id.*  Defendants argue, however, that Serota "changed his theory entirely" by applying a different male-to-female ratio to the Applicable Mortality Table.  Def. Br. at 5.  They then repeatedly contend that this is a fundamental error justifying exclusion.  Def. Br. at 1, 5–6, 7–9.  Defendants' bad argument is not improved by repetition.

As even Defendants' expert acknowledged, mortality tables used to calculate benefits must be unisex — a plan cannot use a male mortality table for male retirees and a female mortality table for female retirees.  Terry Rep. at ¶ 10.  The Applicable Mortality Table is a unisex table that assumes ***equal*** numbers of males and females (*i.e.,* it is blended 50/50).  Serota Am. Rep. at 26.  Serota explained, however, that "the IRS permits a plan sponsor to modify a mortality table to incorporate its specific demographic circumstances."  *Id.*  Thus, Serota acknowledged that it would be possible to use a different male/female blend ***if*** there was data to support it.  *Id.*  He found no data supporting the Plan's use of a 90/10 ratio; however, Defendants produced an Ernst & Young study that indicated that, based on "annuitant participant data" for the period from 2008–2014, the ratio of male-to-female participants in all of HII's union plans (one of which is the Plan) was 71/29, which Serota reviewed after he served his initial report.  Serota Suppl. Rep., ¶ 4 (citing HII Defined Benefit Plans, Experience Study Compilation, HII-0000011551, at 11602-03).  Because there was at least some evidentiary support for the 71/29 blend, and because that ratio was more favorable

11

to HII than the default 50/50 blend, Serota gave HII the benefit of the doubt and used the 71/29 blend in his calculations in the Amended and Rebuttal Reports. *Id.; see also* Serota Am. Rep., at 26; Serota Reb. Rep., ¶ 37.

After reviewing Serota's Amended and Rebuttal Reports, Defendants' counsel obtained a "clarification" from Ernst & Young concerning the document that Serota relied upon.  In an e-mail to Defendants' counsel dated January 9, 2020, Ernst & Young indicated that the 71/29 male-to-female ratio was based on both retirees ***and beneficiaries,*** but acknowledged that the original document "does not explicitly indicate this."  Kindall Decl., Exh. C, ECF No. 65-3.  This is an understatement, since the Ernst & Young study expressly indicates the opposite, describing the demographic data as being based on "annuitant ***participant*** data."  Although they received this email five days earlier, Defendants disclosed it to Plaintiffs for the first time in the middle of Serota's January 14, 2020 deposition.  Serota Tr. at 84.  Once he reviewed this new information, Serota agreed that the 71/29 male-to-female blend was less appropriate.  Accordingly, Serota produced a Supplemental Report that used an 86/14 blend, based solely on the data in the experience study that was related to participants according to the email Defendants withheld prior to Serota's deposition.  In the Supplemental Report, Serota provided updated figures for the calculations in the Amended and Rebuttal Reports, using exactly the same methodology, but substituting an 86/14 blend for the 71/29 blend that he previously used.

Serota's Supplemental Report was entirely proper, and Defendants do not argue to the contrary.  Rule 26(e)(2) provides that experts have a ***duty*** to supplement their reports to add additional or corrective information. *Kinlaw v. Nwaokocha,* No. 3:17-cv-772, 2019 WL 2288445, at *2 (E.D. Va. May 29, 2019); *Enplas Display*, 2015 WL 13037241, at *1 ("Rule 26(e)(2) clearly envisions the possibility that an error could be made in an expert report that would come to light

only after the expert's deposition"). Here, where Defendants sandbagged Serota with new information at his deposition – an e-mail Defendants had not produced that was contrary to information in a report they **had** produced – they can scarcely complain that Serota prepared a Supplemental Report to account for this new information. To the extent that the supplementation creates a "moving target," Defendants have only themselves to blame.

### 2. Serota's Choice of Mortality Table Was Correct

For each year during the Class Period, Serota's model uses the mortality table that the IRS designated the Applicable Mortality Table for use in calculating lump-sum benefits, and he explains his rationale for making that selection. Serota Am. Rep., at 21–22 and 27–28. HII used this same table to calculate benefits for Plan participants who elect to receive their benefits as a lump-sum and in its disclosures to Plan participants concerning the "relative value" of each available benefit option, including the JSAs that each Class Member selected – disclosures which are required to be based on "reasonable assumptions." Serota Reb. Rep. at ¶ 21; *see also* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

Yet Defendants argue, illogically, that Serota's decision to use the Applicable Mortality Table was so unreasonable that his opinion should be excluded. Defendants' arguments directly contradict what they told Class Members and raise significant issues concerning HII's fiduciary duty to disclose accurate information to participants. For purposes of this motion, at most, they amount to a disagreement among experts, which is not proper grounds for a *Daubert* motion. *Argonaut Ins. Co. v. Samsung Heavy Indus. Co.,* 929 F. Supp. 2d 159, 169–70 (N.D.N.Y. 2013) ("The fact that [one expert's] opinion (or any expert opinion) is contradicted by other experts is not a basis to exclude his opinion"); *In re Laurel Valley Oil Co.,* No. 05-cv-64330, 2015 WL 4555579, at *4 (Bankr. N.D. Ohio July 28, 2015) ("disagreement among experts as to the

appropriateness of an assumption does not render an expert opinion inadmissible"); *Swierczynski v. Arnold Foods Co.,* 265 F. Supp. 2d 802, 809–10 (E.D. Mich. 2003) (disagreements between experts concerning discount rate assumptions went to weight, not admissibility); *Abarca v. Franklin Cty. Water Dist*., 761 F. Supp. 2d 1007, 1038 (E.D. Cal. 2011) (disagreements between experts goes to weight, not admissibility); *Samaan v. St. Joseph Hosp.,* 744 F. Supp. 2d 367, 372 (D. Me. 2010) (same).

### a. Even Defendants' Expert Agreed that Using the GAAP Table Was Improper

Defendants argue that Serota should have used "the mortality table used by the Plan for purposes of its financial statements (the "GAAP Table") because Serota supposedly opined that it represented the Plan actuary's 'best estimate.'" Def. Br. at 5. This argument is nonsensical. Not only did Serota explain in his report why he did not use the GAAP table (Serota Am. Rep. at 19-22), Defendants' own expert *agreed* with him, stating that it would not be appropriate for the Plan to incorporate the GAAP table. Terry Decl. ¶¶ 102–03. There is no disagreement on this issue.

Moreover, Defendants misstate Serota's analysis. Serota stated that in preparing audited annual financial statements, companies must value their pension liabilities using GAAP and Accounting Standard ASC 715-30, which require using the plan actuary's "best estimate" of mortality tables *each separate year*. Serota Am. Rep. at 19. Thus, for example, HII used a 2013 IRS mortality table for its audited financial reports for the 2012 10-k Report. Kindall Decl. Exh. B, ECF No. 65-2. Defendants wrongly suggest, based on absolutely nothing in Serota's model or report, that the "best estimate" GAAP report referenced at page 19 of Serota's Report was a reference to the mortality table developed by Ernst & Young *in 2017*, which HII could not have used for any of its annual financial reports prior to the FY 2017 10-k Report (which would have

14

been filed in 2018).[2]  Defendants do not explain how HII could have used this table to calculate the majority of Class Member benefits, because it would have been impossible.[3]

### b. Serota's Selection of an 86/14 Male-to-Female Blend Was Appropriate

Defendants next fault Serota for applying an 86/14 male-to-female blend to the Applicable Mortality Table.  Def. Br. at 8.  Serota explained his rationale in his Supplemental Report:  it was based on new information that the population of retirees taking benefits was approximately 86 percent male.  Serota Suppl. Rep. at 6–7.  Defendants now claim that Serota erred in using the inverse ratio (14 percent male/86 percent female) for the *beneficiary* population.  Def. Br. at 8.  However, Defendants provide no authority (*e.g.*, an ASOP, study, etc.) for this argument.  They don't even provide an *example*.  This may be because Defendants themselves have consistently used the inverse blend for the beneficiary table (90/10 and 10/90),[4] and Defendants' expert likewise used a beneficiary mortality table gender blend that was the simple inverse of the retiree blend.  Terry Decl. ¶ 148–149; *see also* Terry Tr. at 193:17–20 (if the percentage of male retirees goes up, the percentage of female beneficiaries goes up). If Serota is wrong, so are Defendants and their expert.  In fact, what's wrong is the idea that you shouldn't use a gender blend for the beneficiary table that is the inverse of the blend in the retiree table.

---

[2] *See* Def. Br. at 5.  Defendants' brief on this point is deliberately opaque.  They suggest there is only one "GAAP Table" — which is directly contrary to the Serota testimony they are relying on — and they only identify that GAAP Table by reference to the Terry Declaration.  *Id.*   They do not tell the Court that the GAAP Table Terry describes is the one that was developed by Ernst & Young in 2017 (*See* Terry Decl. at para. 173).  Indeed, Terry's entire analysis is flawed because it is based on a mortality table that did not even exist during most of the Class Period.

[3] Defendants repeat the same argument later in their brief (Def. Br. at 13), but don't really add anything to it.  They claim that Serota should have modified Defendants' GAAP mortality tables to make them unisex but fail to explain why he should have done so when their own expert agreed that it would be improper to use the GAAP tables.

[4] *See* ECF No. 54-5, at HII-0000001219.

Defendants also argue that Serota should have used a male/female blend that only reflected the demographics of participants who selected JSAs, rather than the demographics of Plan retirees. Def. Br. at 6. Defendants argue that the former approach, employed by their expert, is supported by guidance from the "Gray Book." *Id.* at 6–7. Defendants ignore several significant problems with their argument, which might explain why they did not attach the relevant pages of the Gray Book. First, the Gray Book states on ***every page*** that it is just a summary of responses to questions by "certain staff members of the Treasury and IRS, which represents only the personal views of the individuals who provided them." *See* Declaration of Douglas P. Needham ("Needham Decl.,") in Support of Plaintiff's Opposition to Defendants' Motion to Exclude the Expert Testimony of Mitchell I. Serota, filed herewith, at Exh. A.

The Gray Book does ***not*** contain the official position of the Treasury Department, the IRS or of any other governmental agency. *See Lightfoot v. Arkema, Inc. Ret. Benefits Plan,* No. 12-cv-773, 2013 WL 3283951, at *11 (D.N.J. June 27, 2013). Moreover, after 2015, the IRS discontinued the Gray Book "because of government concerns surrounding reliance upon responses in the Gray Book."[5] In other words, the Gray Book is unreliable. Even if it were reliable, which it is not, the Gray Book excerpt in question is ambiguous concerning the facts, assumptions and scenarios upon which it was based, and presents a conclusory summary without analysis that endorses both Terry's approach (using the population expected to elect and particular option) ***and*** Serota's approach (reflecting the plan population). *See* Needham Declaration, Exh. A. At most, the Gray Book excerpt points to disagreements between actuaries, which are not grounds for exclusion of testimony under *Daubert. Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.,* No. 1-12-cv-00033-JRN, 2013 WL 12076554, at *2 (W.D. Tex. Nov. 5, 2013) (*"Life Partners"*).

---

[5] *See* https://www.ccactuaries.org/archives/meeting-materials (last accessed on March 21, 2020).

Of greater importance, while Defendants trumpet Serota's "admission" that he might reconsider his view that Terry's approach was flawed based on the Gray Book (Def. Br. at 7), they fail to mention that, upon reconsideration, Serota ultimately stood by his original view. The regulations provide that a QJSA must be "at least the actuarial equivalent" of the normal form and *any* optional form of benefit under the plan. Serota explained that where, as here, more male employees selected the JSA option and more female employees selected a different option, basing the gender blend assumption on the population that is likely to take each particular benefit type would make the present value of the QJSA *less than* the present value of the other benefit form, in violation of the law.[6] Serota Tr. at 156:21–158:14. Therefore, on reconsideration, Serota essentially reaffirmed that Terry's analysis would be invalid. [7]

The regulations also specify that equivalence must be "determined on the basis of consistently applied reasonable actuarial factors." 26 C.F.R. § 1.401-11(b)(2); *see also* 26 C.F.R. § 1.401(a)(4)-12 (an amount or benefit is actuarially equivalent to another amount or benefit "if the actuarial present value of the two amounts or benefits (calculated using the *same actuarial assumptions*) at that time is the same"). The law thus expressly requires that a JSA's value must be compared to the value of an SLA or a certain and life annuity using *the same* mortality tables for each compared benefit, not different tables for each benefit depending on the demographic make-up of the population that *might* select one benefit type over another. Because Terry's

---

[6] If, as Terry testified, 86 percent of all retirees in the Plan were male but 95 percent of retirees who took a JSA were male, it necessarily follows that the population of those who selected non-JSA options must have been *less than* 86 percent male.

[7] When confronted with this flaw in his analysis at his deposition, Terry admitted that he had not considered it before and could not speculate about the impact of the QJSA requirements. Terry Tr. at 192 – 196. If anyone's testimony on the proper gender mix should be excluded, therefore, it is Terry's, not Serota's, since Terry had not considered whether the 95/5 male-to-female retiree blend complied with ERISA's QJSA regulations.

approach necessarily compares benefit types using ***different*** mortality tables (that is, mortality tables tailored to the gender make-up of retirees who are most likely to take that particular benefit), it does not comply with ERISA for this reason as well. The ambiguous and conclusory analysis contained in a source that was discontinued and cannot be relied upon does not trump the requirements of federal law.

Defendants' reliance on *Ruffin v. Shaw Indus.,* 149 F.3d 294 (4th Cir. 1998) and *Marsh v. W.R. Grace & Co.,* 80 Fed. App'x 883 (4th Cir. 2003) is misplaced, as both cases involved scientific studies. As the Fourth Circuit has recognized, "there exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *United States v. Wilson,* 484 F.3d 267, 274 (4th Cir. 2007). Peer reviewed studies or publications supporting an experiential expert are not critical in the context of an experiential expert. *In re Minh Vu,* No. 12-cv-3184, 2013 WL 4804822, at *11 (D. Md. Sept. 6, 2013), *aff'd sub nom. Minh Vu Hoang v. Rosen,* 556 F. App'x 262 (4th Cir. 2014). A recent opinion from the District of Maryland is instructive:

> Limparis's opinion is based on her experience as an accountant and on mathematical calculations she derived from data that is available to Balbed. Her opinion is not based on a scientific theory that could be tested, subjected to peer review, or considered to have a known or potential rate of error. There is nothing mysterious about Limparis's opinion that will prevent Balbed from challenging it.

*Balbed v. Eden Park Guest House, LLC,* No. 16-cv-0193, 2019 WL 3717582, at *4 (D. Md. Aug. 7, 2019). Similarly, Serota's testimony is based on his experience as an actuary; it does not depend on peer reviewed studies, nor is there anything mysterious about it. Serota testified at length as to his basis for disagreeing with Terry and with the actuaries whose opinion is summarized in the

Gray Book.  Defendants are certainly welcome to cross-examine Serota on those disagreements, but they do not justify exclusion of his opinions.[8]

### c.  Serota Used the Same Mortality Table Defendants Use for their Relative Value Disclosures

Defendants finally argue that Serota should have used a blue-collar mortality table rather than the Applicable Mortality Table.  Def. Br. at 8-9.  However, HII uses the Applicable Mortality Table, and not a blue-collar table, as the basis for its relative value disclosures to Plan participants.  Serota Reb. Rep. at ¶ 21.  While the relative value calculations need not use the ***same*** actuarial assumptions as the Plan, the assumptions must still be ***reasonable.***  26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B).  Accordingly, the Plan clearly determined that the Applicable Mortality Table ***was*** a reasonable actuarial assumption, and the Court should reject Defendants' post-hoc contrary argument as the basis for a *Daubert* motion.[9]

### 3.  Defendants' Overblown Claims of Error

Defendants point to a number of what they call "mistakes" in Serota's Report and repeat them over and over in an attempt to create an impression of untrustworthiness.  Many of the

---

[8] Defendants' own expert also based his opinions on his experience.  *See, e.g.,* Terry Tr. at 218:19–220:20 (testifying on redirect from Defendants' counsel that his opinion concerning the propriety of picking an interest rate that was roughly in the middle of a range was based on his "professional judgment;" he was unaware of any publication supporting his view, which did not concern him).

[9] As Serota noted in his Rebuttal Declaration, the blue-collar adjustment to the RP-2014 table did not come out until October of 2014, and HII did not adopt it for accounting purposes until later in that year.  Serota Reb. Rep. at para. 22.  Accordingly, it could not have been used to calculate benefits until 2015, well into the Class Period.  And, as noted, HII ***never*** adopted it for its relative value disclosures, opting instead to provide retirees with information based on the Applicable Mortality Table with no blue-collar adjustment.  Nonetheless, Serota ran an alternative calculation using the blue-collar table beginning in 2015 and determined all class members would still have received higher benefits than they did using the Plan's outdated assumptions. *Id.* at ¶¶ 23 and 53–55.

supposed "errors" amount to differences of opinion between the experts. The rest are minor mistakes that do not – either alone or together – merit exclusion.

As noted above, Serota *did* amend his original report before his deposition to correct certain errors in the inputs to his model. And, as discussed above, courts have consistently held that such corrections are entirely proper and do not merit exclusion of testimony. *See supra* pp. 9–10 (citing cases). None of the other "errors," real or imagined, warrant exclusion either.

### a. Defendants' Arguments Concerning Best Practices Misconstrue Serota's Testimony

Defendants' arguments concerning "best practices" are without merit. Serota's Report uses the phrase "the best practice," but also indicates that multiple actuarial assumptions might be considered "reasonable." *See, e.g.,* Serota Am. Rep. at 26 (stating that use of the Applicable Mortality Table and the discount rate from the preceding year's ASC 715-30 report would be "a reasonable approach," and one that makes more sense than using the discount rate from the 10-k Report); *see also id.* at 19–22 (discussing generally different interest rate and mortality table assumptions that might be reasonable). At his deposition, Serota clarified that he did not mean to suggest that there was a single "best practice" that would dictate a specific choice.

Defendants attempt to manufacture an error where none exists by pointing to a supposed discrepancy in page 22 of Serota's original and amended complaints concerning best practices in selecting a mortality table. In fact, page 22 of Serota's original and amended reports are *identical.* That is because Serota's "best practice" statement was directed at use of the Applicable Mortality Table itself, and he used the Applicable Mortality Table in both his initial report and his Amended Report. The "best practice" discussion Defendants reference did not address when it is appropriate for a sponsor to use a different male/female blend than the Applicable Mortality Table. Serota explained this different issue later in his Amended Report: "For a mortality table, a reasonable

20

approach would call for the Applicable Mortality Table.  The Applicable Mortality Table uses 50% male lives and 50% female lives.  However, the IRS permits a plan sponsor to modify a mortality table to incorporate its specific demographic circumstances." Serota Am. Rep., at 26. There is nothing inconsistent in the testimony.  Using the Applicable Mortality Table ensures the assumptions are updated regularly to take into account the most recent information on life expectancy. Modifying the 50/50 male-to-female ratio to account for plan-specific demographic information is appropriate where good data exist.

Defendants next mischaracterize Serota's testimony concerning best practices with respect to interest rates.  In his initial report and his Amended Report, Serota stated that the interest rate that a company uses to value plan liabilities for its most recent audited financial statements represented the company's best estimate of a reasonable interest rate.  Serota Rep., at 21; Serota Am. Rep. at 21.  He further stated that using this recent, up-to-date interest rate to calculate actuarial equivalence for the following year would be a best practice.  Serota Rep., at 22; Serota Am. Rep. at 22. Nowhere does Serota suggest that it would be appropriate to adopt a plan provision prospectively incorporating future GAAP accounting determinations.  Yet, that is what Defendants asked him about at his deposition where, unsurprisingly, he testified that he was not aware of any plans that adopted such a practice.[10]  Defendants' attempt to "spin" this testimony into a mistake should be rejected.

---

[10] Serota Tr. at 130:21–131:4 (responding "no" to the question, "are you aware of any pension plans that actually use the GAAP interest rate as a plan provision — in other words, ***the plan says that actuarial equivalence will be calculated according to the company's GAAP interest rate***?") (emphasis added).  The focus of Serota's damages analysis was on how the benefits class members are receiving compare to what they would be receiving if Defendants had used actuarial assumptions that were reasonable on the date that their benefits were calculated — not on the ***mechanism*** that Defendants could have used to incorporate up-to-date assumptions.  As a matter of law, Defendants ***could have*** complied with ERISA's actuarial equivalence requirement by adopting variable standards that update automatically (such as an external index for interest rates

**b. Serota's Testimony Concerning Annual Updates Is Correct**

Defendants suggest that Serota's testimony was inconsistent on the frequency of updates. Def. Br. at 11. It was not. Contrary to Defendants' assertion, Serota's "entire methodology" is *not* "premised on the idea that the Steelworkers Plan's mortality tables *must* be updated every year." *Id.* Again, Defendants misconstrue Plaintiff's claim and Serota's testimony. Liability does not turn on *how often* the Plan should have updated its actuarial assumptions. It is undisputed that Defendants' actuarial assumptions remained static for over 40 years and were never updated at *any* point during the Class Period. Serota's testimony that these assumptions were unreasonable *throughout* the Class Period was not contested by Defendants' expert.

To establish injury and damages, Plaintiff had to compare the benefits that resulted from use of the unreasonable actuarial assumptions to benefits that would have resulted from use of reasonable assumptions. For each Class Member, the answer depends on the actuarial assumptions that would have been reasonable when their benefits commenced. "At any given time, a plan participant will have the option to commence a lawsuit alleging that a fixed standard has become outdated, and then a court will determine whether the standard is actuarially reasonable." *Smith v. Rockwell,* 2020 WL 620221, at *7. Thus, it would not have been appropriate for Serota to simply

---

and the Treasury Department's Applicable Mortality Table), *or* by adopting fixed standards that have to be updated when they cease to be reasonable. *Rockwell,* 2020 WL 620221, at *7. Serota's Amended Declaration and his Rebuttal Declaration (as amended by his Supplemental Declaration) describe both of these approaches. Serota testified that it would have been reasonable for HII to use the most recent interest rate it calculated for its plan liabilities for each year — for example, 4.19 percent at the close of the 2012 calendar year. Serota Am. Rep. at 24–25 and 27. That could have been accomplished by an annual Plan amendment that substituted the new interest rate for the prior year's rate. In the alternative, Serota testified that the Company could have amended the Plan to use a third-party index, such as the Mercer Above Mean Index, that closely tracked the interest rates the Company used in its 715-30 Reports. Serota Reb. Rep. at 16–17. Neither approach suggests that the Plan should prospectively incorporate future GAAP accounting determinations in the manner suggested by Defendants' deposition question.

choose an interest rate or mortality table that was reasonable at some point during the Class Period — which is what Defendants' expert improperly attempted to do — and then apply it to the entire period.[11]  Instead, Serota evaluated what actuarial assumptions would have been reasonable for *each* year during the Class Period, and incorporated annual changes in interest rates and mortality tables into his model to improve accuracy.  There was no error in Serota's approach.

Defendants questioned Serota at his deposition about how frequently plans should update actuarial assumptions.  He answered the questions, but as discussed above, the answers are not relevant to either liability or damages.  As the *Rockwell* court rightly noted, how often plans should revisit their assumptions depends on the totality of the circumstances, including such factors as the volatility of interest rates.  *Id.* Serota testified in his deposition that frequency might also depend on the size of a plan, since "small plans might not even have any people retiring on an annual basis."  Serota Tr. at 56.[12]  The Plan, on the other hand, was large, with hundreds of participants retiring each year, thus Serota's testimony was entirely consistent.  In any event, "[i]f a plan prefers to avoid the risk of having the reasonableness of its actuarial assumptions determined through case-by-case litigation, it should either review its assumptions frequently or choose a variable standard."  *Smith v. Rockwell*, 2020 WL 620221, at * 7.

### c.  Serota's Statements Are Not Inaccurate Or Misleading

Defendants fault Serota's statement that the 1971 GAM "is not approved by the IRS as an appropriate mortality assumption for determining liabilities under ERISA," not because the

---

[11] This critical flaw in the methodology employed by Defendants' expert is the subject of Plaintiff's pending motion to exclude portions of Terry's testimony.

[12] For example, as Defendants note in a throwaway line at the end of their brief, the retirement plan for Serota's own firm uses a 1994 mortality table.  Def. Br. at 15.  But Defendants fail to note that, as Serota testified, there are only three participants in his company's plan and *none* of them have ever retired.  Serota Tr. at 161:1–9.

statement is inaccurate — Defendants concede that it is correct — but because Defendants allege

that the "obvious purpose" of the statement was to nefariously mislead the Court.  Def. Br. at 11–

12.  This is complete nonsense, as a simple review of the quote demonstrates:

> The 1971 Group Annuity Mortality table, published in 1971, was based on the mortality experience of group insurance and four large deferred annuity contracts during the years from 1964 to 1968.  The use of the GAM 71 table is not approved by the Internal Revenue Service as an appropriate mortality assumption *for determining liabilities under ERISA.*  Nor is it approved by the AICPA as an appropriate mortality assumption *for disclosing pension liabilities under ASC 715-30.*  In fact, the GAM 71 table has not been used *for ERISA funding or accounting purposes* for years.  That the GAM 71 is antiquated is not a source of debate.  Use of the GAM 71 table to compute actuarial equivalence distorts the actuarial value of the optional form of benefit being calculated.  A reasonable table will generate benefits that are greater for the Plan's JSA options.

Serota Am. Rep. at 23–24 (emphasis added).  The paragraph's first sentence states when the 1971

GAM was published and the data on which it was based. The second, third and fourth sentences

describe areas where use of the 1971 GAM is no longer approved.  Serota was very clear that the

IRS did not approve of using the 1971 GAM for "determining liabilities," and AICPA did not

approve of using the table "for disclosing pension liabilities."  To the extent that there was any

doubt as to his meaning, Serota summarized by saying that the 1971 GAM had not been used for

ERISA *funding or accounting purposes* for years*.*  The "obvious purpose" of these statements is

not, as Defendants suggest, to "confuse the Court into thinking that the IRS has refused to approve

the 1971-GAM table for purposes of computing the conversion factors at issue in this litigation"

(Def. Br. at 12), but to provide additional support for the proposition that the 1971 GAM was

outdated.  Serota was not, as Defendants suggest, forced to "admit" this under the withering cross

examination of their counsel; he simply confirmed what he wrote in his Report:

> Q:     And when you wrote that, you were not referring to actuarial equivalent factors; correct?
>
> A:     Oh.  Not at all.

> Q:      You were referring to funding calculations?
>
> A:      Funding.  Funding calculations.

Serota Tr. at 132:17–22.  There is nothing misleading about Serota's testimony.

Defendants' next argument is even weaker.  They argue that Serota failed to mention that "***his proposed table is also not approved for funding purposes***."  Def. Br. at 12 (emphasis in original).  This misses the point.  As Serota's Amended Report makes clear, the 1971 GAM is no longer approved for funding purposes, or for accounting purposes, ***because its mortality assumptions no longer reflect current experience***.  These are simply examples demonstrating widespread acknowledgement that the 1971 GAM is outdated.

The Applicable Mortality Table, in contrast, is ***not*** outdated, and ***can*** be used for funding purposes, and Serota did not testify to the contrary.  He was not asked whether the IRS approved the use of the Applicable Mortality Table for funding purposes; he was asked whether the IRS had approved the Applicable Mortality Table ***with a gender mix that reflected the Plan's demographic experience***.  Serota Tr. at 132:23–133:5.  As Serota explained in his reports, while the base version of the Applicable Mortality Table assumes a 50/50 gender mix, "[t]he IRS permits a plan sponsor to modify a mortality table to incorporate its specific demographic circumstances."  Serota Am. Rep. at 26.  Because Defendants had data that would have provided a sufficient basis for such a modification, Serota decided it would be appropriate to "giv[e] Defendants the benefit of the doubt" by basing his damages calculations on plan-specific gender data, even though Defendants had not sought IRS approval for such a modification.  *Id.*  Thus, the reason why the IRS had not approved the table Serota used in his calculations for funding purposes ***had nothing to do*** with the table being outdated.  Defendants' argument is a non-sequitur.[13]

---

[13] Defendants also argue that Serota's testimony is misleading because "the IRS ***has*** approved the Steelworkers Plan document, which includes the 1971-GAM table, for purposes of calculating the

### d.  The Remaining Errors Are Harmless

Defendants do identify two uncorrected errors in Serota's reports.  Neither is sufficiently significant as to warrant exclusion of Serota's opinion.

First, Defendants note that Serota failed to update a table in his Amended Report to conform to changes in the data that resulted when he fixed the gender mix in the model.  Def. Br. at 10 and Serota Am. Rep. at 11.  Serota acknowledged the error in his deposition.  Serota Tr. at 121:2–122:20. But the error is irrelevant.  The table simply illustrates a fact that Defendants cannot actually contest:  that life expectancy has improved significantly since 1971.  As Serota noted during his deposition, "[t]he fundamental concept is that life expectancy increased over the last 40 years. . . . Whether it's six or five [years] does not change that concept."  Serota Tr. at 123:2–9.

The second genuine error Defendants raise involves an incorrect number in Serota's Supplemental Report.  As discussed above, the Supplemental Report updated the damages numbers in both the Amended Report and the Rebuttal Report (which, as discussed above, tested alternative model inputs based on arguments advanced by Defendants and their expert), so that they would be based on an 86/14 male-to-female blend rather than a 71/29 blend.  Unfortunately, Serota inadvertently used the numbers from the spreadsheet used to update the Rebuttal Report in the table at paragraph 9(b) showing damages for Retiree #778 rather than the corresponding

---

actuarial conversion factors at issue here."  Def. Br. at 12.  There is no indication in the letter that the IRS considered the reasonableness of the actuarial assumptions in the Plan during their tax compliance review.  Moreover, as discussed in Plaintiff's opposition to Defendants' Motion for Summary Judgment, the IRS determination letter Defendants cite unequivocally states that "our favorable determination only applies to the status of your plan under the Internal Revenue Code *and is not a determination on the effect of other federal or local statutes.*"  Def. Exh. K.  Thus, the IRS letter is not a determination that the Plan complies with ERISA.  A "Plan's reliance on [IRS] determination letters cannot shield it from liability in a suit brought by a plan participant for violations of ERISA."  *Esden v. Bank of Boston,* 229 F.3d 154, 176 (2d Cir. 2000); *accord, McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 206 (2d Cir. 2007); *Rybarczyk v. TRW, Inc.,* 235 F.3d 975, 985 (6th Cir. 2000).

numbers for the Amended Report (which are shown in the table at paragraph 9(d)).  Importantly, however, Plaintiff sent Defendants Serota's worksheets which showed how he calculated the updated damages numbers in the Supplemental Report on the same day that the Supplemental Report itself was served.  Thus, Defendants have had the correct numbers and the underlying data all along.  The "error" they accuse Serota of making is the equivalent of a typo.  These are not the sort of errors that merit a *Daubert* challenge.  *See, e.g., Good v. Am. Water Works Co., Inc.,* No. 2:14-cv-01374, 2016 WL 5441517, at *8 (S.D.W. Va. Sept. 26, 2016) (factual errors in some of the numbers in a report went to weight rather than admissibility; errors did not so undermine the reliability of an expert's conclusions as to merit exclusion); *Baltimore Aircoil Co., Inc. v. SPX Cooling Techs. Inc.,* No. 13-cv-2053, 2016 WL 4426681, at *12 (D. Md. Aug. 22, 2016) (isolated discrepancies in testimony did not merit exclusion), *aff'd,* 721 F. App'x 983 (Fed. Cir. 2018).[14] Excluding Serota's testimony for transposing numbers would make no more sense than denying Defendants' motion because their brief included incorrect record citations.[15]

### D.  Serota Is More Than Qualified

Defendants' final argument — that Serota lacks "specific experience necessary to qualify as an expert in this case" (Def. Br. at 15) — is absurd.  As the Fourth Circuit has held,

> the test for exclusion is a strict one, and the purported expert must have **neither** satisfactory knowledge, skill, experience, training **nor** education on the issue for which the opinion is proffered. One knowledgeable about a

---

[14] In contrast, in the case cited by Defendants (Def. Br. at 12), *EEOC V. Freeman,* 778 F.3d 463, 467–68 (4th Cir. 2015), the court noted that the experts' corrected database failed to change incorrect coding, double-counted applicants and omitted hundreds of applicants.  Here, in contrast, the database was correct, but Serota failed to properly record one of the entries in his declaration.

[15] Of which there were a couple.  For example, on page 7 of their brief, Defendants cite page 166 of Serota's deposition transcript for testimony that in fact appears on pages 154–55.  The point is not that Defendants' counsel are unprofessional; they are not.  And there are almost certainly similar errors in this brief, despite counsel's best efforts to root them out.  Rather, the point is simply that these are the types of errors that are easily made, easily understood and easily fixed.

particular subject need not be precisely informed about all details of the
issues raised in order to offer an opinion.

*Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir. 1993) (emphasis added).   Because Serota has

knowledge, skill, experience, training ***and*** education sufficient to support his testimony,

Defendants' arguments do not come close to meeting this strict test.

Serota has been a member of the American Academy of Actuaries for forty years, and since

1983 has been both an Enrolled Actuary and a Fellow of the Society of Actuaries.   Serota Am.

Rep., Vita.   Of particular relevance to this case, he served on the Pension Committee of the

Actuarial Standards Board from 2011–2017 (*Id.*), helping write ASOPs 27 and 35 which address

how actuaries should select interest rate, mortality and mortality improvement assumptions, for

measuring obligations under a defined benefit pension plan, including actuarial present value

calculations.   Serota Am. Rep. at 2.   ASOPs are "an objective source reference" and "an objective

body's guidelines" for purposes of assessing reliability under *Daubert.   SEC v. Life Holdings,* 854

F.3d 765, 776-77 (5th Cir. 2017).   Even Defendants' own expert acknowledged that ASOPs 27

and 35 should "inform the thinking of the actuary with respect to the development" of calculation

of conversion factors, and they informed Terry's thinking in selecting actuarial assumptions for

his testimony in this case.   Terry Tr. at 83:5–15 and 84:6–10.

Since 1988, Serota has run his own actuarial consulting business, assisting business with

pension design and planning, including the preparation of actuarial valuation reports such as the

ASC 715-30 (the actuarial report used for GAAP accounting).   Serota Am. Rep., Vita.   He has also

provided testimony before bankruptcy courts and state courts.   *Id.*

Despite Serota's decades of relevant experience as a practicing actuary and member of the

Actuarial Standards Board, Defendants claim that "his prior experience has been primarily in

divorce cases."   Def. Br. at 15.   This does not even properly characterize Serota's testimonial

experience, but that is scarcely the point.  Serota is a professional actuary, not a professional expert witness.  It would be a sad day indeed if the Federal Rules were interpreted to favor hired guns over professionals with deep and relevant experience outside the courtroom.

Defendants next claim that "Serota's criticisms of the 1971-GAM are not based on any specific prior experience or experience with other retirement plans," but even were that true (notably, Defendants provide no citation for that proposition), it is not relevant.  Serota grounded his written opinion that the 1971 GAM was obsolete squarely on ASOP 35's requirements that actuaries select reasonable actuarial assumptions and, in particular, take mortality improvements into account in selecting mortality assumptions.  Serota Am. Rep. at 9.  As noted above, Serota was part of the Committee that wrote ASOP 35.  Since he helped to "write the book" that Defendants' own expert admits is relevant to the central question in the case, he cannot be unqualified.  Serota also explained that the 1971 GAM was based on data from the 1960s (*Id.* at 23), and that more recent mortality tables "were built on statistical surveys that showed pronounced advancements in the longevity of the retirement-age populace."  *Id.* at 10.  Serota further bolstered his opinion by indicating that the 1971 GAM was no longer approved for use for ERISA funding or accounting purposes.  *Id.* at 23–24.[16]  These are all facts that are clearly within his expertise.

Where, as here, an expert "explains his findings and the reasoning behind his opinion in detail, and . . . has the professional experience, education, and training necessary to offer an educated opinion," Defendants' criticisms should "wait until cross examination . . . .".  *Life Partners,* 2013 WL 12076554, at *4 (citing *United States v. Ebron,* 683 F. 3d 105, 139 (5th Cir.

---

[16] Defendants' final criticisms of Serota's experience have been refuted above.  Serota had not updated the actuarial assumptions in his 3-person pension plan because no one had ever retired.  *See supra* n.12.  And, Defendant misstates Serota's testimony concerning best practices, since Serota never indicated that it would be appropriate for a plan to prospectively adopt the interest rates that it would employ in its GAAP accounting for future years.  *See supra* pages 21–23.

2012)); *see also Balbed*, 2019 WL 3717582, at *3 (rejecting claim that accountant was not qualified to testify about a particular accounting issue if she had previous experience with that precise issue).[17]  The same result should follow here. Serota is well-qualified to testify to each of the opinions set forth in his reports.

## CONCLUSION

For the reasons set forth above, Defendants' *Daubert* motion should be denied.  The Court should have the opportunity to consider Serota's testimony in deciding summary judgment and at trial.

Dated:  March 24, 2020                              Respectfully submitted,


                                                    */s/ Gregory Y. Porter*
                                                    **BAILEY & GLASSER LLP**
                                                    Gregory Y. Porter (VSB # 40408)
                                                    1055 Thomas Jefferson Street, NW, Suite 540
                                                    Washington, DC 20007
                                                    Tel: (202) 463-2101
                                                    Fax: (202) 463-2103
                                                    Email: gporter@baileyglasser.com

---

[17] The cases cited by Defendants are not to the contrary. *Wehling v. Sandoz Pharm. Corp.,* 162 F.3d 1158 (4th Cir. 1998) found a proposed expert was unqualified because he had ***no*** experience relevant to the issues of causation and negligence in the context of a drug interaction, no "education, training, or experience" in the treatment of patients with schizophrenia, and no experience in "drafting, regulation or approval of product labeling."  *Id.* at *4.  In contrast, Serota has relevant education, training and experience in actuarial present value calculations, pension plan design and valuations, and, through his work with the Actuarial Standards Board, has helped to provide critical guidance to the actuarial community on issues relevant to this case.  *Pledger v. Reliance Tr. Co.,* No. 1:15-cv-4444, 2019 WL 4439606 (N.D. Ga. Feb. 25, 2019) involved proposed testimony by a sales and marketing manager on reasonableness of administrative expenses, where the manager's experience was limited to creating offerings based on T. Rowe Price's data and pricing model (which he did not use for his analysis in the case). *Id.* at *16.  Here again, Serota's decades of experience as a practicing actuary and a member of the Actuarial Standards Board are directly relevant to the issues in this case.

Mark G. Boyko (to be admitted *pro hac vice*)
**BAILEY & GLASSER LLP**
8012 Bonhomme Avenue, Suite 300
Clayton, MO 63105
Tel: (202) 463-2101
Fax:(202) 463-2103
mboyko@baileyglasser.com

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (*pro hac vice*)
Mark P. Kindall (*pro hac vice*)
Douglas P. Needham (*pro hac vice*)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  dneedham@ikrlaw.com

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2020, I caused a copy of the foregoing to be electronically filed through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


*/s/ Gregory Y. Porter*
Gregory Y. Porter