UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

ROGER A. HERNDON, on behalf of
himself and all others similarly
situated,

        Plaintiff,

v.                           Action No. 4:19-cv-52

HUNTINGTON INGALLS
INDUSTRIES, INC.,

    and

THE HUNTINGTON INGALLS
INDUSTRIES ADMINISTRATIVE
COMMITTEE,

    and

JOHN AND JANE DOES 1-5,

        Defendants.

## REPORT AND RECOMMENDATION

This class action alleges that Defendant Huntington Ingalls Industries, Inc. ("HII") violated the Employee Retirement Income Security Act ("ERISA") by using a fifty-year-old mortality table to calculate benefits due to retirees electing joint and survivor annuities ("JSAs") under its defined benefit retirement plan. The statute requires that such JSA benefits be the "actuarial equivalent" of the benefit paid to retirees receiving a single life annuity with no survivor benefits. 29 U.S.C. § 1055(d)(1)(B); 26 U.S.C. § 417(b). Because life expectancies rose substantially

since the 1971 mortality table was created, the class action complaint alleges that HII's use of the outdated mortality estimates deprived Herndon and other JSA beneficiaries of their actuarially equivalent benefits.

Defendants have moved for summary judgment, ECF No. 53, arguing that the conversion factor HII used to determine JSA benefits for the class is reasonable, and that Plaintiff's evidence is insufficient for any reasonable factfinder to conclude otherwise.  The parties each retained expert actuaries to opine on the reasonableness of their competing calculations, and their expert opinions are central to each side's summary judgment position.  Perhaps as a result, the summary judgment motion was followed almost immediately by competing motions to exclude the other's experts.  ECF Nos. 61, 78.

All three motions have been referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).  After reviewing the expert reports and competing exclusion motions in detail, I find that both experts' opinions are sufficiently reliable to assist the trier of fact and thus recommend that the court deny both Motions to Exclude.  And because the questions posed by HII's summary judgment motion may be resolved by a reasonable factfinder endorsing either expert's testimony, I also recommend that the court deny Defendants' Motion for Summary Judgment.

2

## I.    Statement of the Case

Named Plaintiff Roger A. Herndon retired from HII in 2013.
Compl. ¶ 13 (ECF No. 1).  At the time of his retirement, Herndon
participated in an HII defined benefit pension plan (the
"Steelworkers Plan" or the "Plan") available to employees hired
before June 7, 2004 - employees covered by the "Legacy Part" of
the Plan.  Compl. ¶¶ 2, 13.  The Legacy Part typically paid a
single life annuity ("SLA") that provided a monthly payment to the
retiree for the life of the participant.  Defs.' Mem. Supp. Mot.
Summ. J. 3-4, 6 (ECF No. 54); see also Terry Decl. ¶ 66 (ECF No.
54-2).  Herndon instead elected a joint and survivor annuity
("JSA") that would pay benefits during his life and to his spouse
if she survived him.  When participants elect a JSA, their monthly
benefit must be adjusted to account for the sums to be paid to the
surviving beneficiary, usually a spouse.  Serota Am. Decl. 5 (ECF
No. 54-4).  To calculate the monthly amount of the JSA pension,
the retirees' SLA pension amount is multiplied by a conversion
factor derived from actuarial assumptions about the life
expectancy of the participant, the life expectancy of the surviving
beneficiary, and an interest rate to account for the time value of
money.  Terry Decl. ¶¶ 81-83; Serota Am. Decl. 6-16.

The parties and their experts agree that to pass muster under
ERISA, HII must calculate JSA benefits that are actuarially
equivalent to the retirees' SLA benefits.  In other words, "the

3

present values of the benefits received and benefits under a single life annuity are 'equal under a given set of actuarial assumptions.'"   Order 3 (ECF No. 73) (quoting Stephens v. U.S. Airways Grp., Inc., 644 F.3d 437, 440 (D.C. Cir. 2011)).   They also agree on the effect that various inputs have on the calculation of the conversion factor.   For example, if life expectancy for a plan participant goes up, the conversion factor will go up due to the presumably shorter period of benefits that would be due to the surviving beneficiary.   If the life expectancy of the surviving beneficiary goes up, the conversion factor goes down to account for the longer period of benefits likely to be paid to the survivor.   And if the interest rate goes down, the conversion factor will also go down to account for the lower time value of the future benefit stream.   Terry Decl. ¶¶ 84-85; Serota Dep. 63:13-65:11 (ECF No. 54-3).   If multiple inputs change their effect on the conversion factor depends on which change has the greatest impact on a given participant's circumstances.   Serota Dep. 64:18-66:4.

The Plan's Legacy Part underlying this action has been the subject of collective bargaining between the company and the union periodically over the last several years.   The Plan has used the same actuarial assumptions for more than thirty years.   Defs.' Mem. Supp. Mot. Summ. J. Ex. H App. I (ECF No. 54-9, at 89-90).   Specifically,   the   participant   mortality   estimates   for   JSA

4

conversion factors under the Legacy Part use the 1971 Group Annuity Mortality Table (the "1971 GAM Table") with male and female rates blended to reflect a population that is 90 percent male and 10 percent female.  For beneficiary mortality estimates, the Plan's Legacy Part uses the 1971 GAM Table blended to reflect a population that is 10 percent male and 90 percent female.  The interest rate used to reduce future benefits to present value in the conversion factor is 6 percent.  All of these factors have been expressly disclosed in the plan document and in each revision and have been maintained since the 1987 version of the Plan's Legacy Part.  See Defs.' Mem. Supp. Mot. Summ. J. Exs. D, H, I, J, K, L, M (ECF Nos. 54-5, -9, -10, -11, -12; 55-1, -2).

Both Defendants' expert, Thomas S. Terry, and Plaintiff's expert, Mitchell I. Serota, are pension actuaries.  Serota opines that HII's use of the 1971 GAM Table to estimate mortality for participants and beneficiaries is not reasonable and results in lower JSA payments to Herndon and other members of the class. Serota Suppl. Decl. ¶¶ 9-11 (ECF No. 65-4).  Although Serota recognizes the 6 percent interest rate is above market and partially offsets the effect of the outdated mortality table, he has prepared calculations using various other mortality estimates and interest rates to conclude that Herndon and others in the class receive lower benefits than they would if HII had used updated mortality estimates.  Id. ¶¶ 9-10.  Serota's opinions on the most

appropriate actuarial factors to use have shifted as he corrected various errors in the data he received about the Plan and other challenges from Defendants' expert, Terry.  However, his final supplemental report concludes that HII should have used the Applicable Mortality Table designated under ERISA § 205g, and blended to reflect the actual population of participants in the Plan, which the company's actuaries have determined is 86 percent male and 14 percent female.  Applying these mortality figures and Serota's interest rate estimates of between 3.85 percent to 5.28 percent yields a higher monthly benefit for Herndon and all class members.[1]  See Serota Am. Decl. 25; Serota Suppl. Decl. ¶¶ 9-10. Specifically, Serota calculates the total past damages due to JSA participants in the class would be $1,749,335 and the estimated present value of future damages would be approximately $6.4 million.  Serota Suppl. Decl. ¶ 10.

Terry, not surprisingly, disagrees with Serota's opinions. He states that actuarially equivalent benefits can be calculated in a variety of ways and that HII's use of the 1971 GAM Table mortality estimates, along with a higher-than-market interest rate of 6 percent, results in JSA benefits to Herndon and other members

---

[1] Serota opines that a reasonable interest rate assumption would be to use the rate from the preceding year's estimate of plan liabilities projected in accordance with Accounting Standard Codification 715-30.  Serota Am. Decl. 27.

of the class that are actually slightly higher than the benefits calculated using updated Plan-specific mortality tables and a correspondingly adjusted market interest rate reflecting current economic conditions.  Terry Decl. ¶¶ 49, 141-42.

In addition to disputing Serota's calculations, Terry separately analyzed demographic data reflecting the actual mortality experience of HII retirees.  See id. ¶¶ 88-108, 144-50. He then selected a range of interest rates between 1.5 percent and 5.0 percent, which he opined reflected market conditions at the time.  He selected 3.5 (a mid-range) as the most appropriate rate to utilize, but he calculated conversion factors using a range of rates, including 4.19 percent, which was the rate selected by Serota for Herndon's benefits.  At these various rates, and using the Plan-specific mortality estimates, Terry calculated that Herndon's benefits were actually lower than he was presently receiving.  Id. ¶¶ 151-64.  Terry also opines that the IRS generally accepts annuity values within a range of plus or minus 5 percent as being approximately equal.  Id. ¶ 180.  As Herndon's actual benefit – and his revised benefit under either Terry or Serota's calculations – is within this 5 percent margin, Terry opines that HII has used reasonable actuarial factors in arriving at their calculation of JSA benefits for Herndon and other members of the class.  Accordingly, Terry opines that class member benefits are based on reasonable actuarial assumptions consistent with

ERISA commands.   Because the experts' conflicting opinions are central to resolving Defendants' Motion for Summary Judgment, I first address the parties' competing Motions to Exclude.

## II.  <u>Analysis</u>

### A.  Motions to Exclude

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant."  <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 261 (4th Cir. 1999).  "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'"  <u>Nease v. Ford Motor Co.</u>, 848 F.3d 219, 229 (4th Cir. 2017) (quoting <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 591 (1993)).  "With respect to reliability, the district court

must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" Id. at 229 (quoting Oglseby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999)).

The relevant inquiry is "'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached," Westberry, 178 F.3d at 261 (quoting Daubert, 509 U.S. at 594-95), and "the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful," id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). See also E.E.O.C. v. Freeman, 778 F.3d 463, 466 (4th Cir. 2015) ("The scope of the court's gatekeeping inquiry will depend upon the particular expert testimony and facts of the case." (citing Kumho Tire Co., 526 U.S. at 150).

Importantly, "Rule 702 was intended to liberalize the introduction of relevant expert evidence." Westberry, 178 F.3d at 261 (citing Cavallo v. Star Enter., 100 F.3d 1150, 1158-59 (4th Cir. 1996)). Consequently, the court "need not determine that the expert testimony . . . is irrefutable or certainly correct. . . . As with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof.'" _Id._ (citation omitted) (quoting _Daubert_, 509 U.S. at 596).

Rule 702 still applies in bench trials, but "the Court has increased discretion in how to perform its gatekeeping role." _Acosta v. Vinoskey_, 310 F. Supp. 3d 662, 667 (W.D. Va. 2018). The thrust of Rule 702 is to protect the jury from "evidence that is unreliable for reasons they may have difficulty understanding." _Quality Plus Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA._, No. 3:18-cv-454, 2020 WL 239598, at *13 (E.D. Va. Jan. 15, 2020) (quoting 29 Charles A. Wright & Victor J. Gold, _Federal Practice and Procedure_ § 6270 (2d ed. 2019)); _see also In re Zurn Pex Plumbing Prods. Liab. Litig._, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of _Daubert_ exclusion is to protect juries from being swayed by dubious testimony."). However, when the judge serves as the factfinder, this risk of confusion presents significantly less of a concern, if any at all. _See United States v. Brown_, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."). As a result, in a bench trial, "the court may admit expert testimony subject to excluding it later if the court concludes it is unreliable." _Quality Plus Servs., Inc._, 2020 WL 239598, at *13 (quoting Wright & Gold, _supra_, § 6270); _accord In re Salem_, 465 F.3d 767, 777 (7th Cir. 2006) ("[W]here the factfinder and the gatekeeper are the same, the court

10

does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."). With these principles in mind, I now turn to the parties' competing Motions to Exclude.

### 1.   Plaintiff's Motion to Exclude Terry's Testimony

Herndon seeks to exclude the testimony of Defendants' expert witness Thomas Terry, claiming that his opinions are irrelevant because they rely on data that was not available until after Herndon retired. Pl.'s Mem. Supp. Mot. Exclude 5-7 (ECF No. 62). After considering Plaintiff's arguments and Terry's reports in detail, I find his testimony reliable and helpful to the trier of fact. This report, therefore, recommends that the court deny Herndon's Motion to Exclude.

### a.   Terry's Qualifications[2]

Terry is a fully credentialed and ERISA-enrolled actuary. Terry Decl. ¶ 3. He is the founder and CEO of The Terry Group, an actuarial and employees benefits consulting and research firm based in Chicago, Illinois. Id. ¶¶ 1, 3. He is also the chair of the Board of Actuaries, "which has actuarial oversight responsibility for the U.S. government's Civil Service Retirement

---

[2] Plaintiff does not challenge Terry's capacity to serve as an expert in this case, but it is nonetheless helpful to recite his qualifications here.

System and the Federal Employees Retirement System." Id. ¶ 11.
He holds a bachelor's degree in mathematics from Tufts University
and a master's degree in actuarial science from the University of
Michigan. Id. ¶ 12. For more than forty years, he has practiced
as a pension actuary, during which time he has served as CEO and
top actuary at a number of pension consulting firms. Id. ¶ 6 &
App. A. Terry has extensive experience not only in conducting
actuarial valuations for pension plans, id. ¶¶ 4, 6, but also in
educating and training actuaries, id. ¶¶ 5, 8, 10.

From 2008 to 2012, he served on the board of the Society of
Actuaries, "an education and research association that credentials
actuaries and produces authoritative research on relevant
actuarial topics." Id. ¶ 8. During his tenure on the board, and
of particular relevance to this Motion, Terry "helped launch an
important strategic initiative around the study of longevity."
Id. More recently, Terry was a member of the 2019 Technical Panel
on Assumptions and Methods of the Social Security Advisory Board.
Id. ¶ 9. Terry explains,

> The Panel is an independent team of experts –
> demographers, economists and actuaries – convened every
> four years to closely examine assumptions and methods,
> including U.S. mortality and mortality improvement, used
> by the actuaries who work for the Social Security
> Administration to develop the annual report of the
> Social Security trust funds.

Id.

12

Terry has authored or co-authored several publications concerning pension plans and longevity, and he has testified before Congress with regard to Social Security expenditures and the effect of certain proposed changes.  Id. App. A.  He has served as an expert witness in two federal civil actions involving pension plans.  Id.

              b.   Terry's Testimony is Relevant

Plaintiff's sole challenge to Terry's expert testimony on the basis of relevance stems from Terry's use of data that postdates Herndon's date of retirement.  On the instruction of counsel to calculate a conversion factor using Plan-specific data and current conditions, Terry constructed his own mortality table (the "Terry Table") utilizing actual mortality experience data from 2012 to 2016, which was provided by the Plan's actuary, Ernst & Young. Terry Decl. ¶¶ 94-95, 104, 141-50 & App. B; see also Terry Dep. 35:21-36:2, 57:6-18 (ECF No. 65-1).  Terry paired this custom table with an interest rate of 3.5 percent, which he derived from the approximate midpoint of various U.S. high-quality bond rates from 2011 to 2019.  Terry Decl. ¶¶ 151-52.  According to Terry, actuaries generally consider these rates when determining interest rates.  Id. ¶ 152; see also Terry Dep. 121:3-21, 129:18-130:6. This pairing yields a conversion factor of .8338, which is less than the Plan's existing factor for Herndon, .8450.  Terry Decl. ¶¶ 141-42.  Terry also calculated conversion factors using the end

points of the 2011-2019 range of U.S. high-quality bond rates, 1.5 percent and 5.0 percent, and using the interest rate that Serota uses, 4.19 percent. Id. ¶¶ 159-61. Terry arrives at a conversion factor range of .8092 to .8498, which is inclusive of Herndon's factor of .8450. Id. ¶ 160 & Figure 5. Based on the foregoing, Terry concludes that the Plan's conversion factor was reasonable.

Alternatively, Terry calculates conversion factors by utilizing two "externally validated mortality tables." Terry Decl. ¶ 165. The first table is the Plan's IRS-approved Substitute Mortality Table (the "IRS Substitute Table"). Id. ¶ 95. "The minimum funding rules for single-employer pension plans (such as the Steelworkers Plan) require that the actuary's funding calculations be done using a mandated set of standard mortality tables published annually by the IRS." Id. ¶ 97; accord 82 Fed. Reg. 46388-01 (Oct. 5, 2017). However, as long as certain requirements are met, a plan may apply for IRS approval of substitute mortality tables that are plan-specific. Id. ¶¶ 98-100. HHI applied for and received IRS approval for the use of a substitute mortality table for the Steelworkers Plan. Id. ¶ 101. The second table was developed by Ernst & Young for measuring pension obligations under Generally Accepted Accounting Principles (the "GAAP Table"). Id. ¶ 106. Like the Terry Table, both the IRS Substitute Table and GAAP Table are premised on the 2012-2016 actual mortality experience. Id. ¶¶ 173-74.

Because both of these tables utilize different rates for men and women and thus cannot be used directly for calculating JSA benefits, see Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris, 463 U.S. 1073 (1983), Terry "developed a unisex version of each of them by blending the male/female mortality rates by 95%/5% which is the proportion of the Steelworkers Plan's retirees" that elect JSA benefits. Terry Decl. ¶ 167.  He then pairs each table with the four percentage figures identified above – Terry's estimate of 3.5 percent, Serota's estimate of 4.19 percent, and the end points of the 2011-2019 range of U.S. high-quality bond rates, 1.5 percent and 5.0 percent.  Terry calculates a conversion factor range of .8061 to .8474 and .8339 to .8688 for the GAAP Table and the IRS Substitute Table, respectively.  Id. ¶ 168 & Figure 8.

Herndon argues that Terry's opinions are irrelevant because his calculations rest, in part, on actuarial assumptions that did not exist at the time of Herndon's retirement.  Pl.'s Mem. Supp. Mot. Exclude 5-7.  Put differently, "the present value of benefits must be calculated before the benefit commencement date."  Id. at 5 (citing Berger v. Xerox Corp. Ret. Income Guarantee Plan, 338 F.3d 755 (7th Cir. 2003); Smith v. Rockwell Automation, Inc., 438 F. Supp. 3d 912, 921 (E.D. Wis. 2020)).  Consequently, in Herndon's view, it is "per se unreasonable to derive a 2013 benefit calculation based on mortality assumptions that are informed by

15

mortality experience <u>after</u> 2013." <u>Id.</u> at 6; <u>see also</u> Pl.'s Reply Mem. Supp. Mot. Exclude 7 (ECF No. 93) ("[A]lthough Terry's opinions on the reasonableness of the conversion factor are based in part on pre-2013 data, his opinions necessarily depend on post-2013 data and mortality tables, which a reasonable actuary could not have used as the basis for actuarial assumptions in 2013." (emphasis omitted)).

Despite Plaintiff's arguments, I find Terry's opinions relevant. As an initial matter, relevance "presents a low barrier to admissibility." <u>United States v. Leftenant</u>, 341 F.3d 338, 346 (4th Cir. 2003). The "evidence need only be worth consideration" or have a "plus value." <u>Id.</u> (internal quotation marks omitted) (quoting <u>United States v. Queen</u>, 132 F.3d 991, 998 (4th Cir. 1997)); <u>see also</u> <u>Daubert</u>, 509 U.S. at 587 (stating that the relevance standard under Federal Rule of Evidence 401 is "a liberal one" and applying that standard to expert testimony under Rule 702). This is particularly so when a judge, rather than a jury, serves as the factfinder. <u>See</u> <u>Brown</u>, 415 F.3d at 1269.

With this in mind, Terry's testimony easily overcomes this modest threshold. Plaintiff's basic premise of the case is that mortality has greatly improved since 1971, rendering HII's use of the fifty-year-old mortality table unreasonable. Although Plaintiff disclaims the "theoretical notion that newer mortality tables <u>always</u> show lower mortality rates," Pl.'s Reply Mem. Supp.

16

Mot. Exclude 4 (emphasis added), it is undisputedly Plaintiff's position that each year of the class period represented a significant improvement in mortality to some degree when compared to 1971, id. In any event, Plaintiff contends that Defendants should have calculated his JSA benefits using reasonable assumptions as of the date of retirement. And because Terry uses assumptions that take into account post-2013 conditions, his analysis is irrelevant. Importantly, however, Terry does not opine on what Herndon's _should_ be; rather, he opines on whether the benefit he _currently receives_ is reasonable under current conditions. In doing so, Terry pairs various interest rates with three separate mortality tables. That the data underlying those assumptions encompasses conditions that both predate and postdate 2013 does not render his analysis irrelevant. Indeed, even Plaintiff acknowledges that such data pertains to the rest of the class. See id. at 5. And Plaintiff has put forth no evidence that would undermine the logical assumption that such conditions are almost certainly more indicative of conditions in 2013 than in 1971. Because Terry's opinions would be helpful to the trier of fact in assessing reasonableness, I recommend that the court deny Plaintiff's Motion to Exclude.

    2.   <u>Defendants' Motion to Exclude Serota's Testimony</u>

Defendants seek to exclude Plaintiff's expert Mitchell Serota's testimony on several bases. Defendants primarily argue

that Serota's opinions are unreliable because Serota has "issued multiple reports" that are "riddled with mistakes and misleading assertions" and rest on incorrect assumptions.  Defs.' Mem. Supp. Mot. Exclude 3-13 (ECF No. 79).  Defendants also argue that Serota's testimony is irrelevant and that Serota is not qualified to serve as an expert in this case.  Id. at 13-15.

### a.   Serota's Qualifications

Like Terry, Serota is also an ERISA-enrolled actuary and is the president of his own actuarial consulting business, Mitchell I. Serota & Associates, Inc., in Skokie, Illinois, which he established in 1988.  Serota Am. Decl. 1.  Prior to that, he was vice president of two international consulting actuarial firms. Id.  Serota holds several degrees, including two bachelor's degrees, one in mathematics and one in humanities and science, from the Massachusetts Institute of Technology; a master's degree in social sciences from the University of Chicago; and a Ph.D. in history from the University of Chicago.  Id. at 1-2.

Serota too has extensive experience in performing pension valuations, and he belongs to both the Society of Actuaries and the American Academy of Actuaries.  Id. at 1-2.  He served on the Academy's Pension Committee from 2009 to 2018.[3]  Id. at 1-2 & Ex.

---

[3] Although Serota states that he is currently a member of the Academy's Pension Committee, his attached vita indicates that his tenure ended in 2018.  See id. at 2 & Ex. A.

A.     According to Serota, "[t]he Committee addresses actuarial issues affecting public and private pension plans"; monitors ERISA-related developments; and "consults with Congress and relevant regulatory agencies on the effect of regulation on employer pensions and retirement security, and comments on pending legislation and regulations." Id. at 2.

Serota also served on the Pension Committee of the Actuarial Standards Board from 2001 to 2017.   Id. & Ex. A.   This Committee publishes Standards of Practice, or ASOPs, with regard to "setting assumptions and validating methods of valuing and disclosing liabilities and costs of pension plans." Id. at 2.   ASOPs are binding on all members of the Academy.  Id.  Importantly for this Motion, during Serota's tenure, the Committee published ASOP 27, which sets forth the standards for determining discount rates, and ASOP 35, which governs the selection of mortality tables.  Id. at 7, 9.

Additionally, Serota has authored a number of publications and has testified in his capacity as an actuary on multiple occasions, including before the State of New Jersey Board of Public Utilities and in several state court wrongful termination and divorce cases.  Id. Exs. A, C.

        b.   Serota is Qualified to Serve as an Expert

According to Defendants, Serota lacks the specific experience necessary to serve as an expert in this case, noting that his prior

expert witness experience has generally been confined to divorce cases. Defs.' Mem. Supp. Mot. Exclude 15. They also discount the weight of the ASOPs that Serota helped formulate and thus the extent to which their development supports Serota's qualification as an expert. Defs.' Reply Mem. Supp. Mot. Exclude 17 (ECF No. 92).

Despite these arguments, Serota is clearly qualified to serve as an expert in this case. An ERISA-enrolled actuary, Serota has considerable experience performing pension valuations, and he has served on the pension committees of the American Academy of Actuaries and the Actuarial Standards Board. Accordingly, he has the necessary knowledge and experience to offer expert testimony in this case. The issues Defendants raise go to the weight of Serota's testimony and are thus appropriate for cross-examination.

c.   Serota's Testimony is Reliable

Defendants' Motion to Exclude primarily challenges the reliability of Serota's testimony. At bottom, Defendants argue that a number of "errors" in Serota's various reports have rendered his opinions unreliable. I disagree. As Plaintiff recognizes, Serota's reports do include some genuine errors, which Serota has since corrected. But, as explained below, some of the "errors" about which Defendants complain reflect either (1) modifications prompted by the discovery of new information provided by Defendants, or (2) a difference of opinions between the experts as

20

to appropriate actuarial assumptions. Such issues are best reserved for cross-examination.

In his initial report, Serota calculated what he deemed a reasonable JSA benefit. In doing so, he claimed to have used the IRS Applicable Mortality Table, which provides for a blend of 50 percent male and 50 percent female. See Serota Decl. 26-27 (ECF No. 79-1); Serota Dep. 131:5-11. It was soon discovered, however, that Serota had inadvertently used a version of that mortality table with a blend of 10 percent male and 90 percent female. Pl.'s Mem. Opp'n Mot. Exclude 9 (ECF No. 86); Serota Dep. 142:14-21; Terry Suppl. Decl. ¶¶ 4-5 (ECF No. 79-6). Additionally, Serota erroneously "cut off the mortality table for beneficiaries at the retiree's age 120, and included certain individuals who began receiving benefits prior to the beginning of the Class Period." Pl.'s Mem. Opp'n Mot. Exclude 9-10. Plaintiff has acknowledged these mistakes.

In his amended report, which was submitted prior to his deposition, Serota corrected the latter two errors, but rather than utilize the IRS Applicable Mortality Table with a 50 percent male and 50 percent female blend, as originally intended, Serota used a blend of 71 percent male and 29 percent female. Serota Am. Decl. 26; Serota Dep. 68:4-69:19. Serota made this adjustment in response to 2015 Plan demographic data provided by Ernst & Young. Serota Am. Decl. 26; Serota Dep. 91:23-92:17, 143:10-18.

21

During his deposition, however, Serota received additional information demonstrating that an 86 percent male/14 percent female blend was more appropriate than a 71 percent/29 percent blend. Pl.'s Mem. Opp'n Mot. Exclude 12; Serota Dep. 82:21-91:22. Accordingly, Serota submitted a supplemental report that provided updated damages calculations based on the 86 percent/14 percent blend. See Serota Suppl. Decl. Although the changes in the male/female ratio were made in response to information provided by Defendants, Defendants argue that these changes actually reflect a change in Serota's methodology. Defs.' Reply Mem. Supp. Mot. Exclude 3-4.

Defendants further argue that errors are present in the supplemental report. First, they point to an inconsistency regarding damages calculations. Serota's supplemental report includes table summaries of damages calculations. Serota Suppl. Decl. ¶ 9. One of these tables relates to a particular retiree, Retiree #778,[4] and reflects a difference of $43.98 in the actual monthly benefit and the monthly benefit that that retiree would receive under Serota's actuarial assumptions. Id. ¶ 9(b). A subsequent table, however, records that same differential as $81.66. Id. ¶ 9(d). Plaintiff has acknowledged this error and represents that in creating the first table at paragraph 9(b),

---

[4] See Serota Am. Decl. 29 n.32.

"Serota inadvertently used the numbers from the spreadsheet used to update the Rebuttal Report . . . rather than the corresponding numbers for the Amended Report (which are shown in the table at paragraph 9(d))." Pl.'s Mem. Opp'n Mot. Exclude 26-27. Nonetheless, Plaintiff maintains that this typographical error is harmless as "Plaintiff sent Defendants Serota's worksheets which showed how he calculated the updated damages numbers in the Supplemental Report on the same day that the Supplemental Report itself was served. Thus, Defendants have had the correct numbers and the underlying data all along." Id. at 27. I agree that this error is harmless and does not fatally undermine Serota's testimony.

The second error that Defendants identify relates to Serota's use of the IRS Applicable Mortality Table with the 86 percent male/14 percent female blend. According to Defendants, while the Plan's participant ratio is 86 percent male and 14 percent female, "the population of participants who elect the JSA form of benefits is 95% male, and the beneficiaries are 95% female." Defs.' Mem. Supp. Mot. Exclude 7-8. Though somewhat puzzling, Defendants argue that with respect to the beneficiary population, Serota should have used a 5 percent male/95 percent female blend rather than the inverse 14 percent male/86 percent female blend of the Plan participant ratio. Id. at 8.

23

This issue is one for cross-examination as it simply reflects a difference in opinion between the two experts. Based on the information provided by Defendants, Serota believes that it is more appropriate to use the Plan's population blend of 86 percent male and 14 percent female for participants and a blend of 14 percent male and 86 percent female for the beneficiaries. Defendants and Terry disagree. That they disagree does not render Serota's testimony unreliable. See Smith v. Wyeth-Ayerst Labs. Co., 278 F. Supp. 2d 684, 704 (W.D.N.C. 2003) (noting that Daubert neither eliminates nor prohibits a "battle of the experts" and that an expert's opinion "is not unreliable merely because he has a different opinion than that of [an opposing] expert"). Defendants are free to probe the strength of Serota's analysis, including the correctness of his underlying assumptions, at trial in their attempt to persuade the court of the merits of their case.

Defendants advance a similar argument with respect to Serota's use of the IRS Applicable Mortality Table (with the modified male/female ratio) in general. According to them, the IRS Applicable Mortality Table "reflects both white collar and blue collar worker mortality, while the Steelworkers Plan's population is blue collar." Defs.' Mem. Supp. Mot. Exclude 8 (citing Terry Suppl. Decl. ¶ 14). As a result, it is inappropriate to use that table. Defendants further point to Serota's own statement that the GAAP Table, which Ernst & Young developed by

24

using actual HII union population mortality experience from 2012 to 2016 for the purpose of measuring pension obligations under GAAP, Terry Decl. ¶¶ 94-95, 106, represents the plan actuary's "best estimate." Defs.' Mem. Supp. Mot. Exclude 5, 13 (citing Serota Decl. 19). Plaintiff responds that Serota has adequately explained why using the GAAP Table is nonetheless inappropriate. Pl.'s Mem. Opp'n Mot. Exclude 14. Defendants characterize Serota's justifications as "illogical" and contradictory. Defs.' Reply Mem. Supp. Mot. Exclude 11-12. If so, then "[v]igorous cross-examination" will expose such shortcomings. Daubert, 509 U.S. at 596. At this stage, however, Serota has set forth a reliable methodology to survive a Daubert challenge. And contrary to Defendants' assertions, that methodology has not changed as a result of the various modified gender percentage blends, nor is its soundness undermined by the since-corrected errors. See Crowley v. Chait, 322 F. Supp. 2d 530, 540 (D.N.J. 2004) ("Daubert does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes or retracted his false statements. . . . There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report."). For these reasons, I find Serota's testimony reliable.

  d.   Serota's Testimony is Relevant

  Finally, Defendants argue that Serota's testimony is irrelevant "because he fails to opine on the central issue in this case - whether the Plan's conversion factor is unreasonable and, if so, when it became unreasonable." Defs.' Mem. Supp. Mot. Exclude 13-14; see also Defs.' Reply Mem. Supp. Mot. Exclude 13-17. This argument, however, touches on a central issue in this case - whether actuarial equivalence is gauged by assessing the reasonableness of the actuarial assumptions underlying the conversion factor (i.e., the interest rate and mortality table) or the reasonableness of the conversion factor itself. The parties have a difference of opinion on this issue, and they are free to present testimony and evidence consistent with their respective theories. Cf. Smith, 278 F. Supp. 2d at 710 ("Daubert and its progeny does not eliminate the need for, or otherwise prohibit, a 'battle of the experts' as long as each of the expert's reasoning and methodology is sound."). As with Terry's testimony, which supports Defendants' own view of the case, Serota's testimony would be helpful to the trier of fact and is thus relevant.

  For the foregoing reasons, this report recommends that the court deny Defendants' Motion to Exclude.

B.  **Defendants' Motion for Summary Judgment**

  Relying principally on the arguments already framed in the discussion above, Defendants moved for summary judgment, arguing

that Plaintiff cannot establish any violation of ERISA's mandate of actuarially equivalent benefits.   They argue that Serota's opinions, even if admissible, are insufficient to create a dispute of material fact in light of the comparison calculations offered by Terry.   I disagree.

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'  A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25.   When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine

27

issue for trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000); <u>see</u> <u>Anderson</u>, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

Defendants' Motion for Summary Judgment primarily argues that the conversion factors used to calculate class members' JSA benefits under the Legacy Part of the Plan are reasonable and provide actuarially equivalent benefits.[5] Relying on Terry's report and their criticism of Serota's opinions, Defendants argue

---

[5] Because the Motion for Summary Judgment was filed prior to the court resolving HII's earlier Motion to Dismiss, the company also reasserted legal arguments raised in that filing and already resolved by the court. Specifically, the Motion for Summary Judgment renews the argument that HII was not required to "update" its actuarial assumptions under language of ERISA. Defs.' Mem. Supp. Mot. Summ. J. 15-18. It also raised various legal arguments related to the specific counts asserted, objecting to Plaintiff's claims for reformation of the Plan, and breach of fiduciary duty. <u>Id.</u> at 26-30. The court rejected those legal arguments in its prior written opinion denying HII's Motion to Dismiss, ECF No. 73, and the facts developed in discovery provide no basis to depart from that earlier ruling.

that a comparison of conversion factors calculated using the range of updated mortality and interest rate assumptions discussed above demonstrate that Herndon and other class members' JSA benefits fall within a plus or minus 5 percent margin. According to Terry's report, this range of outcomes is an appropriate measure for concluding that class member benefits paid under the Legacy Part are the actuarial equivalent of single life annuity. Because Herndon's JSA benefits are within this range, even applying Serota's calculations, Defendants argue the actuarial factors used to calculate JSA benefits under the Legacy Part are reasonable as a matter of law.

Plaintiff opposes summary judgment, arguing that Terry's testimony regarding his proposed comparison conversion factors is irrelevant (for the reasons also discussed and rejected above), and that Serota's opinions regarding the actuarial assumptions underlying the conversion factors actually used to calculate Herndon's benefits are sufficient for a reasonable factfinder to conclude that HII violated ERISA by utilizing the 1971 GAM Table to estimate enrolled participants' mortality. Although I disagree with Plaintiff on the persuasive force of Terry's comparison testimony, I nonetheless conclude that Serota's testimony and the evidence of record he relies upon are adequate to create a dispute of material fact regarding the reasonableness of the Plan's Legacy

Part's actuarial assumptions sufficient to survive summary judgment.

1.  A Reasonable Factfinder Could Conclude that the 1971 GAM Table was not a Reasonable Actuarial Assumption

Under the terms of both the statute and its implementing regulations, HII is required to ensure that enrolled participants' JSA benefits are "at least the actuarial equivalent of the normal form of life annuity."  26 C.F.R. § 1.401(a)-11(b)(2); see also 26 U.S.C. § 417(b)(2).  The regulations also provide that equivalence may be determined using "reasonable actuarial factors" consistently applied for "each participant or for all participants or reasonable groupings of participants."  26 C.F.R. 1.401(a)-11(b)(2).

As both parties also recognize, plan sponsors like HII meet ERISA's requirement that actuarially equivalent plan benefits be "definitely determinable" as long as "the benefits for each participant can be computed in accordance with an express formula contained in the Plan that is not subject to the discretion of the employer."  Rev. Ruling 70-90, 1979-1 C.B. 155.  This can be accomplished by including in the plan document either a table of conversion factors or actuarial assumptions that would be used to calculate those factors.  Id.  In this case, the Legacy Part of the Plan specified actuarial assumptions, including use of the 1971 GAM Table weighted at the rate of 90 percent male, 10 percent

30

female for participants and 90 percent female and 10 percent male for spouses, and a 6 percent discount rate. Defs.' Mem. Supp. Mot. Summ. J. Ex. D Appx. A (ECF No. 54-5, at 65). The company used these assumptions to calculate numerical conversion factors for Legacy Part participants electing JSA benefits, including Herndon.

Despite the Plan's specification of actuarial assumptions, in its Motion, HII argues that it is the conversion factors themselves - not the underlying assumptions - that must be reasonable. That is to say that as long as the combination of the assumptions yields a reasonable conversion factor, regardless of the assumptions used, ERISA's requirement of actuarial equivalence is satisfied. The company then goes on to argue that Terry's calculations, using a different mortality table and different interest rate, are sufficient to demonstrate that, as a matter of law, the conversion factors resulting from the Plan's assumptions are reasonable.

Plaintiff and his expert, however, argue that reasonableness cannot be judged by simply viewing in the abstract some numerical value. Rather, a conversion factor can only be deemed reasonable if the assumptions that produce that factor are themselves reasonable. Both experts concede that many different combinations of actuarial assumptions could produce similar conversion factors, and that a range of conversion factors could be considered reasonable. But Serota has also consistently maintained that

31

regardless of how many combinations of assumptions could produce comparable conversion factors, the reasonableness of those conversion factors must still be judged on the actuarial assumptions underlying them. Serota Dep. 60:23-63:12, 111:13-112:7. This, then, is the core of the dispute. See Order 3 ("This case asks, 'what is reasonable?'").

At the summary judgment stage, the court, viewing the facts and drawing all reasonable inferences in favor of the nonmoving party, must determine whether Plaintiff has presented sufficient evidence demonstrating the existence of a triable issue of fact. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). And in this case, Plaintiff has done so.

Here, Plaintiff claims that HII's use of the 1971 GAM Table represented an unreasonable actuarial assumption. Serota unequivocally agrees with that assertion. He notes that the table was based upon insurance data from 1964 to 1968, and that the table is not approved by the Internal Revenue Service as an appropriate mortality assumption for determining pension liability, or by the American Institute of Certificate Public Accountants as appropriate for disclosing pension obligations. Am. Serota Decl. 23-24. He has cited uncontested data showing significant improvements in life expectancy from the time the 1971 table was generated to the beginning of the class period. Serota Am. Decl. 10-11. Plaintiff also provided ample legal authority for the

32

proposition that use of outdated mortality data might be deemed unreasonable under ERISA.  See Smith, 438 F. Supp. 3d at 921; Cruz v. Raytheon Co., 435 F. Supp. 3d 350, 352-53 (D. Mass. 2020); Duffy v. Anheuser Busch Cos., 4:19-cv-1189, 2020 WL 1493558, at *6 (E.D. Mo. Mar. 27, 2020).  Although these cases were resolved on a motion to dismiss, they nonetheless support Serota's expert opinion that mortality rates change over time, and that HII's use of a long-outdated mortality table as an actuarial assumption underlying ERISA's statutory requirement for definitely determinable, actuarially equivalent benefits could be unreasonable.

Thus, assuming the court permits Serota to testify as I have recommended, his testimony would be sufficient to support a finding that use of the 1971 GAM Table was unreasonable and deprived the Legacy Part participants receiving a JSA pension of their actuarial equivalent benefits.  In fact, Defendants oppose this point only obliquely.  Their expert, Terry, does not directly state that use of the 1971 GAM Table standing alone would be reasonable.[6]  In fact, he does not defend using outdated mortality data combined with an above-market interest rate (as HII has done with the Plan's Legacy Part).  Instead, Terry made his own extensive calculations

---

[6] Defendants note that the 1971 GAM Table is still listed as a "standard mortality table" under the regulations.  Defs.' Mem. Supp. Mot. Summ. J. 23 (citing 26 C.F.R. § 1.401(a)(4)-12).  But these antidiscrimination regulations have nothing to do with actuarial equivalence.  See Smith, 438 F. Supp. 3d at 924.

based on his derived Terry Table based on the Plan's actual mortality experience as well as various lower interest rate assumptions. He then argues that the conversion factors resulting from the Plan's disclosed use of the 1971 GAM Table along with an above-market interest rate of 6 percent are sufficiently comparable to conversion rates calculated using his updated figures such that the conversion factors themselves are reasonable as a matter of law.

This is indeed a compelling argument and, were I sitting as factfinder, might well be dispositive of the underlying liability question. But Rule 56 requires that I view all disputes of fact in the light most favorable to Plaintiff. And, even accepting the accuracy of Terry's calculations, Plaintiff does not concede that mathematical and actuarial equivalence are interchangeable. Indeed, he cites Terry's own testimony that the concept of actuarial equivalence is different from "approximately equal," which is used elsewhere in the disclosure regulations applicable to relative benefit values. Pl.'s Mem. Opp'n Mot. Summ. J. 22 (ECF No. 64) (citing Terry Dep. 159:8-18). Plaintiff also notes that the disclosure regulations, from which Terry derives his plus or minus 5 percent range of reasonableness estimate, speak to a different issue altogether. They require that regulated plans disclose the relative value among various forms of benefits available to retirees. To simplify this disclosure, the

34

regulations permit grouping of benefits with "approximately equal value." <u>Id.</u> at 23 (citing 26 C.F.R. § 1.147(a)(3)-1(c)(2)). But the values referred to in the disclosure regulations are not a measure of actuarial equivalence. Accordingly, the plus or minus 5 percent estimate described by Defendants as permissible variation may not be incorporated as a definitive measure of the reasonably permitted variation of actuarial equivalence as Terry suggests.[7]

Both experts' various calculations illustrate that adjusting mortality and interest rate assumptions in combination has the effect of raising or lowering the resulting conversion factors. In fact, Plaintiff cites Terry's interest rate assumptions as evidence of the unreasonableness of the 1971 GAM Table. He notes that to achieve comparable conversion factors in a formula using updated mortality estimates, Terry was required to adopt an interest rate change of over 250 basis points. <u>Id.</u> at 18-20. For its part, HII notes that Serota's various mortality table adjustments – from the GAAP Mortality Table to the IRS Applicable Mortality Table – paired with his estimated interest rate of 4.19 percent also reflected a results-oriented analysis aimed at demonstrating significant net damages for Herndon and the class.

---

[7] As with Terry's other arguments in support of this range of reasonableness, this claim bears on the dispute of fact but does not dictate a finding of reasonableness as a matter of law.

What both arguments illustrate is that focus on the numerical variance among the resulting conversion factors alone can mask wide differences in the actuarial assumptions underlying those factors. And because these actuarial assumptions are what was disclosed in the plan document Herndon and other class members received, it is not sufficient on summary judgment merely to show that different, updated actuarial assumptions could produce comparable conversions factors. A reasonable factfinder could conclude, based on Serota's testimony, that use of the outdated table was unreasonable.

2.   Union Approval of the Plan does not Insulate the Disclosures from Review for Compliance with ERISA

Defendants also vaguely argue that the relief sought by the class action complaint would upset the collectively bargained-for union contract agreed to by class members in prior negotiations. Defs.' Mem. Supp. Mot. Summ. J. 19 (citing UMWA Health & Ret. Funds v. Robinson, 455 U.S. 562, 576 (1982)). It is not clear whether this argument is presented as an alternative basis for summary judgment or merely evidence of the reasonableness of the conversion factors resulting from the Plan's assumptions. But as the cases they cite establish, deference to agreements reached during collective bargaining is "circumscribed by statutory requirements and restrictions." Esden v. Bank of Bos., 229 F.3d 154, 172-73 (2d Cir. 2000) ("ERISA was enacted to restrict employers' and

36

employees' freedom of contract when bargaining over pensions."); Robinson, 455 U.S. at 576 ("[J]ointly administered employee benefit plans must comply with the detailed and comprehensive standards of the ERISA."); Gastronomical Workers Union Local 610 v. Dorado Beach Hotel Corp., 617 F.3d 54, 62 (1st Cir. 2010). While union approval of the conversion factors may be relevant to the reasonableness determination, it does not insulate the issue from scrutiny under ERISA. Thus, union approval during a collective bargaining process will likely bear on the reasonableness of the actuarial assumptions used in the Plan. The fact that class members' bargaining unit considered and eventually agreed with the assumptions used by the Plan bolsters the company's claim that the resulting conversion factors fairly calculated JSA benefits and satisfied ERISA's mandate for actuarially equivalent benefits. But it does not provide a separate basis for summary judgment in favor of Defendants.

## III. Conclusion and Recommendation

For the foregoing reasons, the court recommends that the court DENY the parties' competing Motions to Exclude, ECF Nos. 61, 78, and DENY Defendants' Motion for Summary Judgment, ECF No. 53.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

August 28, 2020

37