**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| ROGER A. HERNDON,       ) | |
|       ) | |
|    Plaintiff,       ) | |
|       ) | |
| v.       ) | Case No. 4:19-CV-00052-HCM-DEM |
|       ) | |
| HUNTINGTON INGALLS INDUSTRIES,       ) | |
| INC. AND THE HII ADMINISTRATIVE       ) | |
| COMMITTEE,       ) | |
|       ) | |
|    Defendants.       ) | |
|       ) | |

## DEFENDANTS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), Defendants Huntington Ingalls Industries, Inc. ("HII" or the "Company") and the HII Administrative Committee (the "Committee") (collectively, the "Defendants") respectfully object to portions of the Report and Recommendation of United States Magistrate Judge Miller filed on August 28, 2020 (the "Report").  (ECF No. 106.)

Although Defendants are in substantial agreement with large portions of the Report,[1] there are fundamental flaws in Judge Miller's recommendation to deny Defendants' motion to exclude Plaintiff's expert (Serota).  As explained in more detail below, Serota is simply unreliable.  This finding alone would require Defendants' motion for summary judgment be granted as a matter of

---

[1]  It is clear that Judge Miller gave thoughtful consideration to the issues presented in all of the pending motions.  Defendants agree with Judge Miller's recommendation to deny Plaintiff's motion to exclude Defendants' expert Tom Terry (Report at 11-17), and urge this Court to accept his conclusion that Terry provided a "compelling argument" that "might well be dispositive of the underlying liability question," if Judge Miller were "sitting as the factfinder" (Report at 34).

course.  However, independent of the exclusion of Serota, summary judgment should be granted for Defendants as a matter of law because the Plan's actuarial conversion factors are reasonable.

For reasons discussed herein, there is no need to expend additional judicial resources and impose significant costs on Defendants by holding a trial.  Plaintiff has not met (and cannot meet) his burden of proof.   As the trier of fact, the Court can and should enter summary judgment for Defendants at this juncture.

## STANDARD OF REVIEW

Although a magistrate judge may enter a *recommendation* with respect to a motion, "(t)he recommendation has no presumptive weight" and the district judge retains the ultimate responsibility to make a final determination.  *See Jennings v. Booker*, No. 3:18CV553-HEH, 2019 U.S. Dist. LEXIS 166811, at *37 (E.D. Va. Sept. 26, 2019).  A district judge shall make a *de novo* determination with respect to those portions of a magistrate judge's report and recommendation to which a party has specifically objected.  Fed. R. Civ. P. 72(b); *Buford v. Ocwen Loan Servicing, LLC*, No. 2:18-cv-154, 2018 U.S. Dist. LEXIS 213215, at *4 (E.D. Va. Dec. 18, 2018).   The *de novo* standard means a district judge must give "fresh consideration" to "any individual findings of fact or recommendations for disposition," as well as "all arguments directed to that issue, regardless of whether they were raised before the magistrate." *United States v. George,* 971 F.2d 1113, 1118 (4th Cir. 1992) (citation omitted); *Wimmer v. Cook,* 774 F.2d 68, 73 (4th Cir. 1985).  A district judge "should not give any special weight to the prior determination." *Prototype Prods. v. Reset, Inc.*, 844 F. Supp. 2d 691, 694 (E.D. Va. 2012).  Rather, a district judge has "broad discretion to accept, reject or modify" the findings or recommendations made by the magistrate judge, or "recommit the matter to the magistrate judge with instructions."  *United States v. Raddatz*, 447 U.S. 667, 673-74 (1980).

<u>**ARGUMENT**</u>

I.    <u>**The Court Should Grant Defendants' Motion To Exclude Plaintiff's Expert.**</u>

    A.    <u>**The Report does not fully recognize the import of Serota's numerous errors which, taken together, render him unreliable.**</u>

Defendants generally agree with the Report's recitation of many of Serota's errors, but the Report leaves out other significant errors, as well as some key themes surrounding those errors. *First,* Serota's errors were far more extensive than mentioned in the Report. *Second,* the Report incorrectly credits Plaintiff's argument that Serota's errors were the result of incorrect data he received from Defendants, which is demonstrably untrue. *Third,* the Report does not fully credit the fact that each and every one of Serota's errors exaggerated Plaintiff's claim, and each correction brought Serota's so-called "reasonable" benefit closer to the Plan's benefits, calling into question Serota's objectivity. *Fourth,* the Report does not appropriately weigh the fact that Serota failed to spot *any* of his own errors—*all* of them were identified by Defendants. *Fifth*, the Report does not reflect the fact that Serota's Declarations *also* contain several misleading statements and exaggerations, all of which tilt the opinions in Plaintiff's favor.

The full record indicates Serota's numerous errors undermine his reliability, and suggest improper bias, contrary to the Report's conclusion on this point.   In short, Serota is simply too inaccurate and careless to be trusted by a trier of fact.

    1.    <u>**Serota's errors are far more extensive than recited in the Report.**</u>

The Report lists certain of Serota's errors, including: (1) his presumably accidental use of a 10% male / 90% female table when he professed to using a 50% male / 50% female table; (2) his cutting off the lifespan of a beneficiary when the participant reaches age 120 (in some cases, slicing decades off the beneficiary's potential life-span); and (3) his calculation that the Plan's demographics are 71% male / 29% female when the actual percentages are 86% / 14%.  (Report

at 20-25.)   Each of these errors affected the calculation of Serota's "reasonable" benefit for every class member.   The Report also shows that: (4) Serota's original Declaration inaccurately included over 100 Plan participants who were not class members; and (5) Serota's most recent Declaration shows both $43.98 and $81.66 in places where the numbers should be the same.[2]   That said, there are *additional* errors identified in Defendants' motion that are not included in the Report.   (ECF No. 79 at 10-12.)

Most notably, even after some of these errors were identified by Defendants' expert (Tom Terry) in his initial December 17, 2019 Declaration,[3] Serota still repeated these same errors two weeks later in his Amended Declaration, and has never corrected them.   Plaintiff claims these errors are "unimportant," failing to explain why this erroneous information was included in Serota's Declaration in the first place, if its truthfulness is irrelevant.   The answer, of course, is obvious: this erroneous and exaggerated information was included to bolster the intuitive appeal of Plaintiff's claims with little regard as to its accuracy.   That Serota displayed such carelessness with his analysis and opinions renders him fatally unreliable.

The Report suggests that Serota's errors were "harmless," and not fatal.   (Report at 23.) However, this analysis misses a major point of Defendants' argument: the sheer *number* of errors made by Serota demonstrates a lack of care or concern for the accuracy and credibility of his

---

[2]      As the Report also notes, Serota's errors begin on Page 2 of both his initial Declaration and his first Amended Declaration, where he states that "***Currently***, I am one of 24 actuaries nationwide on the Pension Committee of the American Academy of Actuaries" (emphasis added) – a statement which is patently false and can easily be fact-checked by a quick look on the Academy's website.   (Report at 18 n.3; ECF No. 79-1 at 2; ECF No. 79-2 at 2 (emphasis added); s*ee* https://www.actuary.org/committees/dynamic/PENSIONCOM (last visited September 10, 2020).)   This error may be harmless in and of itself, but is probative as part of the larger picture of Serota's carelessness with the truthfulness of his testimony.
[3]      ECF No. 79-4 at 8-9, ¶¶ 38, 39, 41.

proffered opinions.  This, rather than any one error, renders him unreliable.  *See EEOC v. Freeman*, 778 F.3d 463, 467-68 (4th Cir. 2015) (finding district court did not abuse discretion in excluding expert due to the "sheer number of mistakes and omissions" in expert's report).

### 2.   Plaintiff's explanation of Serota's 71% error is demonstrably untrue.

Plaintiff attempts to excuse Serota's use of 71% male / 29% female as the result of allegedly erroneous data provided by Defendants,[4] and the Report seems to have accepted this explanation. (Report p. 22 ("the changes were made in response to information provided by Defendants").) However, the only "information" provided by Defendants was that Serota misread the accurate data previously provided to him.  The correct figure—86% male / 14% female—was prominently displayed in Terry's December 17, 2019 Declaration, which was provided two weeks *before* Serota issued his Amended Declaration with the incorrect 71% figure. (*See* ECF No. 98 at 3-4.)

### 3.   All of Serota's errors exaggerate Plaintiff's claim and supposed damages.

It is implausible that a series of completely inadvertent errors would all favor Plaintiff.  If you flip a coin repeatedly, you do not expect to get heads every time; yet this is what happened with Serota's errors, each of which either overstates the so-called "reasonable" benefit or exaggerates some fact used in support of Plaintiff's theory.  (ECF No. 79 at 12; ECF No. 79-6 at 6, ¶ 20.)  This pattern suggests either bias, fabrication, or at a minimum, an inexplicable and unacceptable level of care in rooting out errors that favor Plaintiff.  *See Chartwell Litig. Tr. v. Addus Healthcare, Inc.* (*In re Med Diversified, Inc.*), 346 B.R. 621, 642 (Bankr. E.D.N.Y. 2006) ("As the foregoing demonstrates, the deliberate, manifest, pervasive and systematic bias on

---

[4]    ECF No. 96 at 3 n.3.

Cimasi's part in applying the standard methodologies for estimating the total enterprise value of Addus warrants disqualifying him and his report on the principal ground of unreliability.")

### 4. Serota did not find or correct any of his errors on his own; instead, Defendants pointed them out.

Defendants' motion and reply outline many of Serota's errors, how they were discovered, and whether they were corrected.  (ECF No. 79 at 3-13; ECF No. 92 at 1-13.)   Notably, all of Serota's *known* errors were uncovered by Defendants, and some of his errors remain uncorrected to this day.  (*See* ECF No. 92 at 7-11.)  Serota's failure to catch any of his own errors (or, alternatively, his willingness to leave his errors uncorrected until discovered by Defendants), demonstrates that the Court cannot rely on his opinions to be accurate or reasonable.  An expert who is *occasionally* accurate *after* his errors have been pointed out to him is simply not reliable.  This is the very definition of *unreliable* and alone mandates exclusion, or a complete disregard, of his opinions.  *See In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*, No. 1785, 2009 U.S. Dist. LEXIS 83849, at *43 (D.S.C. Aug. 26, 2009) ("Dr. Cohen's changing opinions, and willingness to abandon or qualify her opinions when faced with further facts, undermines the reliability of her opinions."); *Nucor Corp.* v. Bell, 251 F.R.D. 191, 200 (D.S.C. 2008) ("When an expert arrives at his final theories only because the opposing party's expert discredits all previous theories . . . a court should rightly be concerned with the reliability of the final theories as well.").

### 5. Serota's Declarations contain numerous misleading statements and exaggerations.

Defendants' memorandum contains discussions of Serota's misleading statements and exaggerations, and there is no need to reproduce that here.  (ECF No. 79 at 3-13; ECF No. 92 at 1-13.)  However, two examples highlight why misleading statements and exaggerations are antithetical to Serota's reliability.

In his initial Declaration, Serota opines it is "**the** best practice" to use the GAAP Interest Rate and the "IRS Applicable Mortality Table" with a 50% male / 50% female gender blend for purposes of calculating a plan's actuarial equivalence factors.  (ECF No. 79-1 at 22.)  In his Amended Declaration he says it is "**the** best practice" to use the GAAP Interest Rate and the IRS Applicable Mortality Table with a 71% male / 29% female gender blend.  (ECF No. 79-2 at 22, 26.)  However, at his deposition, Serota admitted that he knew of no plan that uses his "best practice," that there may be many "best practices," and if he had to do it over again, he would say "**a** best practice" — not "**the**" best practice.  (ECF No. 79-5 at 130:7-132:7; *see also* ECF No. 79 at 15.)  At best, describing a procedure that is not in use anywhere by anyone as "**the** best practice" is misleading.

Serota's Declaration is similarly misleading when he says that the 1971-GAM table is not approved by the IRS as a mortality assumption for determining liabilities under ERISA (that is, funding).  (ECF No. 79-1 at 23, ECF No. 79-2 at 23.)  While the statement is technically true, it is plainly included to suggest that such approval is relevant and lacking.  However, he admits that his own proposed table is also not approved by the IRS for funding purposes.  (ECF No. 79-5 at 132:10-133:5.)  And, importantly, the IRS *has* approved the 1971-GAM table for the purpose for which it is used by this Plan.[5]

Serota undoubtedly desired that both of these statements—as well as his other misleading statements and exaggerations—would, if anything, lead the Court to an erroneous conclusion as to their probative value.  There is no other reason to include them.

-     -     -

---

[5]     *See* ECF No. 79-11 (2016 IRS Determination Letter (HI-0000172590-92)).

The Report concludes that the soundness of Serota's calculations is not undermined by "since-corrected errors." (Report at 25.) Perhaps a corrected error or two would not undermine an expert's reliability. But the sheer number of errors, some affecting every class member, and some remaining uncorrected even after being pointed out to him, shows a level of carelessness that renders Serota unreliable. In the context of an expert witness, reliability does not mean that it is possible, after thorough fact-checking, review and correction, to extract some nugget of useful information. "Reliable" means considerably more – it means that the expert's opinions are trustworthy.[6] Serota's are not.

**B.      The Report incorrectly summarizes Serota's final calculations.**

The Report erroneously states that Serota's final calculations yield "a higher monthly benefit for Herndon and all class members." (Report at 6.) This is not correct. Serota admittedly reviewed the benefit calculations for each Class Member. (ECF No. 99 at 4.)   However, Serota's calculations resulted in *lower* benefits for some class members than the Plan provides. (*See* ECF No. 92-1 at 8-9, ¶¶ 29-30 (showing that after Serota had "corrected" his calculations *five times* in response to errors pointed out by Defendants, Serota's so-called "reasonable" benefit for class member No. 239 had dropped from $658.13 to $601.94, while his actual Plan benefit is $611.19).) Plaintiff does not contest this.

**C.      The Report improperly minimizes the fact that Serota rejected his own "best estimate" table.**

Serota repeatedly refers to the GAAP Table as the "best estimate" mortality table. (*See, e.g.*, ECF No. 79-1 at 19; ECF No. 79-2 at 19.) Despite this, he does not use or even show the

---

[6]      Reliable *adjective.* That may be *relied on or trusted*; dependable in achievement, accuracy, honesty, etc. *Reliable, Dictionary.com*, https://www.dictionary.com/browse/reliable (last visited September 11, 2020).

results of using the GAAP Table.   Serota offers only one explanation in his Declaration, and in his Amended Declaration, for not using the GAAP Table—it is not a unisex table.  (ECF Doc. 79-1 at 19-22; ECF No. 79-2 at 19-22.)  But Serota also admits that the GAAP Table, or any table, can be converted to a unisex table, as Terry has done.  (ECF No. 79-5 at 107:13-17.)

The reason Serota does not show the results of using the GAAP Table is obvious—use of the GAAP Table would show the Plan's actuarial equivalence factors to be *reasonable*.  As shown in Terry's Declaration, use of a unisex GAAP Table and 4.19% interest rate—the rate Serota prefers—would result in a benefit for Herndon of $99.42, which is *lower* than his actual Plan benefit of $100.14.  (ECF No. 79-4 at 38-39, ¶ 170 (Figure 9).)  Terry's calculations on this point are uncontroverted and unchallenged.

Plaintiff's counsel would like this Court to believe that Serota's real reason (as opposed to his stated reason) for not using the GAAP Table is that it would violate the definitely determinable benefits rule.  (*See* ECF No. 86 at 14 (citing ECF No. 79-4 at 22-23, ¶¶ 102-103).)  However, as Defendants have argued and as the Report confirms, there is no violation in using the GAAP Table to assess the reasonableness of the Plan's factors.  And indeed, any defect from using the GAAP Table would necessarily also extend to the GAAP Interest Rate, which Serota *does* use.[7]

---

[7]     Plaintiff points to ¶ 103 of Terry's Declaration to claim that Terry agrees that the GAAP Table cannot be used.  This argument is wrong and obviously disingenuous, as Terry *does* use the GAAP Table.  As explained in ECF No. 92 at 12-13, in ¶ 103, Terry explains that the Substitute Mortality Table cannot be written into the Plan document for purposes of calculating actual Plan benefits (which is different from assessing reasonableness) because it is within the discretion of the employer and therefore prohibited for that specific purpose by Internal Revenue Code § 401(a)(25) (26 U.S.C. § 401(a)(25)), which codified Rev. Rul. 79-90.  The GAAP Table suffers the same problem for purposes of calculating Plan benefits (but not assessing reasonableness).  However, Serota uses the GAAP Interest Rate, which, as he admits, is controlled by the employer in the same way as the GAAP Mortality Table – through firing and hiring the actuary.  (ECF No. 79-5 at 109:17-24.)  Thus, the reason Plaintiff advances for Serota ignoring the "best estimate" GAAP Table is not only wrong, it is inconsistent with Serota's use of the GAAP Interest Rate.

Finally, Serota does not offer the Court a range of reasonable options, as Terry does. Although Serota's numbers have been constantly shifting, at each stage he offers only a single point as his "reasonable" number.  Consequently, it makes no sense to allow him to use the *second-best* number he can conjure.  Having said the GAAP Table is the "best estimate," and having used the GAAP Interest Rate, and having advanced only an illogical reason (which he has admitted is wrong) for *not* using the GAAP Table, his reason for using a different table (the IRS Applicable Mortality Table) is apparently results-oriented bias.

The Report suggests that vigorous cross examination will uncover the shortcomings in Serota's analysis.  (Report at 25.)  But when such shortcomings are apparent on the record, Serota's opinions should be excluded, and a trial is not necessary. *See Freeman*, 778 F.3d at 467-68.

## II.    <u>The Court Should Grant Defendants' Motion For Summary Judgment.</u>

As the Report notes, in considering a summary judgment motion, "the court must draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party."  (Report at 28.)  But the Report overlooks a key caveat to that principle.  "(F)ailure by a plaintiff to rebut a defendant's motion with sufficient evidence will result in summary judgment when appropriate."  *Davis v. Old Dominion Tobacco Co.*, 755 F. Supp. 2d 682, 691 (E.D. Va. 2010) (Smith, J.).  Indeed, "the plain language of Rule 56(c) ***mandates*** the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added)).[8]

---

[8]    The full quote from *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) reads:

. . . the plain language of Rule 56(c) ***mandates*** the entry of summary judgment, after adequate time for discovery and upon motion, ***against a party who fails to make a showing***

For the reasons discussed in Section I above, the Court should reject the Report's recommendation, and grant Defendants' motion to exclude Serota.   Without Serota's opinions, Plaintiff has no evidence or expert testimony to support the primary contention of his Complaint — *i.e.*, that he is not being paid enough —  such that he cannot establish an "essential element" of his case (namely, any loss or damage) and summary judgment for Defendants is not only proper, but *mandatory*.  *Celotex Corp*, 477 U.S. at 322-23; *see, e.g., Belville v. Ford Motor Co*., 919 F.3d 224, 228 (4th Cir. 2019) (affirming grant of summary judgment where district court granted *Daubert* motions as to expert opinions that were "critical to the remaining summary judgment issues," and without which plaintiff's theory was "largely hypothetical"); *see also Ruffin v. Shaw Indus*., 149 F.3d 294, 300 (4th Cir. 1998); *Holmes v. Wing Enters*., No. 1:08-cv-822, 2009 U.S. Dist. LEXIS 53108, at *22 (E.D. Va. June 23, 2009).

Significantly, however, even if the Court accepts the Report's recommendation on Defendants' motion to exclude and considers Serota's opinions, summary judgment for Defendants is still appropriate for the reasons explained below.

### A.      The Report fails to resolve a threshold matter of law.

The Report correctly cited Judge Morgan's assessment that this case boils down to: ***"What is reasonable?"*** (Report at 32.)  But the Report fails to answer a fundamental threshold question of law—whether to apply this reasonableness analysis to the conversion factor (*i.e.*, the combined result of both mortality and interest rate) (as Plaintiff avers in his Complaint, and to which

---

*sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial*.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Defendants agree) or to the underlying assumptions on their own.  The Report acknowledges this legal issue is the "core" of the parties' "dispute," but then inexplicably declined to address this dispute "at the summary judgment stage."  (Report at 32.)    Herein lies the flaw in the Report.  Whether any such "reasonableness" requirement applies to the *conversion factor*, or to the underlying independent *assumptions* themselves, is not a matter of *fact*, or expert *opinion*, but a matter of *law* to be determined by this Court.[9]    The Report erred in declining to address this threshold point of law *prior* to addressing the parties' evidence.  Had the Report done so—concluding that it is the conversion factor that is subject to any reasonableness analysis—summary judgment in favor of Defendants would be *mandatory* because (even accepting Serota) Plaintiff has no evidence or expert opinion the conversion factor is unreasonable.  *Celotex Corp*, 477 U.S. at 322-23.

Defendants' argument (which again Plaintiff has conceded in paragraph 30 of its complaint) is logically and fundamentally grounded in authorities that Plaintiff does not—and cannot—reasonably dispute.   *First*, Rev. Rul. 79-90 provides that a plan can **either** specify the interest rate and mortality tables, **or alternatively** can simply include a table of conversion factors (referred to in the revenue ruling as "adjustment factors").   Because there is no requirement to specify the specific mortality table or interest rate in a plan document at all, there cannot be any corresponding requirement that such individual ingredients be independently "reasonable." (ECF No. 54 at 20.)   *Second*, the very regulation cited by Plaintiff in forming his Complaint refers to the reasonableness of the actuarial ***factors***, not the underlying independent *assumptions*.  (*See* ECF

---

[9]     *See United States v. Boynton*, 63 F.3d 337, 342 (4th Cir. 1995) ("The proper construction of the regulations is a matter of law."); *Billings v. United States*, 322 F.3d 1328, 1332 (Fed. Cir. 2003) ("The underlying issue, one of statutory and regulatory construction, is a question of law . . . .").

No. 1 at ¶ 30(a) (citing 26 C.F.R. § 1.401(a)-11(b)(2) (actuarial "(e)quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*. . .")).)

Plaintiff initially conceded this point, acknowledging that it is the reasonableness of the conversion factor (*i.e.*, the assumptions combined together) that matters.  (*See* ECF No. 20 at 17 n.14 (explaining his claim "is not simply that 'old mortality tables are bad' . . . but rather that the 'conversion factor' resulting from the Plan's use of an old mortality table, coupled with its use of a 6% interest rate, harms participants who select Non-SLA Annuities."); *see also id.* at 1 ("(E)quivalence must be determined using reasonable actuarial assumptions (*or at the very least, that the combined assumptions produce a reasonable result*.") (emphasis added)).)   After discovery, and recognizing the facts were not on his side, Plaintiff's position shifted.  Plaintiff *now* argues in opposition to summary judgment that the conversion factor can only be deemed reasonable if the individual underlying assumptions that produce the factor are themselves *independently* reasonable.  (Report at 31.)

The Report correctly notes that plan sponsors must provide actuarily equivalent plan benefits that are "definitely determinable," and acknowledges "(t)his can be accomplished by including in the plan document *either* a table of conversion factors *or* actuarial assumptions that would be used to calculate those factors")   (Report at 30  (emphasis added) (citing Rev. Ruling 79-90).)  This means a plan sponsor (like HII) could calculate the J&S conversion factor for every possible combination of age of participant and age of beneficiary, and collect all those conversion factors in a table and put that in the plan document, without ever mentioning what underlying mortality table and interest rate were used to compute those conversion factors.   If HII had done so here, it would still produce *exactly* the same benefit as the current Plan document for every participant in every circumstance.   And, such plan – the same as HII's current plan in every

meaningful detail – would clearly be compliant with ERISA, and there would be no basis for Plaintiff to challenge whether the underlying mortality table used to calculate that factor was "old" or "unreasonable."

It is the conversion *factor* — *i.e.*, the *combined result* of both mortality and interest rate — that matters for any reasonableness analysis.  This is dispositive here.  Defendants' expert, Terry, provided uncontroverted evidence demonstrating that the Plan's actuarial conversion factors used to convert SLA to 50% J&S annuities are reasonable in the context of Plan-specific demographic experience and current economic conditions.  (ECF No. 54 at 12-13, ¶¶ 69-73, 82.)[10]   Plaintiff's expert, on the other hand, admits that: (1) he did not analyze or opine on the reasonableness of the Plan's actuarial conversion factors, and offers no opinion on that issue (*id.* ¶¶ 78-79);[11] (2) he did not examine whether there were any other sets of reasonable assumptions that could get to Herndon's conversion factor (*id.* ¶ 79);[12] and (3) offers no opinions or testimony controverting Terry's calculations (*id.* ¶ 82).  Therefore, Plaintiff has not proffered any evidence (let alone sufficient evidence) to rebut Defendant's motion, and summary judgment for Defendants is proper.  *Celotex Corp.*, 477 U.S. at 324; *Davis*, 755 F. Supp. 2d at 691 (Smith, J.).

---

[10]    *See also* Report at 17 ("Because Terry's opinions would be helpful to the trier of fact in assessing reasonableness, I recommend that the court deny Plaintiff's Motion to Exclude.").

[11]    ECF Doc. 54-3 at 62:9-14 (answering "I don't believe I did" in response to question whether "you rendered an opinion as to the reasonableness of the conversion factors themselves, as opposed to the reasonableness of the inputs"); *id.* at 111:13-112:7 ("… a conversion factor being reasonable or not is nothing that I'm looking at…").

[12]    ECF No. 79-5 at 63:8-12 ("Q: Could there be a different set of inputs, assumptions that are reasonable that would produce the same factor? A: I haven't investigated that, but I kind of doubt it.")  Of course we know from Terry's report that there *are* other reasonable assumptions that produce the same factor as the Plan, for Herndon.

**B.**      <u>**The Report errs in finding there is a remaining triable issue of fact.**</u>

The Report states that "in considering a motion for summary judgment," the court "must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence." (Report at 28 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986)).) The Report goes on to state that the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* After the Report finds Serota's opinions are sufficiently credible and reliable, the Report finds that "viewing the facts and drawing all reasonable inferences in favor of" Plaintiff, then Plaintiff has "presented sufficient evidence demonstrating the existence of a triable issue of fact." *Id.* at 32.

The Report's reliance on *Reeves* is misplaced. The basis for this statement in *Reeves* is that such functions are "for the jury, not the court." *See Reeves,* 530 U.S. at 150; *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts *are jury functions*, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.") (emphasis added).[13] But that rigid standard is simply not applicable, where, as here, this Court sits as the ultimate trier of fact. *Young v. United States*, 667 F. Supp. 2d 554, 560 (D. Md. 2009) (citing *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003) ("The Fourth Circuit has recognized that a court has more leeway in granting motions for summary judgment when it will sit as the trier of fact."); *Davis v. United States*, No. 5:08-CT-3130-FL, 2010 U.S. Dist. LEXIS 49112, at *9 n.3 (E.D.N.C. May 18, 2010) (". . . the court will

---

[13]      Likewise*, Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) involved a *jury trial* adjudicating a claim of excessive use of police force. (Report at 32.)

therefore be acting as the trier of fact in this matter.  In such circumstances, the court may draw inferences from the evidence submitted in support of a motion from summary judgment in ruling on the same if a trial on the merits would not enhance its ability to draw inferences and conclusions from the facts presented.").

For the reasons discussed in Section I, *supra*, and in Defendants' motion to exclude, Serota's final Declaration is still riddled with errors rendering his opinions wholly unreliable.  But even if this Court accepts the Report's recommendation and deems Serota's opinions sufficiently reliable and credible to be considered,[14] the Court can and should still draw appropriate inferences to render summary judgment for Defendants.  As the ultimate factfinder, there is nothing precluding this Court from making such a determination now, obviating the need for a trial.  *E.g., McCarthy v. The Dun & Bradstreet Corp.*, 372 F. Supp. 2d 694, 699 (D. Conn. 2005) (granting summary judgment in favor of defendant where no reasonable juror could find the reduction method rate selected by the Plan was unreasonable), *aff'd*, 482 F.3d 184, 202 (2d Cir. 2007).

1.   <u>**Plaintiff's overarching theory is fundamentally flawed.**</u>

*First*, Plaintiff's theory is fundamentally flawed and inconsistent.  Serota concedes the Court *must* evaluate *both* the mortality table and the interest rate *combined*.   (*See* ECF No. 79-2 at 18.)[15]  But this is not what Serota does.  Serota's Declarations claim the 1971-GAM mortality table is "old" and "outdated" (and, therefore, "unreasonable"), but he does not criticize the Plan's factor resulting from the use of a 6% interest rate.  (ECF No. 54-3 at 62:9-14, 111:13-112:7.)  Even

---

[14]     For the reasons explained, Defendants disagree with Serota's opinions but recognize the Court may choose to consider Serota's opinions and methodology to also be reasonable.

[15]     "The other aspect that must be reviewed is the impact of the change of discount rate upon the Conversion Factors." (ECF No. 79-1 at 18; ECF No. 79-2 at 18.) "The Plan's use of an above market discount rate generates a higher Conversion Factor. . . .Ultimately, however, the modern mortality table **combined** with a market value discount rate, in this case, will generate a higher JSA Conversion Factor. . . ."  (ECF No. 79-2 at 18.)

Plaintiff's counsel acknowledges that the Plan's 6% interest rate is "unreasonably high." (ECF No. 64 at 11 n.5.)  This underscores the fundamental problem with Plaintiff's theory.  These two components — the mortality table and the interest date — *cannot* be viewed in isolation, but must be reviewed together.

Plaintiff wants this case to be about what has intuitive appeal — that a 1971 mortality table sounds "old," and as there has been an increased life expectancy, changing that mortality table should result in larger benefits for participants.  Plaintiff is blatantly cherry picking a theory that sounds good but is inconsistent with what his own expert opines about how the calculation is actually performed.  Plaintiff's sole focus on the 1971-GAM table (while acknowledging that the Plan's 6% interest rate is "unreasonably high" (*id.*) likely stems from his recognition that the combination of the two—which is the number actually used to calculate the JSA benefits at issue—is indeed *reasonable*.

The Report concludes that use of an outdated mortality table "*could* be unreasonable" because there is "ample legal authority for the proposition that use of outdated mortality data *might* be deemed unreasonable under ERISA."  (Report at 32-33 (emphasis added).)  This reasoning is flawed.  All of the cases cited are opinions on *motions to dismiss* complaints brought by the same counsel, asserting the same theory.   That is not controlling, or even persuasive, legal authority that such a novel theory is meritorious, only that the same counsel has repeatedly plead it.

The Report erroneously emphasizes that, because these underlying "actuarial assumptions are what was disclosed in the Plan document," then notes that "a reasonable factfinder *could* conclude," based on Serota's testimony, that use of an "outdated table" was unreasonable.  (Report at 36.)   Again, this reasoning is flawed.   It cannot possibly be that a mortality table, standing alone, is *unreasonable*.   If that were the case, then the exact **same conversion factors** would be

- 17 -

*reasonable* when calculated with Mortality Table A and Interest Rate A, but *unreasonable* when calculated with Mortality Table B and Interest Rate B.  This defies common sense.[16]

        2.      **Plaintiff offers no evidence that the Plan's factors are outside a reasonable range.**

Both the courts, and Judge Morgan, have acknowledged that ERISA does not require any specific mortality table or any specific interest rate at any given time.   Rather, a plan sponsor "may choose from the options that fall within the ***range of reasonableness*** at the time of the benefit determination, ***as determined by professional actuaries***."   (ECF No. 73 at 4 (emphasis added, citation omitted); *see also McCarthy*, 482 F.3d at 203 ("We conclude, as did the district court, that the regulations do not specify a rate or range of discount rates that qualify as 'reasonable actuarial reductions' for payment of early retirement benefits.").)   Indeed, the word *reasonable* necessarily implies that there is not a precise point, nor a single set of actuarial assumptions, that is required. (ECF No. 73 at 4 (citing *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.,* 888 F.3d 696, 706 (4th Cir. 2018) ("[r]easonableness is a zone, not a point") (quoting *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1351 (7th Cir. 1992)).).

This position is consistent with the Actuarial Standards of Practice (ASOPs) which state that:

> . . . because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions and two different actuaries both using reasonable methods and assumptions could reach different but reasonable results.

---

[16]    To illustrate, there are many combinations of adding two numbers to get to the number 10: 1+9, 2+8, 3+7, 4+6, and 5+5.   Under Serota's logic, the combination of 1+9 is "unreasonable" because 1 is low, but ignores the fact that 9 is high.  He would prefer to use 5+5.  But that is a distinction without a difference.  Both combinations added together produce the same result: 10.

(ECF No. 54-2 at 34-35, ¶ 156; ECF No. 55-11 (ASOP #1)).  Significantly, it is only when conduct falls "outside of that range that it is said to be unreasonable."  (ECF No. 73 at 4.)

Here, the Court has been presented with two *different* opinions, from two *professional* actuaries.  Terry computed his own conversion factors based on the Plan's statistically credible actual mortality experience and various interest rate assumptions to determine that the Plan's current conversion factors are "reasonable."[17]   In doing so, Terry provided a *range* of potential reasonable options that result in a potential benefit to Herndon of $94-104/ month.  Because Herndon's current Plan benefit ($100/month) is "comfortably" within that range, Terry concluded the Plan's conversion methodology is reasonable.  In his Report, Magistrate Judge Miller notes that Terry provided a "compelling argument," and might well be dispositive, if he were the one "sitting as the factfinder."  (Report at 34.)

Serota agreed at his deposition with the premise of ASOP #1, and agreed that reasonableness is a range.[18]  But again, however, this is not what he did.  Instead, Serota selected *one* mortality table (the IRS Applicable Mortality table, not his "best estimate," the GAAP Table) and *one* interest rate (4.19%) and suggests that this combination is "the" one and only reasonable solution.  Serota's failure to provide *any* range is inconsistent with the well-established principle of law and actuarial practice that reasonableness is not any one point.[19]

In any event, even accepting *both* opinions from these two professional actuaries reaching different results, summary judgment for Defendants is still proper.  The question is not which

---

[17]     The Report states that Terry concluded the conversion factors are reasonable "as a matter of law."  (Report at 34.)  This is wrong.  Terry does not make any legal conclusions, but only opines that the conversion factors are reasonable as a matter of fact.

[18]     ECF No. 79-5 at 74:4-75:4.

[19]     As discussed in Section I, Serota then backed off this position in his deposition, noting that a "best practice is not an end all be all"—and there can be more than one option. (*Id*. at 131-132.)

expert is *more* credible, or which expert's number(s) are *more* reasonable.  As the ASOP makes clear, two different actuaries both using reasonable methods and assumptions could reach different but reasonable results.  The issue is whether the Plan's factors are so "outside of the range" of reasonableness so as to be entirely *unreasonable*.  (ECF No. 73 at 4.)  If the Plan's factors are anywhere within the range of Terry's reasonable calculations, then the Plan's factors are reasonable.[20]  Nothing in this record suggests the Plan's conversion factors are *unreasonable*, and for that reason summary judgment for Defendants is proper.

### C.   <u>The Report fails to address any of Defendants' additional arguments.</u>

Defendants raised several other arguments that require summary judgment:

(1)   Plaintiff's claim for "reformation" is legally unavailable because they have no evidence of "mutual mistake" or "fraud." (ECF No. 54 at 27 (citing *Cross v. Bragg*, 329 F. App'x 443, 454 (4th Cir. 2009) (noting that reformation is available only in "limited circumstances" to correct a mutual mistake or to mitigate a fraud scheme; and holding such an action requires that the party seeking reformation present clear and convincing evidence showing that "the mistake (was) mutual, or if unilateral, it (was) accompanied by fraud on the part of the other contracting party.").)

(2) As a matter of law, the Committee could not breach any fiduciary duty here because the decision to include certain actuarial factors in the plan document is a plan sponsor (*i.e.*, "settlor") decision not a fiduciary one (ECF No. 54 at 28 (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) and *Lockheed Corp. v. Spink*, 517 U.S. 882, 891) (1996).)  Indeed, Congress made clear that such actuarial factors must be put in the plan document, and expressly

---

[20]     Plaintiff's arguments as to why Terry's calculations should be excluded have rightly been rejected by the Report.

"precluded" future fiduciary "discretion" with regard to such factors.  26 U.S.C. § 401(a)(25).

(3) Moreover, the Committee did not breach any fiduciary duty here because this is not a situation where the Plan terms are plainly inconsistent with ERISA, or the Committee was on notice of any flaw in the Plan. (ECF No. 54 at 28-29.) This is particularly true given that two professional actuaries disagree on this point.

(4) Plaintiff has no evidence the Company failed to "supervise and monitor" the Committee to support a derivative monitoring claim. (ECF No. 54 at 29-30.)

The Report does not address any of these four additional and alternative arguments, any of which could dispose of certain of Plaintiff's claims, in whole or in part.

## CONCLUSION

For the reasons set forth above, and in their *Daubert* and summary judgment briefing, Defendants respectfully submit that the Court should decline to adopt the portion of the Report recommending denial of Defendants' motion to exclude Plaintiff's expert (Serota) and Defendants' motion for summary judgment, and grant summary judgment for Defendants on all of Plaintiff's claims.

Respectfully Submitted,

HUNTINGTON INGALLS INDUSTRIES, INC. AND
THE HII ADMINSTRATIVE COMMITTEE

*By Counsel*:

/s/Robert W. McFarland
Robert W. McFarland (VSB No. 24021)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3730
E-mail: rmcfarland@mcguirewoods.com

Emily Seymour Costin (*pro hac vice*)
emily.costin@alston.com
David R. Godofsky (*pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Telephone (202) 239-3300
Facsimile: (202) 239-3333

Cari K. Dawson (*pro hac vice*)
cari.dawson@alston.com
H. Douglas Hinson (*pro hac vice*)
doug.hinson@alston.com
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Counsel for Defendants Huntington Ingalls Industries, Inc.*
*and the HII Administrative Committee*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 11th day of September, 2020, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

Respectfully Submitted,

HUNTINGTON INGALLS INDUSTRIES, INC. AND THE HII ADMINSTRATIVE COMMITTEE

*By Counsel*:

/s/Robert W. McFarland
Robert W. McFarland (VSB No. 24021)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3730
E-mail: rmcfarland@mcguirewoods.com

Emily Seymour Costin (*pro hac vice*)
emily.costin@alston.com
David R. Godofsky (*pro hac vice*)
david.godofsky@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, D.C. 20004-1404
Telephone (202) 239-3300
Facsimile: (202) 239-3333

Cari K. Dawson (*pro hac vice*)
cari.dawson@alston.com
H. Douglas Hinson (*pro hac vice*)
doug.hinson@alston.com
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Counsel for Defendants Huntington Ingalls Industries, Inc. and the HII Administrative Committee*